# Exhibit A

Julie E. Kenworthy (9536)
**KIRTON MCCONKIE**
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893
jkenworthy@kmclaw.com

Alyson Foster (14877)
Jennifer Schrack Dempsey (ID Bar No. 7603)
(Admitted pro hac vice)
**DEMPSEY FOSTER PLLC**
714 W. State Street
Boise, ID 83702
Telephone: (208) 401-9533
alyson@dempseyfoster.com
jen@dempseyfoster.com

*Attorneys for Plaintiff Konala, LLC*

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| KONALA, LLC, an Idaho limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>MESSNER REEVES LLP, a Colorado limited liability partnership; and INBE CAPITAL LLC, a Wyoming limited liability company,<br><br>        Defendants. | **DECLARATION OF TRACE MILLER IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT BY THE COURT**<br><br>Case No.: 2:24-cv-00195-HCN<br><br>District Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Jared C. Bennett |

Pursuant to 28 U.S.C. § 1746, Trace Miller declares under penalty of perjury under the laws of the United States of America that the foregoing is true and correct as follows:

1.      I am the owner and founder of Plaintiff Konala, LLC ("Konala"). I am competent to make this declaration based on my personal knowledge.

2.      Konala is a quick service restaurant (QSR) that offers healthy food through a drive through-only model.

3.      Konala's first QSR was opened in 2022 and located at 107 E. 7th Ave, Post Falls, Idaho. ("Konala Post Falls site")

4.      The Konala Post Falls site performed well. By early 2023, it was clear that the healthy QSR industry was poised for significant growth.  In anticipation of that significant growth, Konala franchised its business model.

5.      At this time, Konala began seeking funding to facilitate its franchising opportunities and support its growth.

6.      In seeking funding, Konala became aware of INBE Capital LLC ("INBE"), a venture capital lender and investor.

7.      Ultimately, INBE offered Konala its business expansion line of credit ("BELOC") to open a new location.

8.      On July 31, 2023, Konala and INBE entered into the BELOC Agreement (the "BELOC Agreement"). Attached hereto as **Exhibit A** is a true and correct copy of the BELOC Agreement and its associated exhibits. As contained in Exhibit A to this Declaration, Exhibit I to the BELOC Agreement is the INBE BELOC 3.0 Term Sheet ("INBE/Konala Term Sheet").

9.      Among other things, the INBE/Konala Term Sheet summarized the principal terms of the BELOC in the amount of $1.3 million which included: 1) an initial down payment of $325,000 by Konala as an interest control account ("ICA Payment"); 2) a term of 120 months; 3)

2

an interest rate of 6%; and 4) a payment schedule of three equal Advances (or Tranches--33% each) to occur as follows: First Advance: no later than 90 calendar days following confirmation of receipt by INBE of the ICA Payment; Second Advance: 30-45 banking days after the first Advance; Third Advance: 30-45 banking days after the Second Advance.

10.    Pursuant to Section 10.12 of the Agreement, INBE made representations and warranties to Konala that INBE had the financial ability to fund the BELOC on the terms and conditions set forth in the BELOC Agreement and INBE/Konala Term Sheet. Konala relied on these representations and warranties to move forward with INBE's BELOC Agreement so that it could expand its operations to keep pace with the growing demand.

11.    Based on the INBE/Konala Term Sheet, Konala was to receive the full amount of the INBE BELOC ($1.3 million less an establishment cost of $117,000) approximately 7.5 months after Konala paid the ICA Payment.

12.    On August 1, 2023, Konala directed the ICA Payment in the amount of three hundred and twenty-five thousand dollars ($325,000.00) to be wired to the Trustee Messner Reeves LLP – COLTAF Paymaster ("Messner") , pursuant to Section 3.6 and Exhibit F of the Agreement. (the "Konala ICA Payment")

13.    On August 3, 2023, INBE confirmed receipt of the Konala ICA Payment.

14.    Based on the INBE/Konala Term Sheet, Konala anticipated that it would receive the full amount of the BELOC disbursement by mid-February 2024 (approximately 7.5 months later).

15.    Over the course of the following months, in addition to paying the Konala ICA Payment, Konala met all other conditions precedent required by the Agreement to receive INBE's

3

disbursement of the Advances. Thus, according to Section 7.1 of the Agreement, INBE was obligated to pay the first Advance (approximating 33% of the total loan amount of $1.3 million) to Konala on or around November 1, 2023, with the later Advances to be paid over the course of the following 4.5 months.

16.     In reliance on the Agreement and INBE's promises, and in anticipation of receipt of the three Advances from INBE, Konala moved forward with preparations to expand its operations and launch a new location at 1423 W. Appleway Avenue, Coeur d'Alene, Idaho. ("Konala 1423 Appleway site")

17.     Konala anticipated this new location would generate gross revenue streams in excess of one-million dollars ($1,000,000) per year, greater than the revenue generation at the Konala Post Falls location. The Konala 1423 Appleway site was at an optimal location, had better ingress and egress to the site, and had an important anchor tenant, Winco, that would drive more customers and business to the Konala 1423 Appleway site than had been experienced at the Konala Post Falls site.

18.     For this new location, Konala engaged architects, contractors, and other professionals to begin construction.

19.     Konala retained HDG Architecture to design the Konala 1423 Appleway site. Attached hereto as **Exhibit B** is a true and correct copy of the Architecture and Design Proposal of HDG Architecture. HDG completed the work stated in the proposal and Konala paid HDG the total amount of $18,813.00. Attached collectively hereto as **Exhibit C** are true and correct copies of proof of payment of $18,813.00.

20.     Konala also retained Xtreme Cubes Corp ("XCC") to design and deliver the steel frame modular cube construction utilized for Konala's sites. Attached hereto as **Exhibit D** is a true and correct copy of the July 17, 2023, XCC Proposal which reflects the total amount of these costs paid by Konala. While Konala was able to terminate the full contract with XCC (totaling $576,973.31) once it became clear that INBE breached its BELOC Agreement and would not provide the funding, by that time, Konala had already incurred certain design, engineering, and soft costs in the total amount of $18,610.00.  Attached collectively hereto as **Exhibit E** are true and correct copies of proof of payment of $18,610 to XCC.

21.     Konala had also entered into ground lease with the owner of the real property on which the Konala 1423 Appleway site would sit. The ground lease was for new construction of the Konala 1423 Appleway site and included a financing contingency, which required Konala provide proof that it had access to adequate funds to finance Konala's improvements. Attached hereto as **Exhibit F** is a screen shot of the wire transfer Konala made on August 25, 2023, in the amount of $10,000.00 reflecting the ground lease deposit after INBE's BELOC Agreement initially satisfied the financing contingency.

22.     By early fall 2023, Konala was on target to open the Konala 1426 Appleway site in January 2024--so long as the funding promised by INBE came through.

23.     Had Konala opened the Konala 1423 Appleway site as planned, there is no doubt in my mind it would have generated net revenue that was equal to or better than the Konala Post Falls site given the better location and anchor tenant.

24.     Notwithstanding that Konala had made the ICA Payment and met all its contractual obligations and promises, INBE never made the first Advance, or any other Advances, to Konala as required by the Agreement.

25.     Additionally, INBE never responded to Konala's repeated requests for information or otherwise responded in any way to Konala's several attempts to communicate or correspond with it, in direct breach of its representations in Exhibit F of the BELOC Agreement.

26.     Due to INBE's breaches and ongoing silence, and to hedge against any further loss, Konala had no choice but to terminate the Agreement and attempt to mitigate its already significant losses by seeking return of the $325,000 ICA Payment.

27.     Immediate return of the Konala ICA Payment would have allowed Konala to obtain alternative financing to satisfy the ground lease's financing contingency and finalize construction of the Konala 1423 Appleway site.

28.     On December 8, 2023, Konala delivered to INBE written notice of termination in the form and manner required by Section 13.7 and Exhibit E of the Agreement. Attached collectively hereto as **Exhibit G** is a true and correct copy of the properly executed termination letter, with proof of delivery by certified mail upon INBE on December 11, 2023.

29.     Pursuant to the termination clause of Section 13.7 of the BELOC Agreement, INBE had ninety (90) calendar days from the date of receipt of the termination notice within which to return Konala's ICA Payment. **Exhibit A**, pp. 24-25. Likewise, under Exhibit F of the Agreement, INBE had ninety (90) calendar days to reimburse the full amount of Konala's ICA Payment if Messner was unwilling or unable to return the funds. *Id.*, Ex F.

30.     INBE thus had until March 10, 2024, to return the Konala ICA Payment and release any security interests.

31.     Having heard nothing from INBE since delivery of the termination notice, on February 15, 2024, Konala made demand upon Messner for return of the Konala ICA Payment that it was holding as Trustee.

32.     Despite repeated attempts to communicate with both INBE and Messner about the Konala ICA Payment, neither INBE nor Messner ever responded to Konala.

33.     Neither INBE nor Messner have returned the Konala ICA Payment.

34.     Neither has INBE made any of the three BELOC Advances to Konala.

35.     Without the INBE BELOC funds or return of the Konala ICA Payment, Konala could not satisfy the financing contingency in the ground lease and was unable to continue with its expansion to the Konala 1423 Appleway site.

36.     Konala ultimately lost not only the Konala ICA Payment but also the 1423 Appleway location, the expenses Konala had already paid for this location, , and the significant profits the Konala 1423 Appleway site would have generated had it opened as planned in January 2024.

37.     Nonetheless, to keep its other operations afloat, Konala scrambled and was ultimately able to mitigate some of these losses.

38.     After the ground lease failed, I reached out directly to colleagues in the community involved with commercial real estate. Fortunately, one of these colleagues identified a site that already had a building on it that could readily be renovated.  That site was located at 106 E. Appleway Ave, Coeur d'Alene, ID (the "Konala 106 Appleway site").

39.     While the Konala 106 Appleway site is situated in the same city as the Konala 1423 Appleway site, its location is not as optimal: there are fewer people that frequent the area, the location does not have an anchor tenant like Winco, and it is not situated or visible from the freeway, like the Konala 1423 Appleway site would have been.  Even though the location was not as good as Konala 1423 Appleway site, I had no choice but to proceed with it to mitigate the significant losses incurred when the Konala ICA Payment was not returned and no advances were made pursuant to INBE's BELOC Agreement.

40.     In addition to having to settle on a less optimal location, Konala essentially had to start over, spending time and money to renovate the new second location, incurring engineering, design, and lease expenses it had already incurred for the Konala 1423 Appleway site. After INBE failed to provide any of the advances required by the BELOC Agreement and failed to return Konala's ICA Payment, and despite Konala's extraordinary efforts to mitigate, Konala still experienced a delay of eight months in opening the Konala 106 Appleway site, as the Konala 106 Appleway site did not open until August 23, 2024.

41.     Attached collectively hereto as **Exhibit H** are the Profit and Loss statements from the Konala Post Falls site from January 2024 through August 2024. As demonstrated in these profit and loss statements, from January through August 2024, the Konala Post Falls site generated an average total monthly sales in the amount of $136,405.10. (Total Sales of $1,091,241/8 = $136,405.10) From January through August 2024, the Konala Post Falls site generated average monthly net revenue in the amount of $47,104.93.

42.     Since opening the Konala 106 Appleway site on August 23, 2024, as of September 12, 2024, Konala has generated total sales in the approximate amount of $163,000.00, exceeding

the Konala Post Falls site's average total monthly sales by close to $30,000. The Konala 106 Appleway site will continue to perform as well as, if not better than, the Konala Post Falls site. By all business metrics, the lost Konala 1423 Appleway site would have performed even better than the Konala 106 Appleway site.

43.     Based on the conservative profit margins from the Konala Post Falls site, Konala has lost profits in an amount no less than $376,839.40 ($47,104.03 x 8) because of INBE's (and Messner's) breaches and failures.

44.     Konala not only lost the optimal location and profits of the Konala 1423 Appleway site but I was also forced to sell off real property located at 702 Spokane St., Post Falls, Idaho ("Post Falls real property") and a restaurant called Bunker Bar at a significantly reduced value to cover the note owed to the lender for Konala's ICA Payment and to meet payroll and other ongoing expenses of Konala.

45.     The Bunker Bar business was sold for $750,000.00. Attached hereto as **Exhibit H** is a true and correct copy of the closing statement for the sale of the Bunker Bar. In my opinion, as the owner of this business, with more time to market the property and seek buyers, and without the pressure of selling in order to cover the losses caused by INBE and Messner, this business should have sold for closer to $1 million.  Based on my knowledge of the business, and the going market for liquor licenses, restaurant equipment, and other similar businesses, in my opinion, had I not been forced to sell, I would have made at least another $50,000 for the liquor license; another $50,000 for the equipment and another $150,000 for the business itself.

46.     I was also forced to accept a lower price for the Post Falls real property. Because of my urgent need to keep Konala afloat, I accepted a lower offer for the Post Falls real property

in the amount of $3,000,000.00. At the time of the sale, this property was listed for $4,000,000.00. After Konala accepted that offer, and while under contract, Konala received a higher offer of $3,500,000.00.  In my opinion, with more time to market the property and seek buyers, Konala could have received, at a minimum, based on the higher offer, an additional $500,000.00 for this property.

47.     Had the ICA Payment been returned in a timely manner, and/or had the BELOC funds been provided, Konala would have been able to open the Konala 1423 Appleway site and would not have had to sell the Bunker Bar or the Post Falls real property. Because it was forced to do so in a fire-sale manner, Konala lost in excess of $750,000.00.

48.     The total amount of consequential, direct, and foreseeable damages suffered due to INBE's (and Messner's) failure to return Konala's ICA Payment and fund the BELOC is as follows:

| **Category of Damages** | **Amount** |
|---|---|
| Konala ICA Payment-Sum Certain | $325,000.00 |
| HDG Architecture | $18,813.00 |
| XCC Design and Engineering | $18,610.00 |
| Lost Lease Deposit | $10,000.00 |
| Lost Profits | $376,839.40 |
| Lost Value for Fire Sale of Bunker Bar | $250,000.00 |
| Lost Value for Fire Sale of Bunker Bar Property | $500,000.00 |
| **TOTAL DAMAGES** | **$1,499,262.40** |

Dated: 11/19/2024

*/s/ Trace Mille*
TRACE MILLER
(Signed with permission via email dated
November 19, 2024)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of July 2024, I served the foregoing on the following parties in the manner indicated below:

CM/ECF Registered Participant:

Andres M. Hermosillo
**GORDON REES SCULLY MANSUKHANI, LLP**
555 Seventeenth Street, Ste. 3400
Denver, CO 80202
ahermosillo@grsm.com

Non-CM/ECF Registered Participant Via first class mail, postage prepaid, and email to:

**INBE Capital LLC**
30 N. Gould Street
Sheridan, WY 82801
craig@theinbegroup.com

**INBE Capital LLC**
Attn: Buffalo Registered Agents LLC
412 N. Main St. Ste 100
Buffalo, WY 82834

*/s/ Jennifer Schrack Dempsey*
Jennifer Schrack Dempsey

# Exhibit A
# Miller Declaration

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

## – CONFIDENTIAL & PRIVATE, NOT FOR PUBLIC USE –

Among

**INBE Capital LLC**

as Lender

&

Konala

As Borrower

Dated as of

Jul 31 2023



# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made and entered as of   Jul 31 2023

between INBE Capital LLC (the "Lender")

, and   INBE Capital, LLC

a   Wyoming,USA                                        Company ("Borrower").

## RECITALS

A.   The Borrower desires to obtain from Lender an asset backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.   The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion (as more fully described on Exhibit I attached hereto the "Project").

C.   Secured assets will be described on Exhibit C attached hereto (the "Property").

D.   The Borrower has agreed to pay a loan application fee of   N/A Waived

to the Lender, within fourteen (14) Calendar days after the Lender receives the Borrower's fully executed counterparts of the LOC Documents.

E.     The Borrower has agreed to pay, pursuant to Section 3.6 hereof, of

three hundred twenty-five thousand dollars              $325,000

,(the "ICA Payment"), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

F.   Lender has agreed to make the LOC to Borrower in an aggregate amount, according to Exhibit I, not to exceed the Maximum Amount for the purposes set forth in these recitals and in the Promissory Note (as hereinafter defined) and upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:



# ARTICLE 1 - DEFINITIONS

Section 1.1. Certain Defined Terms. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied. As used in this Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

"Advance(s)" means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

"Applicable Interest Rate" means the fixed interest rate specified in the Promissory Note.

"Borrower" means that term as defined in the first paragraph of this Agreement.

"Business Expansion" means any transaction that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"Closing Date" means the last date of signed execution of this Agreement by Lender and Borrower.

"Collateral" means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

"Event of Default" means any event or condition that shall constitute an event of default as described in Article 12 of this Agreement.

"ICA" means the Interest Control Account.

"ICA Payment" means the amount remitted pursuant to Recital B of this Agreement.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

"Interest Reserve" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from or on behalf of the Borrower, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"Interest Reserve Account" means funds retained to cover the contractual payment obligations.

"Lender" means that term as defined in the first paragraph of this Agreement.

"LOC" means the Line of Credit provided to the Borrower by the Lender as defined in Exhibit I of this Agreement.

"LOC Disbursement Account" means that term as defined in Section 3.12 hereof.

"LOC Document(s)" means, collectively, this Agreement, the Promissory Note and each   Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"Maximum Amount" means an amount equal to the Project LOC Amount plus all fees, costs and expenses which are the Borrower's responsibility to pay.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and Regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

"Project" means that term as defined in Recital B of this Agreement.



"Project Costs" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project, as more specifically set forth in the project  budget set forth on Exhibit B attached hereto).

"Project LOC Amount" means as defined in Exhibit I attached hereto.

"Property" means that term as defined in Exhibit C of this Agreement.

"Promissory Note" means the Promissory Note, in the form attached hereto as Exhibit A.

"Security Agreement" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as Exhibit D.

"Security Document" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"Scheduled Maturity Date" means the  10  year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"Subsidiary" means any other entity in which the Company controls, directly or indirectly, at least 50% of the equity or which is under the direct control or management of the Company or Company's owners.

"Taxes" means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"Term Sheet" means that document(s) attached hereto as Exhibit I, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.



"Tranche Schedule" means the schedule of Advances to Borrower from the Lender, based upon the dates of the disbursements attached hereto in the Term Sheet: Exhibit I; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Project LOC Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

# ARTICLE 2 - THE CREDIT

<u>Section 2.1. Line of Credit Amount</u>. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

<u>Section 2.2. Line of Credit Documents</u>. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and it's counsel.

    a.  Promissory Note.

    a.  this Agreement; and

    a.  each Security Document.

# ARTICLE 3 - TERM, INTEREST AND PAYMENTS

<u>Section 3.1. Initial Term</u>. The initial term of the LOC is ten years      10      years and shall commence on the Closing Date. This Agreement will initially expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full on the Scheduled Maturity Date.

<u>Section 3.2. Extended Term</u>. As of the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "Extended Term"; collectively, the "Extended Terms"). In connection with Lender's granting of each Extended Term,



(a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees.

Section 3.3. Applicable Interest Period. The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full; provided, however, that, no interest period may end later than the Scheduled Maturity Date.

Section 3.4. Interest Rate Calculation. Interest shall be calculated on the basis of a 365- day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "Maximum Interest Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to fees or other amounts due to lender, then to the unpaid principal balance outstanding under the Promissory Note, then, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. Interest Payments. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. Reserves. Following the signing of this Agreement, the Borrower shall remit

 three hundred twenty-five thousand dollars                                     $325,000

as the ICA Payment, in accordance with the terms and time period set forth in Exhibit I. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and become non-refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable. The ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds, and may be utilized by Lender.

Section 3.7. Prepayment. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC. Upon a full prepayment of all outstanding principal of the LOC, Lender must, within ninety (90) calendar days from the date of that full prepayment, pay Borrower an amount equal to any credit balance of the ICA.



Section 3.8. Interest Credit Account. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit in the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable. Where the Lender has agreed to a payment holiday, as specified within Exhibit I, the interest payments shall first be drawn from the ICA for the duration of the payment holiday, thereafter the Borrower shall make interest payments monthly.

Section 3.9. Fees. LOC Establishment Fee. Out of the initial Advance, the Borrower shall pay Lender a non-refundable fee for the LOC in an aggregate amount equal to        9%                % of the Loan Value, being:  one hundred seventeen thousand dollars              $117,000

(the "Establishment Fee"). The Establishment Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Section 3.10. Line of Credit Extension Fees. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a non-refundable LOC extension fee for each extension in an aggregate amount equal to six percent (6%) multiplied by the Project LOC Amount.

Section 3.11. Legal and Incidental Fees. Charges and Costs. Borrower shall pay all reasonable out of pocket legal, recording and filing fees, documentary stamps, taxes, service charges, credit reports, reasonable search costs, title company and escrow fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or an adversary proceeding) or judicial or non-judicial proceeding, through appeal. Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or wilful misconduct.

Section 3.12. Line of Credit Disbursement Account. The proceeds of each Advance under the LOC shall be advanced into the account with Lender to be used by Borrower for payment of the Borrower's Project Costs (the "LOC Disbursement Account"), solely for the purposes and in the manner set forth in this Agreement.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights to the LOC Disbursement Account.

Section 3.13. Taxes.

    a.    All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

    b.    Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or Other Taxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of  any such failure.

    c.    The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

# ARTICLE 4 - CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing (the same to be considered representations of Borrower upon Closing):

Section 4.1. Delivery of the LOC Documents.

    a.    As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

    b.    The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Deposit Account and Security Account (as each term is defined in the Security Agreement) maintained by the Borrower.



<u>Section 4.2. Authority</u>. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, and (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

<u>Section 4.3. Liens</u>. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of security searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) security termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender, such permission not to be unreasonably withheld.

<u>Section 4.4. Litigation</u>. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

<u>Section 4.5. Events of Default</u>. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in full compliance with the terms and provisions of this Agreement.

<u>Section 4.6. Purchase and Agreement Contracts</u>. Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

<u>Section 4.7. Compliance with Certain Requirements</u>. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable local, state, federal and international laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) and all local, state, federal and international laws, regulations, ordinances, conditions, reservations and restrictions applicable to the Project.



Section 4.8. Evidence of Insurance.

a.   For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders 'loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of the size and character of the business of the Borrower, and shall furnish Lender with the satisfactory evidence of such insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

b.   Borrower shall always maintain a life insurance policy on the life of   N/A Waived

, as permitted under applicable local, state, federal and international law in an amount agreed to by Lender. The Borrower shall have provided to Lender (directly or through the issuer of such life insurance policy) an assignment of each such life insurance policy, in form and substance satisfactory to Lender, on or before the date of the funding of the first Advance under the Tranche Schedule. In connection with such policy(ies), the Borrower shall cause the insurer to agree to provide in writing to Lender any notice of cancellation or non-renewal at least thirty (30) days prior to such event. In the event   N/A Waived   cannot qualify for a keyman policy, Borrower shall submit proof of application and denial of coverage. Upon submission of proof of denial, Lender may thereafter waive the requirement in writing.

Section 4.9. Financial Statements. Lender shall have received all financial reports  required by Section 8.6 hereof.

Section 4.10. Business Pro Forma. Lender shall receive a pro forma income and expense statement quarterly in connection with the Project.

Section 4.11. Management Plan. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of business.

Section 4.12. Material Change. Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.



Section 4.13. Non-Subordination. Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

Section 4.14. Securitization. Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or due diligence required by the insurer in a timely manner.

# ARTICLE 5 - USE OF LINE OF CREDIT PROCEEDS

Section 5.1. Business Expansion Costs.

a.  Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached Exhibit B, updated yearly by Borrower.

b.  The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

# ARTICLE 6 - INSPECTIONS

Section 6.1. Project Inspection. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days 'prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

Section 6.2. Books and Records. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project and the Borrower and to make extracts therefrom or copies thereof.



Section 6.3. Force Majeure Event Inspection Right. In the event of a Force Majeure Event which actually interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project for a period of time beyond ninety (90) days, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project.

# ARTICLE 7 - ADVANCE OF FUNDS

Section 7.1. Timing and Advances to Payee. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than ninety (90) calendar days (inclusive of underwriting period) following confirmation of receipt by the Lender of the ICA Payment.

Section 7.2. Conditions Precedent to Advance of Funds. Lender's obligation to make Advances hereunder shall be conditioned upon fulfilment of the terms set forth in Article 4 hereof to Lender's satisfaction.

Section 7.3. Unpaid Lien Claims. If Lender receives notice of non-payment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred fifty percent (150%) of the lien amount claimed from future advances .

Section 7.4. Mandatory Advances. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.



# ARTICLE 8 - BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion):

Section 8.1. Project. (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project. Borrower shall submit and update its business plan which shall include the scope of the Project. Lender agrees that all affiliates, joint venture partners and subsidiaries described in the business plan are a part of the Project and the Project LOC Amount may be used within such entities. This Section 8.1prevails over Section 5.1(b), and additional approval from Lender is not required.

Section 8.2. Compliance with Laws. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

Section 8.3. Compliance with Documents. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

Section 8.4. Books and Records. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

Section 8.5. Payment of Obligations. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

Section 8.6. Financial Reports. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within fifteen (15) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within sixty (60) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.



Section 8.7. Notification to Lender. Promptly after learning thereof, notify Lender of:

a.   the details of any material action, proceeding, investigation or claim against or affecting the Borrower or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower or the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

Section 8.8. Partnership/Corporate Existence. Preserve and maintain its existence,  rights, franchises, and privileges in the jurisdiction of its formation.

# ARTICLE 9 - BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion) Borrower shall not:

Section 9.1. Liquidation, Merger and Sale of Assets. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

Section 9.2. Liens. Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion  thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such Liens, shall not be increased).

Section 9.3.     Intentionally Omitted.

INBECAPITAL

<u>Section 9.4. Investments, Loans and Guaranties</u>. (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind, without prior written approval of the Lender.

<u>Section 9.5. Acquisitions</u>. Without prior written approval of the Lender the Borrower may not enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

<u>Section 9.6. Organizational Documents</u>. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

<u>Section 9.7. Project and Project Documents</u>. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a Major Decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

    a.    terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

    b.    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project.

# ARTICLE 10 - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

<u>Section 10.1. Validity of Agreement</u>. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms.

The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than as permitted by this document) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. Existing Defaults. As of the date of execution of the LOC Documents, Borrower is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower is a party or by which it, or any of its properties, may be bound.

Section 10.3. No Default in Other Agreements. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a
party or by which it or any of its properties may be bound or result in the violation by it of any law, order, rule, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties.

Section 10.4. No Consents. No consent, approval, authorization, or other acknowledgment  of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

Section 10.5. Litigation. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to its knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.



<u>Section 10.6. Financial Statements</u>. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

<u>Section 10.7. Legal Requirements</u>. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning and equal employment practices.

<u>Section 10.8. Taxes</u>. The Borrower has filed all tax returns and reports required of it, has paid all Taxes which are due and payable, and has provided adequate reserves for payment of any Tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of Taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any Taxes except as otherwise previously disclosed to the Lender in writing.

<u>Section 10.9. Organization</u>. The Borrower is a duly formed or organized and validly existing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement.

<u>Section 10.10. Insurance</u>. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

<u>Section 10.11. Accurate and Complete Statements</u>. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

<u>Section 10.12 Lender's Ability to Fund</u>. Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount. Lender covenants and agrees that it shall fully and timely fund each Advance requested by Borrower so long as no Event of Default has occurred and is continuing at the time of such Advance and subject to satisfaction by Borrower of the requirements of Article 4 hereof with respect to each Advance.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

Section 10.13. Timing of Lender Funding. Lender will provide Advances as defined in the Payment Schedule within Exhibit I.

# ARTICLE 11 - NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. Generally. The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for an representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

# ARTICLE 12 - EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

Section 12.1. Non-payment. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower (such thirty (30) day notice to be given once during each twelve (120 month period of the Term; thereafter, no such notice is required).

Section 12.2. Other Covenants and Agreements. Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not  have been fully corrected within twenty (20) days after notice of such default is sent by Lender to  Borrower.

Section 12.3. Representations and Warranties. If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

Section 12.4. Security. If any lien granted in this Agreement or any other LOC Document favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days

INBE CAPITAL

from the date of such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. Validity of LOC Documents. If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. Petition for Bankruptcy, Insolvency. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; commencement of a sale for the benefit of creditors; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of  any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

Section 12.7. Material Litigation. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, or the Project of the disclosed litigation.

# ARTICLE 13 - REMEDIES

Section 13.1. General. Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable;



(b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13.

If an Event of Default referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Section 13.2. Right of Remedial Action. At the sole direction of Lender should the Lender assess and deem it necessary due to negative trending performance or upon the occurrence of an Event of Default hereunder, Borrower shall place the Project and business into a late state incubator operated by the Lender or by agent for the purposes of providing remedial management and guidance.

Furthermore, upon the occurrence of an Event of Default hereunder Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC Documents, to enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender in so doing, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

For the purpose of allowing the Lender to exercise its rights and remedies provided hereunder following the occurrence of an Event of Default, the Borrower hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

a.    to enter and endorse all agreements, instruments, and documents in connection therewith.

b.    to use any unadvanced proceeds of the LOC for the purpose of completing, operating, or maintaining the Project.



c.   to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

d.   to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

e.   to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security  satisfactory to the Lender has been provided.

f.   to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

g.   to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

h.   to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable, (A) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (B) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. Curing of Defaults by Advances. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which  Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right (but not the obligation) to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

<u>Section 13.4. Remedies Are Cumulative</u>. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

<u>Section 13.5. Offsets</u>. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC Documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any and all deposit (general or special) balances, and any and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

<u>Section 13.6. Collateral</u>. The Lender shall at all times have the rights and remedies of a secured party, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Document executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC Documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC Document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC Documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than seven (7) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC Documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC Documents, the cost of which shall be paid by Borrower.

Section 13.7. Default by Lender and Borrower's Sole Remedy.

a.  If Lender fails to provide the first (1st) Advance when due, pursuant to the Payment Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Upon receipt of such notice, Lender shall have ninety (90) calendar days from the date of receipt within which to return the ICA Payment to Borrower.



b.  If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Within ninety (90) calendar days from the date of receipt of such notice by Lender, the Lender must (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) terminate Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC Documents.

c.  Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC Documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue.



Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

<u>Section 13.8 Binding Arbitration</u>. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming USA, before a single arbitrator  using  the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules").  The parties consent and required that the  JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply.

The Party initiating a demand for Arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to being arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming USA. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

# ARTICLE 14 - GENERAL PROVISIONS

<u>Section 14.1. Disclaimer of Liability</u>. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith.



<u>Section 14.2. Publicity</u>. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and it's financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

<u>Section 14.3. Confidentiality</u>. Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC Documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place except to any officers or shareholders in the Borrower or the Borrower's advisors or as required by law. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

<u>Section 14.4. Responsibility for Application of Funds</u>. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or wilful misconduct (in each case as determined by a court of competent jurisdiction in a final and non- appealable decision).

<u>Section 14.5. Notices</u>. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the Lenders portal using the Borrower's Portal account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two calendar days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower:  Konala

      Founder and CEO

      702 N Spokane St.
      Post Falls, ID 83854

To Lender:   INBE Capital LLC

Attention:   Chief Funding Officer

    30 N Gould St Sheridan, WY 82801



Section 14.6. Applicable Law. This Agreement and, unless otherwise specifically provided for therein, each other LOC Document, shall be governed by and construed in accordance with the laws of the State of Wyoming.

Section 14.7. Successors and Assigns. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.8. Severability. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition.

Section 14.9. Amendments. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

Section 14.10. Headings; Attachments. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

Section 14.11. No Third-Party Rights. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

Section 14.12. Indemnification. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by final non- appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement.



The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the Manager of Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfil all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Lender's default of its obligations under this Agreement.

Section 14.13. General Limitation of Liability. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; or the making or administration of the Advances, including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called "lender liability theories," or any covenants, agreements, duties or obligations set forth in the Loan Documents, (or any actions or omissions of any of the Lender Parties and/or the Lenders' Affiliates in connection with the initiation or continuing exercise of any right or remedy contained in the Loan Documents or at law or in equity, or lost profits, or loss of business opportunity, or increased financing costs, or increased legal or other administrative fees, or damages to business reputation. ; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage.

Section 14.14. Entire Agreement. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.



Section 14.15. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

Section 14.16. Legal Representation of the Parties. The LOC Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

Section 14.17. JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

**[Remainder of page intentionally left blank; Signatures follow]**



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:**     INBE Capital LLC

By:     *Jonathan Wright*

Name:     Jonathan Wright

Title:     Chief Funding Officer

**BORROWER:**     Konala

By:     *Trace Miller*

Name:     Trace Miller

Title:     Founder and CEO

By:

Name:

Title:



# EXHIBIT A: PROMISSORY NOTE

**one million three hundred thousand dollars**                         $1,300,000

FOR VALUE RECEIVED,   Konala

, a   USA

corporation (the "Maker"),

hereby promises to pay to INBE Capital LLC or any subsequent holder of this Master Promissory Note (the "Payee"), at such place as Payee may designate, the principal sum of

 one million three hundred thousand dollars                         $1,300,000

or the aggregate unpaid principal amount of all Advances, as defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is less, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below,  payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

a.  Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this "Note") as follows:

   i.  simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to;

- six percent              (  6%          % )  per annum for years one to ten (1-10).

Interest payments  shall be due and payable to Payee monthly in arrears, on the first (1st) day of each month of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

a.  Except for the payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

a.  All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.



All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.

d.    Maker shall pay all amounts due under this Note to INBE Capital LLC, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

d.    All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the "Obligation" of Maker.

In addition, the following provisions shall govern this Note:

1.    LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.  This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the document entitled "Business Expansion Line of Credit Agreement" dated on or about the date of this Note between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "LOC Agreement"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.    LATE CHARGES. If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the "Late Charges") shall be added to the delinquent payment in an amount equal to ten percent (10.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges   are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

DEFAULT, CROSS-DEFAULT AND ACCELERATION. Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC



Agreement or any  of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, then this Note shall be in default. Upon default, Payee shall provide written notice to Maker specifying the nature of the default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon default, the interest rate provided for in this Note shall immediately increase to twenty four percent (24%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in Konala
and the project – Konala
To INBE Capital LLC.

3.    COSTS, FEES AND COMPENSATION. Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

4.    WAIVER. Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

5.    SUCCESSOR AND ASSIGNS. The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

6.    CUMULATIVE REMEDIES. Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

7.    GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY. This Note shall be governed by and construed in accordance with the laws of the State of Wyoming, United States of America.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

BINDING ARBITRATION: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using  the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules").  The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-Calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of Western Australia. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

8.  AUTHORIZATION. To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:



a. That the undersigned is the authorized representative of Maker and has the authority to bind Maker.

b. That Maker is duly organized and validly existing under the laws of the State of its formation, and duly qualified to transact business where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

c. That upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

9. ATTORNEY FEES AND COSTS OF COLLECTION. Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

10. MISCELLANEOUS PROVISIONS.

a. No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

b. The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

c. This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.



d.   This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

e.   Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

**[Remainder of page intentionally left blank; Signature page follows]**



IN WITNESS WHEREOF, the Maker has duly executed and delivered this Master Promissory Note as of the date first set forth above.

**MAKER:**    Konala

By:    *Trace Miller*

Name:    Trace Miller

Title:    Founder and CEO

Address:    702 N Spokane St.
Post Falls, ID 83854

**PAYEE:**    INBE Capital LLC

By:    *Jonathan Wright*

Name:    Jonathan Wright

Title:    Chief Funding Officer

Address:    30N Gould St, Sheriden, WY 82801, USA



# EXHIBIT B: PROJECT COSTS

This loan agreement pertains to the direct funding for   Konala

which is set out in the Term Sheet attached herein Exhibit I and executed by INBE Capital LLC and

Konala

This agreement pertains to the loan of   one million three hundred thousand dollars

$1,300,000



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

# EXHIBIT C: THE PROPERTY – SECURED ASSETS

TO SECURE THE PAYMENT OF THE BUSINESS EXPANSION LOC AND ALL OTHER OBLIGATIONS OF BORROWER TO LENDER, ITS SUCCESSORS AND ASSIGNS, HOWEVER CREATED, WHETHER DIRECT OR INDIRECT, ABSOLUTE OR CONTINGENT, OR NOW OR LATER EXISTING, BORROWER GRANTS TO LENDER A SECURITY INTEREST IN THE FOLLOWING PROPERTY AND ANY REPLACEMENTS THEREOF:

a.   all fixtures and Company property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment),  documents (including, if applicable, electronic documents), instruments, promissory notes,  chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights  (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

b.   all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing,  and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c.   all plant and equipment

d.   all computer equipment and electronic data stored therein

e.   all Intellectual Property rights

f.   all inventory

g.   all motor vehicles

h.   all goodwill

i.   all brand names

j.   all real estate and land

k.   all accessories, parts, and equipment now or later affixed to the same

l.   to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

# EXHIBIT D: SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of  Jul 31 2023
(as amended, supplemented or otherwise modified from time to time in accordance with the provisions
hereof, this "Agreement"), is made by  Konala
(the "Grantor"), in favor of INBE Capital LLC (the "Secured Party").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC
Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to
time, the "LOC Agreement").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure  the payment and
performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that
the Grantor execute and deliver this Agreement, and this Agreement is being  executed and delivered in
consideration of the Secured Party entering into the LOC Agreement and each financial accommodation
granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for
other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the
Parties agree as follows:

1. <u>Definitions</u>. Capitalized terms used but not otherwise defined herein shall have the meanings
   assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to
   Sections and Schedules herein are to Sections and Schedules of this Agreement. For purposes of
   this Agreement, the following terms shall have the following meanings:

   "Collateral" has the meaning set forth in Section 2 hereof.

   "Control Agreement" means (a) with respect to a deposit account, each Deposit Account Control
   Agreement (or similar agreement with respect to a Deposit Account) among the Grantor, the
   Lender and a depository institution, to be in form and substance satisfactory to the Lender, and  (b)
   with respect to a Securities Account, each Securities Account Control Agreement (or similar
   agreement with respect to a Securities Account) among the Grantor, the Lender and a securities
   intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may
   from time to time be amended, restated or otherwise modified.

   "Deposit Account" means a deposit account. "Event of Default" has the meaning set forth in the LOC
   Agreement.

   "First Priority" means, with respect to any lien and security interest purported to be created in any
   Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which
   such Collateral is subject (subject only to liens permitted under the LOC Agreement).

   "Proceeds" means all dividends or other income from the Collateral, collections thereon or
   distributions with respect thereto.



"Secured Obligations" has the meaning set forth in Section 3 hereof.

"Securities Account" means a securities account.

2.   <u>Grant of Security Interest</u>. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following,  wherever located, whether now existing or hereafter from time to time arising or acquired and any replacements thereof (collectively, the "Collateral"):

   a.   all fixtures and property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment),   documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

   b.   all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

   c.   all plant and equipment

   d.   all computer equipment and electronic data stored therein

   e.   all Intellectual Property rights

   f.   all inventory

   g.   all motor vehicles

   h.   all goodwill

   i.   all brand names

   j.   all real estate and land

   k.   all accessories, parts, and equipment now or later affixed to the same

   l.   to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



3.   <u>Secured Obligations</u>. The Collateral secures the due and prompt payment and performance of:

    a.   the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

    b.   all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "Secured Obligations").

4.   <u>Perfection of Security Interest and Further Assurances</u>.

    a.   The Grantor shall, from time to time, as may be required by the Secured Party with   respect to all Collateral, promptly take all actions as may be requested by the Secured Party  to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party, including filing of a UCC-1 statement. All the foregoing shall be at the sole cost and expense of the Grantor.



b.  The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by applicable law  of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

c.  The Grantor hereby further authorizes the Secured Party to file with relevant governmental authorities or agencies this Agreement and other documents for the purpose of perfecting, confirming,

d.  continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

e.  If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

f.  If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

g.  The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.



5.  <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

    a.    (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable law and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

    b.    At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

    c.    The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

    d.    Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

    e.    Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

    f.    No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.



g.  The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

h.  The Grantor has taken all action required on its part for control to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to applicable law. No person other than the Secured Party has control or possession of all or any part of the Collateral.

i.  Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Deposit Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or Securities Intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

j.  Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6.  Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.  Covenants. The Grantor covenants as follows:

a.  The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.



b.   The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

c.   The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

d.   The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

e.   The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

f.   The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

g.   The Grantor will continue to operate its business in compliance with all applicable provisions of applicable law dealing with the control, shipment, storage or disposal of hazardous materials or substances.

h.   The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Deposit Account or Securities Account not listed on <u>Schedule 2</u> hereto, and, prior to or simultaneously with the creation of such Deposit Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.



i.   The Grantor shall provide the Secured Party with prompt written notice with respect  to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

j.   At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.   <u>Secured Party Appointed Attorney-in-Fact</u>. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

9.  <u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. <u>Reasonable Care</u>. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. <u>Remedies Upon Default</u>. If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice.     So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder.



The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

a. If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

b. If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12. <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.



13. <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

   a. any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

   b. any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

   c. any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

   d. any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

   e. any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

   f. any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

   g. any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.



15. <u>Addresses for Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

16. <u>Continuing Security Interest; Further Actions</u>. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17. <u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. <u>GOVERNING LAW</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Wyoming, United States of America.

19. <u>Binding Arbitration</u>. Except for any rights to self-help or possession of the collateral under state law. any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules"). The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules.



Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections.   No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming, United States of America. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20.  <u>JURY TRIAL WAIVER</u>. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

21.  <u>Counterparts</u>. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

**[Remainder of page intentionally left blank; Signature page follows]**



IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR:**   Konala

By:   *Trace Miller*

Name:   Trace Miller

Title:   Founder and CEO

**SECURED PARTY:** INBE Capital LLC

By:   *Jonathan Wright*

Name:   Jonathan Wright

Title:   Chief Funding Officer



# EXHIBIT E: FORM TERMINATION LETTER

INBE Capital LLC
ATTENTION: Craig Boddington
30 N Gould Street,
Sheridan, Wyoming, 82801


Re:    Konala


To Whom it May Concern:


The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated   Jul 31 2023


Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.


BORROWER:


By:


Name:


Title:



By:


Name:


Title:



SUBSCRIBED AND SWORN TO BEFORE ME on this day:


NOTARY PUBLIC
In and for the State of


My Commission Expires:



# EXHIBIT F: WIRE & JOINT INSTRUCTIONS

I instruct the BORROWER to fund the sum of $325,000

(the "ICA"),

to be initially wired to INBE Capital LLC or one of its nominated administrative agents for aggregation before being forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit). The Trustee will be nominated and confirmed via electronic communication during final underwriting. Best efforts are made to select The Trustee based on a suitably negotiated escrow holding term per funding cycle. Typically, a 90 day escrow term applies. However, upon successful negotiation of a shorter escrow term, we're then able to facilitate tranche 1 delivery faster than our standard 90 day allowance. Whilst this cannot be guaranteed, we will always apply best efforts to shorten the overall payment schedule so we consistently deliver your funding quickly and seamlessly. Expect regular communication as we move through the remaining stages of the process. As well as ongoing open access to your appointed INBE representatives.

**Contractual Guarantee on ICA Advance Fee:**

In the event that Lender is unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee. Such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA Advance Fee, which shall be in Trustee's sole possession and control. The Lender agrees none of the Indemnitees shall be liable in any manner should Trustee fail to return the ICA Advance Fee per his contractual obligations with the Lender, although the Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per his contractual agreement with the Lender. For avoidance of doubt, in the event we're unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days.

**WIRE INSTRUCTIONS:**

| | |
|---|---|
| Account Name: | Messner Reeves, LLP – COLTAF Paymaster |
| Bank Name: | The Northern Trust Company |
| Account Address: | 50 S LaSalle, Chicago, IL |
| Account No.: | 3813128494 |
| ACH Transfers: | N/A |
| ABA: | 071000152 |
| Swift (US Currency): | CNORUS44 |
| Swift (Foreign Currency) | |
| Payment Reference: | INBE CAP |

<u>Mandatory KYC/AML Required Message on all wire transfers:</u>   <span style="color:red">**KYC/AML message not required. Use only payment reference ("INBE CAP") as shown above.**</span>

All transfer instructions shall state: **"Funds are clean and clear of non-criminal origin and are for immediate credit – same day value / instant cash upon receipt."**

<u>**IMPORTANT: All transfers must be accompanied by proof of wire to frb@inbe.capital**</u>



**Re: Joint Instructions regarding Deposit Amount**

The purpose of these joint instructions ("Instructions") is to document the agreement of the parties regarding the Deposit Amount described below.

As background, (The Borrower) has obtained a loan commitment from INBE Capital LLC for the total amount of:

(the "Loan Amount") from INBE Capital LLC ("The Lender") To fund their proposed project and business activities as further set forth in Exhibit B, Exhibit H, & Exhibit I.

In connection with the Proposed Transaction, INBE Capital LLC, requires the borrower remit to INBE Capital LLC the Interest Credit Deposit Amount of:

(the "Deposit Amount"), which Lender requires as a deposit for the funding of the Proposed Loan, care of the "WIRE INSTRUCTIONS" stipulated within this Exhibit - Exhibit F (the "Escrow Account").

These Instructions are provided to clarify what happens with the Deposit Amount and when the Deposit Amount may be returned to The Borrower. Specifically:

- The administrative agent will remit the Deposit Amount to Lender where it will remain in Escrow until the Lender funds the Proposed Loan specified in Exhibit I.
- If the Proposed Transaction does not complete pursuant to the execution of definitive agreements and the payment of the BELOC Loan to The Borrower, then INBE Capital LLC or one of it's nominated agents will wire return the Deposit Amount to The Borrower promptly.
- If Lender cancels the Proposed Loan pursuant to the terms of the Business Expansion Line of Credit to be entered into between The Borrower and Lender, or if the Proposed Loan commitment expires, then INBE Capital LLC will promptly wire return the Deposit Amount to The Borrower.

All signers of these Instructions agree to strictly comply with the terms hereof.

INBE Capital LLC may update or supplement these Instructions at any time in writing signed by all parties. If there is a conflict between these Instructions and the Proposed Loan, these Instructions control.

The parties agree to the use of email for the purpose of delivering notices under these Instructions, as follows:

If these Instructions are acceptable, please acknowledge below.

**The Borrower**

*Trace Miller*

_____

**INBE Capital LLC**

*Jonathan Wright*

_____



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

# EXHIBIT G: KYC & AML

In order to satisfy Know Your Customer (KYC) and Anti Money Laundering compliance all clients must complete the following Client Information Form and upload verification information:

## STEP 1 – COMPLETE KYC & AML FORM

### GO HERE – Link to online Client information form

or Scan QR Code:



## STEP 2 – DECLARATION

We may take up such references and make such enquiries about your company as we consider necessary, and we may use credit scoring and may search the files of credit reference  agencies. The fact a search had been made will be recorded by each credit reference agency used and the data supplied will be available to other lenders and others authorized  to search  the  credit reference agencies files, for purpose such as credit assessment of your company and occasionally for debtor tracing and fraud prevention. If your application for finance is accepted then details about your company and the conduct of your account may be passed to credit reference agencies and these details will be used for similar purposes.

We may also disclose information about your company and the conduct of your account to credit industry fraud avoidance networks and to tracing and debt collection agencies and our solicitors.

Data Protection Your company information will be treated as confidential and will only be disclosed:
a) at your request;
b) to our agents in connection with running accounts;
c) in the public interest; or
d) to prevent fraud or legal compulsion; or
e) taking up of references.

The Data Protection Act gives you a right to a copy of your company records held on our files on payment of a fee.

*Signatures Follow on Next Page*



Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM

1. Signatures(s) ................................................................ Date: . ......................................

Name . .............................................................................

2. Signatures(s) .............................................................. Date: ........................................

Name . .............................................................................

3. Signatures(s) .............................................................. Date: ........................................

Name .............................................................................



# EXHIBIT H: TERM SHEET

[intentionally left blank; Executed Term Sheet follows]

# EXHIBIT I: THE PROJECT

The Borrower desires to obtain the LOC from Lender for the purposes detailed below;

[intentionally left blank; Project Summary follows Term Sheet]



# INBE BELOC 3.0 TERM SHEET

**FOR THE PROPOSED Funding OF**

| Konala |
| --- |

**Loan Offer Valid Through to:**

| July 31th 2023 |
| --- |

This Term Sheet summarizes the principal terms of Funding to support;

| Konala |
| --- |

(the "Company" or "Borrower)

by INBE Capital LLC or their joint assignee ("Inbe").

No other legally binding obligations will be created until definitive agreements are executed and delivered by all parties.  This Term Sheet shall be governed in all respects by the laws of the State of Wyoming, United States.

**The following conditional offer is non-binding and subject to underwriting and capital lending committee approval.**

## Conditionally Approved Loan Terms

| | |
| --- | --- |
| **Scope** | The Borrower has been pre-approved for capital funding via a non-recourse, asset-backed Business Expansion Line of Credit ("BELOC"). |
| **Currency** | USD |
| **Loan Principal** (Gross Capital) | $1,300,000 |
| **Establishment Cost** | $117,000<br>9.00% paid out of loan principal one-time at closing for costs such as lending + legal + closing + custodian + broker commissions etc. |
| **Drawdown Amount** (Net Capital Less Costs) | $1,183,000 |
| **ICA Advance Cost** | $325,000<br>Interest Control Account (Prepaid Interest, escrow amount). |
| **Term** | 120 Months |
| **Interest Rate** | 6.00% APR - Interest Only |
| **Payment Holiday** (standard) | $156,000<br>(2 years) Interest prepaid, see ICA, after the holiday period interest to be paid monthly. |
| **ICA Surplus** (Risk Premium / Prepayment Credit) | $169,000<br>Risk premium retained as prepayment credit in ICA and returned to borrower at final settlement. Option available down the line to repurpose ICA surplus for additional lines of credit (T&Cs apply). |



1

Zoho Sign Document ID: 2B0A4254-IQWPXXPOOYF2V3WOPN-20TB32_405Z7BDKXMG99HSRS

# INBE BELOC 3.0 TERM SHEET

| | |
|---|---|
| **Final Approval** | After loan conditions have been met already and approvals are formally in place. |
| **Collateral Provider** <br> **(ICA Provider)** | Konala |
| **Balloon Note** | Pay back principal by end of term. <br> No prepayment penalties. |
| **Payment Schedule** <br> **(As Per Project Schedule** <br> **Or As Approved By Inbe)** | Tranche Payment 1: <br> 33.33% <br> Transferred 60-90 banking days post underwriting completion <br><br> Tranche Payment 2: <br> 33.33% <br> Transferred 30-45 banking days after Tranche 1 <br><br> Tranche Payment 3: <br> 33.33% <br> Transferred 30-45 banking days after Tranche 2 |
| **Funding Date** | Funding will be available within 30-45 banking days; <br> Post underwriting completion.. |
| **Underwriting Period** | 15- 45 banking days. |
| **Securitization** | Interest Control Account (ICA). <br> UCC1 Lien over company assets. <br> *NOTE: No Personal Guarantee.* |
| **Reporting Requirements** | Quarterly management accounts. |
| **Confidentiality** | Neither the Company members nor the Company will disclose the terms of this Term Sheet to any person, other than officers, Shareholders of the Board of Directors and the Company's accountants and legal counsel, without the written consent of Inbe, unless required by law. |
| **Next Step** | Final approvals get completed within 48 hours of conditional offer acceptance. Loan Documents are then generated and sent via e-sign. <br> *(offer is voided if borrower fails to complete all remaining obligations)* |



Zoho Sign Document ID: 2B0A4254-IQWPXXPOOYF2V3WOPN-20TB32_405Z7BDKXMG99HSRS

# INBE BELOC 3.0 TERM SHEET

## <u>ACCEPTANCE</u>

| **Executed: This Day** | Jul 31 2023 |
|---|---|

| **On Behalf Of:** | Konala |
|---|---|

| **By:** | Trace Miller |
|---|---|

| **Title:** | Founder and CEO |
|---|---|

**Signature:** *Trace Miller* _____


| **On Behalf Of:** | INBE Capital LLC |
|---|---|

| **By:** | Jonathan Wright |
|---|---|

| **Title:** | Chief Funding Officer |
|---|---|

**Signature:** *Jonathan Wright* _____



3

# Exhibit B
# Miller Declaration

**HDG**
—
**Architecture**

# Konala – Appleway Ave

## ARCHITECTURE & DESIGN PROPOSAL

2023.07.20

Trace Miller & Jammie Jannisse,

We are looking forward to working with you on your second Konala location! Enclosed is a description of our professional services.

**CLIENT**
Trace Miller & Jammie Jannisse
702 N. Spokane St.
Post Falls, ID 83854

**PROJECT**
1423 W. Appleway Ave
Coeur d'Alene, ID 83814

**CONTACT**
jtfoodbunker@yahoo.com
775.225.9902



## SCOPE OF WORK

2

**PROJECT SITE**
- Shared lot with Sweeto Burrito

**GROUND UP KONALA**
- Approximately 1,000 sq. ft.
- Design stand-alone drive through building
- Interior equipment layout by SRE
- Interior materials by HDG
- Separate ordering station "stand alone" approximately 20 sq. ft.

**MISCELLANEOUS**
- HDG to use previous design of Konala on Breezy Way for consistency in branding
- X-Stream Cubes to be the contractor



## PROJECT PHASES

3

**PRE-DESIGN (PD)**
- Research and determine Client's criteria for the project.
- Client's criteria are usually: budget, schedule, program, and building and/or site parameters.
- Photograph all existing conditions as required.

- Introduce consultant(s) to existing conditions, as needed.
- Walk the site once to verify existing conditions with Client.
- If required, Client shall provide a property survey prior to commencement of Schematic Design.

**SCHEMATIC DESIGN (SD)**
- Utilizing the criteria established in Pre-Design, geographically explore design concepts.
- Research code, zoning and any design review committee requirements and timeframes.
- Prepare a floor plan and site plan illustrating spatial relationships and square feet of all areas prescribed within the scope of work.
- Prepare a 3-dimensional computer-generated model to aid in the design and material selection process.

- Preliminary material selection and placement.
- Present design direction/concept for Client approval.
- This phase of service includes one initial design based on Client's directives.
- After presentation of initial design, we will incorporate minor revisions based on Client comments.
- Additional options will be addressed as an agreed upon additional fee.

**DESIGN DEVELOPMENT (DD)**
- Refine and develop the design such that the major design decisions have been made.
- Finalize the Client approved floor plan/site plan.
- Implement building systems (preliminary engineering) into the design if required.

- Verify all applicable codes and ordinances.
- Identify location of finishes, materials and building components.

**INTERIOR DESIGN (ID)** Concurrent with DD/CD
- Selection of interior materials at designated areas and their associated finishes and quality
    - Where applicable; floor covering, base trim, wall covering, color and/or stain, interior window and door trim type and associated stain or color, material accents, ceiling finishes and associated trim work, general casework design and associated components/counters, specialty lighting selection & placements.
- Prepare technical information and drawings identifying key design components.
- Coordinate Client provided furniture within drawings.

- Selection and procurement of finish material samples for presentation and approval.
- All furnishings and accessories illustrated within the design are placeholders to show design intent only. Actual furnishings and accessories sourced and/or designed by HDG at Client's request to be billed hourly, when applicable.
- All graphic imagery (photographs, artwork, murals, and text) illustrated within the design are placeholders to show design intent only. Actual imagery sourced and/or designed by HDG at Client's request to be billed hourly, when applicable.
- Finishes/materials for all areas will be identified within the finish schedule.



4

## PROJECT PHASES (Continued)

**CONSTRUCTION DOCUMENTS (CD)**

- Preparation of technical and written graphic documents that establish the requirements for constructing the project, gaining jurisdictional approval and construction cost estimating.
- Incorporate consultant drawings, as required, into permit/pricing set.
- See Fee Structure and Client Obligations for included or excluded engineering consultants.

- Permit drawings submittal to local jurisdiction.
- Coordination with local jurisdiction during the permit review process.
- Coordination with selected contractor on constructability and construction timeframe deliverables.
- Shop drawings by others.

**CONSTRUCTION ADMINISTRATION (CA) Hourly**

- Communication and negotiations with builder prior to construction.
- Value engineering.
- Review of contractor provided shop drawings and submittals.

- On-site and digital communication/coordination with contractor and Client during the construction process including attendance at construction meetings.
- CA services will be billed hourly.

**CLIENT OBLIGATIONS**

- Client will provide an ALTA survey, which is a detailed land parcel survey of property lines, utilities, easements, topography, existing improvements in DWG format.
- Client will provide all covenants, conditions, restrictions, and homeowner association / design review requirements within one week of signing the proposal.
- Client will approve each phase of the design, (PD, SD, DD, ID) before HDG proceeds to the next phase.
- Client will pay for all engineering, professional and consulting services needed for the Project including geotechnical, civil, structural, mechanical, electrical, plumbing, fire suppression, specialty lighting design, acoustical design, septic, landscape, disabilities consulting, energy code compliance and shoreline requirements.
- Client will pay for all jurisdictional (city/county/state/federal/homeowner association) and all other outside fees associated with the review, approval, permitting, inspection, and testing of the Project. HDG can pay for said fees on behalf of the Client with a 15% markup
- Client will pay overtime at $300 per hour if Client elects to expedite the services being provided to the Project.



5

**FEE STRUCTURE**

| | |
|---|---|
| Architecture / Interior Design (hourly up to contracted amount) | $ 10,000 |
| Civil Engineering | $ 9,900 |
| Landscape Design | $ 3,800 |
| Structural Engineering | $ 4,180 |
| | |
| Total Proposed Fee (Excluding CA) | $ 27,880 |

The Total Proposed Fee is based on initial Client prescribed parameters and up to a total of 1,000 sq. ft.

Additional fees may be incurred due to Client-directed changes related to an increase or decrease in size, bank financing requested changes / additions, construction budget, design complexity or unforeseen conditions.  Said fees will be assessed based on changes and determined prior to commencement of additional work.

**Fees** are understood to be estimates and based on initial Client prescribed parameters. These may change based on approved Schematic Design and/or Design Development phases. Estimate fees may also be affected during construction and may be related to but not limited to unforeseen conditions.

**PAYMENT SCHEDULE**

Services will be scheduled following Client's execution of this proposal and payment of a 50% retainer of the Total Proposed Fee. $ 13,940
Client will pay HDG retainers at the following service milestones.
- 50% initial retainer = for services to be performed up to 50% of completion
- 25% retainer = for services to be performed up to 75% of completion. Billed at 50% completion.
- 25% retainer = for services to be performed up to 100% completion. Billed at 75% completion.
Remaining fees, CA services and reimbursable expenses will be billed monthly based on the services provided and by the percentage of services completed.

Thank you for selecting HDG to collaborate with you on this project. Please call if you have any questions or comments regarding this proposal and Terms and Conditions.

Sincerely,

**Joshua T. Hissong** Assoc. AIA – Principal          **Armando S. Hurtado** AIA - Principal


Approved by _____          Printed Name(s) _____


Date _____          Title _____



# Terms and Conditions

6

HDG will perform the services described in this Agreement, according to the following Terms and Conditions. unless stipulated otherwise by an additional written agreement mutually agreed to between HDG and our client. The proposal may be accepted within thirty (30) calendar days from its date. Otherwise, it's terms are subject to renegotiation.

## STANDARD OF CARE

HDG will perform its services consistently with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances (the "Standard of Care"). HDG will perform its services as expeditiously as is consistent with the Standard of Care and the orderly progress of the Project. HDG is not required to exceed the Standard of Care.

## CONSTRUCTION COST ESTIMATES

HDG's cost estimates are developed and based on its experience and judgment. They are to be considered good faith, reasoned estimates for the Client's use to gauge the feasibility of the Project. However, since market conditions and bidding procedures vary, HDG does not warrant that cost estimates are accurate, nor should they be used as a basis for construction costs. HDG is not liable for the accuracy of the estimates provided. Client acknowledges that changes may be required to the Project because of possible omissions, ambiguities or inconsistencies in the plans and specifications. Client also acknowledges the costs of the Project may exceed the construction contract sum. Changes to the Project / design will be addressed through an agreed upon contract agreement. Fees will be assessed based on Value Engineering scope and are in addition to the contracted fixed fee. HDG will make commercially reasonable efforts to notify the Client of changes in the estimates as the Project moves forward but shall not be liable for the failure to do so.

## TIMEFRAME/SCHEDULE

Weeks/days prescribed in this Agreement to accomplish each phase of service are calculated as business days. Due to circumstances beyond HDG's control (such as Client approvals, jurisdictional approvals/delays, design changes and consultant delays), weeks/days prescribed do not imply consecutive days but rather amount of time estimated to complete the phases of the Project, barring any changes or additional scope. HDG does not warrant that the phases of services will be completed within weeks/days prescribed.

## CLIENT APPROVALS

Client approvals of any phase of design or portion thereof constitutes completion of that phase and initiates the next phase in the design process.  If at any time, any of the approved phases of design and/or components of these phases are changed by the Client, additional fees will be billed hourly.

## CLIENT PROVIDED INFORMATION

The ALTA survey, and the engineering, professional and consulting services to be provided by the Client shall be provided by licensed professionals in their respective fields of expertise.  HDG may reasonably rely on all Client provided information, and HDG is not liable for the consequences of inaccurate or insufficient information.

## CLIENTS CONTRACTOR

In its provision of CA services HDG will make periodic observation of materials and work to observe the Client's contractor's general compliance with construction contract documents. These periodic observations do not include responsibility for supervising construction methods and processes, site conditions, equipment operations, personnel, or safety on the work site. HDG has no authority over Client's contractor and is not liable for the contractor's performance.

## FEE

The Total Proposed Fixed Fee is a commercially reasonable estimate, based on information available to HDG at the time the proposal was made. If HDG believes it will exceed the estimate, it will consult with and obtain Client's approval in advance of incurring fees in excess of the stated estimate. Any, hourly rate services include but are not limited to the following: Design, architecture and/or engineering services, site visits, meetings, procurement of materials, verbal and written communication, travel, etc.

## HOURLY BILLING RATES

| | |
|---|---|
| Principal: | $ 250 |
| Architect: | $ 175 |
| Associate Architect: | $ 150 |
| Support Staff: | $ 125 |
| Admin: | $ 100 |
| Expedited Services: | $ 300 |

Hourly rates may vary depending on demand and are subject to change. Client will be notified of any change in rates prior to commencement of any additional work. HDG's fee for all Client contracted consultants is 20% above proposed consultant fee

## BILLINGS, PAYMENTS, AND INTEREST

At HDG's option, invoices will either be submitted to Client upon completion of services or phases of services, or monthly, based on the percentage of services completed. Invoices are due upon receipt. If an invoice is not paid within 30 calendar days of the date of the invoice, HDG may, without waiving any claim or right against the Client, and without liability to the Client, suspend or terminate the performance of service until such time as the account is made current.  If an invoice is not paid within 60 calendar days of the date of the invoice, unpaid amounts will accrue interest at an annual rate of 18%. Client will pay all costs of collection, including reasonable attorney's fees and costs associated therewith. Any remaining retainer amount will be credited to the Client on the final invoice.



7

**REIMBURSABLE & LATE PAYMENTS**

Reimbursable items include but are not limited to the following: jurisdictional and outside fees, fees and costs of engineering, professional and consulting services retained by HDG at Client's request; in-house and out-sourced printing, mileage, fees for out-of-town travel and associated meals, lodging, and transportation; vehicle and equipment rental; and materials, samples and/or supplies purchased or consumed in association with the project. All reimbursable items are billed to the Client at cost plus 15%.

**RISK ALLOCATION/LIMITATION OF LIABILITY**

In recognition of the fees charged by HDG, the relative risks and benefits of the Project to the Client and HDG, the Client agrees that HDG's liability to the Client, its agents, employees, principals, officers, directors, shareholders, members, managers, partners, contractors, and/or subcontractors for all injuries, claims, losses, expenses or damages whatsoever arising out of, or in any way relating to the Project or this Agreement, from any causes, including, but not limited to the negligent acts, gross negligence, errors and omissions, breach of contract  breach of warranty, and/or strict liability (Claims) arising out of, related to or caused by HDG, its agents, employees, principals, officers, directors, shareholders, members, managers, partners, contractors, subcontractors, or engineering, professional and consulting service providers retained by HDG (HDG Parties), shall be limited to, but not more than, the lesser of $250,000 or ten times the fees paid by the Client to HDG.  Further, no agents, employees, principals, officers, directors, shareholders, members, managers, partners, or other representatives of the HDG Parties shall have any personal liability to the Client or any other party for any Claims.

**INDEMNIFICATION**

HDG will indemnify and hold Client harmless from Claims arising out of, related to or caused by the HDG Parties' performance of services on the Project. Client will indemnify and hold the HDG Parties harmless from Claims arising out of, related to or caused by Client's acts or omissions on the Project. For all liabilities in excess of HDG's limitation of liability (the lesser of $250,000 or ten times the fees paid by the Client to HDG), Client will indemnify and hold the HDG Parties harmless from any third-party Claims against them arising out of, related to or caused by their acts or omissions in connection with the Project.

**INSURANCE**

HDG will maintain $1 million, $2 million of general liability and professional liability insurance coverage as well as workers compensation coverage as required by law at all times during the term of the Agreement.

**TERMINATION OF SERVICES**

This Agreement may be terminated by written notice by either party at any time should the other party fail to perform its obligations under this Agreement. The terminating party will provide the other with 7 business days to respond to a termination notice and an additional 14 business days to provide a cure. In the event of termination, Client will pay HDG for all services rendered to date of termination and will pay for all reimbursable expenses incurred by HDG. Any remaining retainer amount will be returned to the Client.

**SUSPENSION OF SERVICES**

Should the project be suspended due to Client's directive or for reasons beyond HDG's control for a period of ninety (90) calendar days, Client agrees to pay the HDG Parties fees and costs associated with recommencement of services. Recommencement of services following a suspension will need to be rescheduled upon authorization to proceed. Client understands that HDG Parties may not be able to recommence services immediately after receipt of the authorization to proceed.

**OWNERSHIP OF INTELLECTUAL PROPERTY**

Drawings, specifications, documents, designs and all other instruments of service, (Instruments of Service), prepared by the HDG Parties are solely for use on the Project. This includes documents in electronic form. The HDG Parties are deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights. The Instruments of Service shall not be used by Client for future additions or alterations to the Project or for other projects, without the prior written agreement and consent of the HDG Parties. Any unauthorized use of the Instruments of Service shall be at the Client's sole risk. Client will indemnify and hold the HDG Parties harmless from all third-party claims arising out of, related to or caused by the unauthorized use of the Instruments of Service.

**MARKETING**

HDG may use any Instruments of Service, design imagery and/or photographs of the Project, all associated components (furniture, equipment, artwork, graphic design, etc.) and the Client's business name for HDG's marketing and promotional efforts.

**DISPUTE RESOLUTION, VENUE, GOVERNING LAW**

In an effort to resolve any dispute that arises during or following the completion of a project, the parties agree to have representatives with decision-making power meet to informally resolve the dispute. In the event that no resolution is achieved, the parties agree to submit the dispute to mediation with each party paying an equal share of the mediator's fee. The mediator will be mutually selected by the parties, or in the absence of agreement, by petition to the Spokane County, Washington District Court. In the event that litigation becomes necessary to resolve a dispute, the parties expressly consent to personal jurisdiction in and venue in the Washington state courts located in Spokane County, Washington, and agree that Washington law applies to any legal action among them without consideration of any conflict of law rules. The parties agree to include these binding dispute resolution, venue and governing law provisions in all of their agreements with independent contractors, professional service providers and consultants retained for the Project.



# Exhibit C
# Miller Declaration

**HDG Architecture**
230 S Washington St
Spokane, WA 99201
+1 5093215064



**BILL TO**

Trace Miller & Jammie
Jannisse
702 N Spokane St.
Post Falls, ID 83854

| DATE | PLEASE PAY | DUE DATE |
|---|---|---|
| 08/01/2023 | **$0.00** | 08/01/2023 |

**P.O. NUMBER**

[23.20] Konala Appleway

**INVOICE NUMBER**

23.20-001

| ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| **HDG Services** | 50% Retainer for Architectural services | 0.50 | 27,880.00 | 13,940.00 |

| | |
|---|---|
| SUBTOTAL | 13,940.00 |
| TAX | 0.00 |
| TOTAL | 13,940.00 |
| PAYMENT | 13,940.00 |
| **TOTAL DUE** | **$0.00** |

THANK YOU.

**HDG Architecture**
230 S Washington St
Spokane, WA 99201
+1 5093215064



| **BILL TO** | | **DATE**<br>02/06/2024 | **PLEASE PAY**<br>**$0.00** | **DUE DATE**<br>02/06/2024 |
|---|---|---|---|---|
| Trace Miller & Jammie<br>Jannisse<br>702 N Spokane St.<br>Post Falls, ID 83854 | | | | |

**P.O. NUMBER**
[23.20]  Konala Appleway

**INVOICE NUMBER**
23.20-002

| ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| **HDG Services** | The final accounting of design services for time spent on the Konala Appleway Project. See information below | 1 | 4,873.00 | 4,873.00 |

Final numbers from the design team:
Civil = $7,125
Structural = $2,100
Landscape = $2,700
Architecture = $6,888
Total ($18,813) - Paid to date ($13,940) = $4,873

PAID

| | |
|---|---|
| SUBTOTAL | 4,873.00 |
| TAX | 0.00 |
| TOTAL | 4,873.00 |
| PAYMENT | 4,873.00 |
| **TOTAL DUE** | **$0.00** |

THANK YOU.

# Exhibit D
# Miller Declaration



# Proposal

| SOLD TO: | QSR cubes | 1,030 sq. ft. | | JOB # | 23069 |
| --- | --- | --- | --- | --- | --- |
| KONALA | | | | | |
| | Project | 1,030 sq. ft. | | PROPOSAL DATE | 7/17/23 |
| **ATTN:** Trace Miller | | | | PROPOSED SHIP DATE | TBD |

| DELIVERY LOCATION: | SHIP VIA | Best Way |
| --- | --- | --- |
| 1423 W Appleway Ave | FOB | 8370 Eastgate Rd |
| Coeur D'Alene, ID | | Henderson, NV 89015 |

| DESCRIPTION | NET | TOTAL |
| --- | --- | --- |
| **Konala QSR - Estimated per XCC drawings dated 10.18.2022** **Approximately 1,030 sq. ft.** | | |
| **QSR Cubes - New 2023** - Approximate floor area      **1,030 sq. ft.** | $ 534,412.31 | $ 534,412.31 |
| **Subtotal cost of Modular Cubes FOB Henderson, NV - excludes taxes** | | $ **534,412.31** |
| Transportation Allowance - Est. at $5.50/mile for 1120 miles for 4 trucks, $4/mile for the return trip | | $ 42,560.00 |
| **Subtotal cost of Modular Cubes FOB Las Vegas, NV - excludes taxes** | | $ **576,972.31** |
| NOT INCLUDED IN ABOVE TOTAL | | |
| Sales Tax: Subject to Nexus rules and tax laws governing the ship-to state | | TBD |
| **DESIGN, ENGINEERING AND SOFT COSTS (not included in above totals)** | | |
| Engineering and Stamped Drawings | | $ 17,500.00 |
| State approval and inspections | | $ 7,110.00 |

**PROPOSAL VALID FOR 10 DAYS**

**SUBJECT TO FINAL ENGINEERING AND DESIGN**

**THIS PROPOSAL IS SUBJECT TO THE GENERAL TERMS AND CONDITIONS OF SALE, WHICH ARE AVAILABLE UPON REQUEST. ALL DEPOSITS AND MONIES PAID TO XCC ARE NON-REFUNDABLE.**

**KONALA**

Brandon Main
Xtreme Cubes Corporation

## PAYMENT TERMS

| Payments | Schedule | Amount | | Due Date |
|---|---|---|---|---|
| 1st | | | | Upon Execution of Proposal. |
| | | | | |
| | | | | |
| | Design and Engineering | $ | 11,500.00 | |
| | **Total due upon execution of proposal.** | **$** | **11,500.00** | |
| 2nd | Initial project deposit | $ | 187,044.31 | Upon Execution of Proposal. |
| | State approval and inspections | $ | 7,110.00 | |
| | | | | |
| | | | | |
| | | | | |
| | **Total due upon execution of proposal.** | **$** | **194,154.31** | |
| 3rd | Project Kickoff payment | $ | 133,603.08 | Upon project kickoff and release to the shop. |
| | | | | |
| | | | | |
| | | | | |
| | **Project Kickoff payment** | **$** | **133,603.08** | |
| 4th | Progress Payment | $ | 133,603.08 | 30 days after execution of proposal. |
| | | | | |
| | | | | |
| | | | | |
| | **Progress Payment** | **$** | **133,603.08** | |
| 5th (Final) | Final Payment | $ | 80,161.85 | Upon notice of ready to ship |
| | Sales tax | TBD | | |
| | Transportation | $ | 42,560.00 | |
| | | | | |
| | **Total due upon execution of proposal.** | **$** | **122,721.85** | |

**TOTAL PROJECT COST**          $          595,582.31

Client Initials:_____

## DESCRIPTION AND ASSUMPTIONS

**Konala QSR - Estimated per XCC drawings dated 10.18.2022**
- Approximate floor area                                          **1,030 sq. ft.**

| Qty | Description |
|-----|-------------|
| - | **Steel and Framing** |
| 2 | 11.5x32x 11.3 HSS Space Frame |
| 1 | 11.3 x26 x 11.3 HSS Space Frame |
| - | Parapet |
| - | Phosphate |
| - | Primer |
| - | Cold-rolled Steel |
| 2 | Aluminum Awnings |
| - | **Subfloors** |
| - | 3/4" Structocrete |
| - | R-28 Spray Foam |
| - | **Wall Sheathing Ext** |
| - | Zip system (Ext.) |
| - | COR-A-VENT STURDI BATTEN or equal sheathing |
| - | Spray Foam insulation (R-21) walk-in cooler section only |
| - | Batt roll insulation (R-21) |
| - | **Roof Sheathing** |
| - | 5/8" Plywood |
| - | Batt roll insulation (R-21) |
| - | Spray Foam insulation (R-21) walk-in cooler section only |
| - | **Wall/floor/Ceiling Finish Interior** |
| - | FRP Panels w/ gyp. board backer |
| - | ACT |
| - | Painted gyp ceiling (bathroom only) |
| - | Quarry Tile with Cove base |
| - | **Exterior Finish** |
| - | PAC-CLAD or equal |
| - | Western red cedar or equal |
| - | **Mechanical** |
| - | HVAC/ Hoods/ Exhaust fans per mechanical schedule |
| - | Ductwork per mechanical schedule |
| - | **Electrical** |
| - | Rough Electrical - Outlets/switches/etc. |
| - | Electrical Panel per electrical schedule |
| - | Lighting per lighting schedule |
| - | **Plumbing and fixtures** |
| - | Plumbing fixtures and accessories per page xD401 |
| - | **Doors/Windows** |
| - | Doors and windows per page xD801 |
| - | **FF&E/Misc.** |
| - | Installation of customer supplied Hood |
| 3 | Transportation wrap |
| - | **Misc.** |
| - | State inspections |

## EXCLUSIONS

**Proposal price does not include:**

| | |
|-----|-------------|
| - | Local building permits |
| - | Site preparation |
| - | Foundation |
| - | Installation |
| - | Fire Suppression |
| - | Material and labor for the walk-in cooler |
| - | Low Voltage |
| - | On-site interior and exterior MEP connections |
| - | Re-installation of any items removed for transport |
| - | Roofing - XCC to provide sheathing only |
| - | Exterior cladding stitching across module mate lines |
| - | Interior finish stitching across module mate lines |
| - | FF&E except where noted |
| - | Hood material - XCC to hang the hood only |
| - | Installation of all kitchen equipment |
| - | Order Kiosk |
| - | Signage |

Client Initials:_____


XTREME
CUBES CORP

# RESPONSIBILITY MATRIX

PROJECT NAME: **KONALA**          PROPOSAL DATE: 7/17/2023

PROJECT #: 23069

| DESCRIPTION | FURNISHED BY | | | | | INSTALLED BY | | | |
|---|---|---|---|---|---|---|---|---|---|
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER |
| **DIVISION 00 - PROCUREMENT AND CONTRACTING REQ** | | | | | | | | | |
| Modular Structure Project Management & Coord. | XCC | | | | | | | | |
| Modular Structure Design & Engineering | XCC | | | | | | | | |
| Electronic Communication Protocols | XCC | | | | | | | | |
| Modular Structure Fabrication Progress Docs | XCC | | | | | | | | |
| Survey And Layout Data | | OWNER | | | | | | | |
| Purchase Order Tracking | XCC | | | | | | | | |
| Quality Requirements | XCC | | | | | | | | |
| Quality Assurance | XCC | | | | | | | | |
| Quality Control | XCC | | | | | | | | |
| Permit Application - Planning / Entitlements | | OWNER | | OTHER | | | | | |
| Permit Application - State / Manuf Housing | XCC | | | | | | | | |
| Design & Permitting - Foundation for XCC Cubes | | OWNER | G.C. | OTHER | | | | | |
| Permits - Mitigations - Fees | | OWNER | | | | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 01 - GENERAL REQUIRMENTS - SITE REQS** | | | | | | | | | |
| Site - Work to Accommodate Cube Structure | | OWNER | | | | | OWNER | | |
| Site - Utility Points Of Connection for Cube Structure | | OWNER | | | | | OWNER | | |
| Site - Foundation Design/Eng, Permit & Approvals | | OWNER | | | | | OWNER | | |
| Site - Foundations - Incl. Anchor Bolts or Weld Plates | | OWNER | | | | | OWNER | | |
| Modular Structure Factory Fabrication & Assembly | XCC | | | | | XCC | | | |
| Modular Structure Pre-Ship Inspections / Testing | XCC | | | | | XCC | | | |
| Modular Structure Inspections / Decals at XCC | XCC | | | | | XCC | | | |
| Modular Structure Storage / Pre-Ship | XCC | | | | | XCC | | | |
| Modular Structure Storage / Extended | | OWNER | G.C. | | N/A | | OWNER | G.C. | |
| Modular Structure Transportation to Site | XCC | | | | | XCC | | | |
| Modular Structure On-Site Placement / Lift Plan | | | G.C. | OTHER | | | | G.C. | OTHER |
| Modular Structure On-Site Placement | | | G.C. | OTHER | | | | G.C. | OTHER |
| Modular Structure On-Site Anchoring & Connection | | | G.C. | OTHER | | | | G.C. | OTHER |
| Modular Structure On-Site P.O.C. Connections | | | G.C. | OTHER | | | | G.C. | OTHER |
| Modular Structure On-Site Inter-Cube M.E.P. Conn. | | | G.C. | OTHER | | | | G.C. | OTHER |
| Modular Structure On-Site Commissioning / Fit-Out | | OWNER | | | | | OWNER | | |
| Temporary Forklifts | | | | | | | | | |
| Temporary Cranes | | | | | | | | | |
| Field Offices And Sheds for Modular Installer | | | | | N/A | | | | |
| Temporary Scaffolding And Platforms | | | G.C. | | | | | G.C. | |
| Temporary Fencing | | | G.C. | | | | | G.C. | |
| Temporary Erosion And Sediment Control | | | G.C. | | | | | G.C. | |
| Temporary Storm Water Pollution Control | | | G.C. | | | | | G.C. | |
| Execution And Closeout Requirements | XCC | | | | | XCC | | | |
| Protection Of Adjacent Construction | | | G.C. | | | | | G.C. | |
| - - - | | | | | | | | | |
| **DESCRIPTION** | **FURNISHED BY** | | | | | **INSTALLED BY** | | | |
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER |



| DESCRIPTION | FURNISHED BY | | | | | INSTALLED BY | | | |
|---|---|---|---|---|---|---|---|---|---|
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER |
| **DIVISION 02 - EXISTING CONDITIONS** | | | | | | | | | |
| Schedules For Existing Conditions | | OWNER | | | | | OWNER | | |
| Surveys | | OWNER | | | | | OWNER | | |
| Existing Conditions Assessment | | OWNER | | | | | OWNER | | |
| Hazardous Material Assessment | | OWNER | | | | | OWNER | | |
| Geotechnical Investigations | | OWNER | | | | | OWNER | | |
| Selective Site Demolition | | OWNER | G.C. | | | | OWNER | G.C. | |
| Structure Demolition | | OWNER | G.C. | | | | OWNER | G.C. | |
| Removal And Salvage Of Construction Materials | | OWNER | G.C. | | | | OWNER | G.C. | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 03 - CONCRETE** | | | | | | | | | |
| Cast-In-Place Concrete Base / Foundation | | | G.C. | | | | | G.C. | |
| Concrete Anchors | | | G.C. | | | | | G.C. | |
| Grouting | | | G.C. | | | | | G.C. | |
| Concrete Cutting And Boring | | | G.C. | | | | | G.C. | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 04 - MASONRY** | | | | | | | | | |
| Not Included | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 05 - METALS** | | | | | | | | | |
| Metal Fastenings | XCC | | | | | XCC | | | |
| Structural Framing - Heavy Moment, Special Moment, LGS | XCC | | | | | XCC | | | |
| Light Gauge Steel - Metal Framing | XCC | | | | | XCC | | | |
| Light Gauge Steel - Metal Joists | XCC | | | | | XCC | | | |
| Light Gauge Steel - Joists Framing | XCC | | | | | XCC | | | |
| Metal Fabrications | XCC | | | | | XCC | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 06 - WOOD, PLASTICS AND COMPOSITES** | | | | | | | | | |
| Sheathing | XCC | | | | | XCC | | | |
| Subflooring - Plywood, Cementitious, Gypsum | XCC | | | | | XCC | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 07 - THERMAL AND MOISTURE PROTECTION** | | | | | | | | | |
| Insulation - Walls | XCC | | | | | XCC | | | |
| Insulation - Floor Structure | XCC | | | | | XCC | | | |
| Insulation - Batt Insul. Inside Roof Structure | XCC | | | | | XCC | | | |
| Insulation - Tapered Rigid Insulation above Roof Substrate | | | G.C. | | | | | G.C. | |
| Roofing Material | | | G.C. | | | | | G.C. | |
| Sheet Metal Flashing And Trim | | | G.C. | | | | | G.C. | |
| Manufactured Gutters And Downspouts | | | G.C. | | | | | G.C. | |
| Firestopping | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |

| DESCRIPTION | FURNISHED BY | | | | | INSTALLED BY | | | |
|---|---|---|---|---|---|---|---|---|---|
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER |
| **DIVISION 08 - OPENINGS** | | | | | | | | | |
| Doors & Frames | XCC | | | | | XCC | | | |
| Specialty Doors & Frames | | | | | N/A | | | | |
| Access Doors & Frames | XCC | | | | | XCC | | | |
| Access Panels & Frames | XCC | | | | | XCC | | | |



| DESCRIPTION | FURNISHED BY | | | | | INSTALLED BY | | | |
|---|---|---|---|---|---|---|---|---|---|
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER |
| Windows | XCC | | | | | XCC | | | |
| Door Hardware | XCC | | | | | XCC | | | |
| Access Control - Raceway/Conduit | | | | | N/A | | | | |
| Access Control Hardware | | | | | N/A | | | | |
| Hardware Accessories | XCC | | | | | XCC | | | |
| Mirrors | | | | | N/A | | | | N/A |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 09 - FINISHES** | | | | | | | | | |
| Gypsum Board Assemblies | | | | | N/A | | | | |
| Gypsum Board Shaft Wall Assemblies | | | | | N/A | | | | |
| Gypsum Board Area Separation Wall Assemblies | | | | | N/A | | | | |
| Metal Furring | XCC | | | | | XCC | | | |
| Non-Structural Metal Framing | XCC | | | | | XCC | | | |
| Floor Tiling | XCC | | | | | XCC | | | |
| Acoustical Ceilings & Suspension Assemblies | XCC | | | | | XCC | | | |
| Specialty Ceilings | | | | | N/A | | | | |
| Acoustic Underlayment | | | | | N/A | | | | |
| Flooring Treatment | XCC | | | | | XCC | | | |
| Laminate Flooring | | | | | N/A | | | | |
| Resilient Flooring | | | | | N/A | | | | |
| Carpeting | | | | | N/A | | | | |
| Exterior Wall Finishes - Glass Tile | | | | | N/A | | | | |
| Wall Finishes - FRP | XCC | | | | | XCC | | | |
| Wall Coverings | | | | | N/A | | | | |
| Exterior Painting | | | | | N/A | | | | |
| Interior Painting | | | | | N/A | | | | |
| Interior Staining And Finishing | | | | | N/A | | | | |
| Textured Finishing | | | | | N/A | | | | |
| High-Performance Coatings | | | | | N/A | | | | |
| Special Coatings | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 10 - SPECIALTIES** | | | | | | | | | |
| Toilet Compartments / Partitions | | | | | N/A | | | | |
| Wall And Door Protection | | | | | N/A | | | | |
| Toilet Accessories | XCC | | | | | XCC | | | |
| Grab Bars | XCC | | | | | XCC | | | |
| Fire Protection Specialties | | | | | | | | | |
| Storage Specialties | | OWNER | G.C. | | | | OWNER | G.C. | |
| Awnings | XCC | | | | | | OWNER | G.C. | |
| Canopies | | | | | N/A | | | | N/A |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DESCRIPTION** | **FURNISHED BY** | | | | | **INSTALLED BY** | | | |
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER |
| **DIVISION 11 - EQUIPMENT** | | | | | | | | | |
| Commercial Equipment / Appliances | | OWNER | | | | | OWNER | | | |
| Residential Equipment / Appliances | | OWNER | | | | | OWNER | | | |
| A/V - Conduit/Raceways | XCC | | | | | XCC | | | |
| A/V Equipment & Cabling | | OWNER | G.C. | | | | OWNER | G.C. | |
| Security Equipment  - Conduit/Raceways | XCC | | | | | XCC | | | |
| Security Equipment / Cameras | | OWNER | G.C. | | | | OWNER | G.C. | |



| DESCRIPTION | FURNISHED BY | | | | | INSTALLED BY | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER | N/A |
| **DIVISION 12 - FURNISHINGS** | | | | | | | | | | |
| Window Treatments | | OWNER | G.C. | | | | OWNER | G.C. | | |
| Casework (Built-In), Countertops & Hardware | | OWNER | | | | | OWNER | | | |
| Furnishings And Accessories | | OWNER | | | | | OWNER | | | |
| Furniture | | OWNER | | | | | OWNER | | | |
| Other Furnishings | | OWNER | | | | | OWNER | | | |
| Site Furnishings - Bicycle Racks | | | | | N/A | | | | | |
| Site Furnishings - Trash And Litter Receptors | | | | | N/A | | | | | |
| Site Furnishings - Seating And Tables | | | | | N/A | | | | | |
| - - - | | | | | | | | | | |
| - - - | | | | | | | | | | |
| **DIVISION 13 - SPECIAL CONSTRUCTION** | | | | | | | | | | |
| Controlled Environment Rooms | | | | | N/A | | | | | |
| Security Vaults | | | | | N/A | | | | | |
| Special Structures | | | | | N/A | | | | | |
| Fabricated Engineered Structures | | | | | N/A | | | | | |
| Special Instrumentation | | | | | N/A | | | | | |
| - - - | | | | | | | | | | |
| - - - | | | | | | | | | | |
| **DIVISION 14 - CONVEYING EQUIPMENT** | | | | | | | | | | |
| Elevators | | | | | N/A | | | | | |
| Other Conveying Equipment | | | | | N/A | | | | | |
| - - - | | | | | | | | | | |
| - - - | | | | | | | | | | |
| **DIVISION 21 - FIRE SUPPRESSION** | | | | | | | | | | |
| Fire Suppression Standpipes / Riser | | | G.C. | | | | | G.C. | | |
| Fire Suppression Sprinkler System - In Cube | | | G.C. | | | | | G.C. | | |
| Fire Suppression Sprinkler System - Outside Cube | | | G.C. | | | | | G.C. | | |
| Fire Suppression System Connection to Cube | | | G.C. | | | | | G.C. | | |
| Fire Pumps | | | G.C. | | | | | G.C. | | |
| Fire Suppression Water Storage | | | G.C. | | | | | G.C. | | |
| - - - | | | | | | | | | | |
| - - - | | | | | | | | | | |
| **DIVISION 22 - PLUMBING** | | | | | | | | | | |
| Instrumentation And Control For Plumbing | | | | | N/A | | | | | N/A |
| Plumbing Piping - In Cube Only | XCC | | | | | XCC | | | | |
| Plumbing Equipment | XCC | | | | | XCC | | | | |
| Plumbing Fixtures | XCC | | | | | XCC | | | | |
| - - - | | | | | | | | | | |
| - - - | | | | | | | | | | |
| **DESCRIPTION** | **FURNISHED BY** | | | | | **INSTALLED BY** | | | | |
| | XCC | OWNER | G.C. | OTHER | N/A | XCC | OWNER | G.C. | OTHER | N/A |
| **DIVISION 23 - HVAC** | | | | | | | | | | |
| HVAC Units | XCC | | | | | XCC | OWNER | | | |
| HVAC Air Distribution | XCC | | | | | XCC | | | | |
| Hood | | OWNER | | | | XCC | | | | |
| - - - | | | | | | | | | | |
| **DIVISION 25 - INTEGRATED AUTOMATION** | | | | | | | | | | |
| Not Included | | | | | N/A | | | | | |
| - - - | | | | | | | | | | |
| - - - | | | | | | | | | | |



| DIVISION 26 - ELECTRICAL | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Electrical Power - In Cube Only | XCC | OWNER | | | | XCC | OWNER | | |
| Programmable Controllers | | | | | N/A | | | | |
| Lighting Control Devices | | | | | N/A | | | | |
| Central Dimming Controls | | | | | N/A | | | | |
| Network Lighting Controls | | | | | N/A | | | | |
| Low Voltage - Conduit & Raceways | XCC | | | | | XCC | | | |
| Low Voltage - Wiring | | | G.C. | | | | | G.C. | |
| Low Voltage - Terminations & Punch Downs | | | G.C. | | | | | G.C. | |
| Interior Lighting | XCC | | | | | XCC | | | |
| Emergency Lighting | XCC | | | | | XCC | | | |
| Exit Signs | XCC | | | | | XCC | | | |
| Special Purpose Lighting | | | | | N/A | | | | |
| Exterior Lighting | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 27 - COMMUNICATIONS** | | | | | | | | | |
| Audio-Video Communications | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 28 - ELECTRONIC SAFETY AND SECURITY** | | | | | | | | | |
| Not Included | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 31 - EARTHWORK** | | | | | | | | | |
| Sitework Not Included | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 32 - EXTERIOR IMPROVEMENTS** | | | | | | | | | |
| Sitework Not Included | | | | | N/A | | | | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |
| **DIVISION 33 - UTILITIES** | | | | | | | | | |
| Water - Point of Connection | | OWNER | G.C. | | | | OWNER | G.C. | |
| Sanitary Sewer - Point of Connection | | OWNER | G.C. | | | | OWNER | G.C. | |
| Natural Gas - Point of Connection | | OWNER | G.C. | | | | OWNER | G.C. | |
| Electric - Point of Connection | | OWNER | G.C. | | | | OWNER | G.C. | |
| Communications Utilities - Point of Connection | | OWNER | G.C. | | | | OWNER | G.C. | |
| - - - | | | | | | | | | |
| - - - | | | | | | | | | |

GENERAL TERMS AND CONDITIONS OF SALE

**1. Definitions.** (a) "Contract" means the Proposal, and these Terms and Conditions; (b) "XCC" means Xtreme Cubes Corporation, a Delaware corporation; (c) "Goods" means the products purchased by Purchaser as described in the Proposal; (d) "Proposal" means the written proposal governing the purchase of the Goods placed by Purchaser; (e) "Purchaser" means the person, firm, or company set forth in the Proposal that is purchasing the Goods; (f) "Purchase Price" means the total price for the purchase of the Goods as specified in the Proposal; and (g) "Terms and Conditions" means the General Terms and Conditions of Sale binding on the parties, and are set forth in the following numbered paragraphs.

**2. Acceptance.** XCC's manufacture and sale of the Goods to Purchaser is expressly made conditional on Purchaser's acceptance of the Terms and Conditions, which are in lieu of any additional or different terms contained in Purchaser's purchase order or other document or communication pertaining to Purchaser's order of the Goods.  Purchaser's assent to the Terms and Conditions herein shall be conclusively presumed from Purchaser's execution of the Proposal, acceptance of all or any part of the Goods, or payment by Purchaser to XCC for all or any part of the Goods, whichever occurs first.  None of these Terms and Conditions may be added to, modified, superseded, or otherwise altered, nor shall any other terms or conditions proposed by Purchaser, which is different from or in addition to the Terms and Conditions, shall bind XCC, and shall be of no legal force or effect, unless expressly agreed to a signed writing by XCC. Failure of XCC to object to any other terms or conditions which may be contained in any document or form of Purchaser shall not be construed as a waiver of these Terms and Conditions, nor as an acceptance of any such terms and conditions.

**3. Purchase Price/Payment.** Purchaser shall be responsible for payment of the Purchase Price and any other amounts due and owing to XCC in United States currency as set forth herein, along with the cost of freight, insurance, impounds, tariffs, duties, and sales, use, excise, or any other taxes or assessments levied by any federal, state, municipal, or other governmental authority. Purchaser shall pay XCC the Purchase Price, and all other amounts due to XCC in accordance with the payment terms as described and set forth in the Proposal, or as otherwise agreed to in writing by XCC.  **ALL AMOUNTS PAID TO XCC ARE NON-REFUNDABLE.**

**4. Notice to Ship.** Upon completion of the manufacture of the Goods or a respective phase of the Goods, XCC shall notify Purchaser (the "Notice to Ship") that the Goods or a respective phase of Goods are ready to ship.  Unless otherwise agreed to in writing by XCC, within ten (10) calendar days following the Notice to Ship, Purchaser shall pay XCC the Purchase Price in full, and any other amounts due and owing to XCC in full. If Purchaser fails to pay such amounts in full to XCC, Purchaser shall not be obligated to ship the Goods in accordance with Section 5 herein until payment in full has been made. Additionally, Purchaser shall be responsible for all storage expenses and other costs incurred by XCC at the Default Rate set forth in Section 8 herein until payment in full has been made.  **FOR THE AVOIDANCE OF DOUBT, XCC SHALL NOT BE OBLIGATED TO SHIP ANY GOODS OR ANY RESPECTIVE PHASE OF THE GOODS UNTIL THE PURCHASE PRICE FOR SUCH GOODS, AND ANY OTHER AMOUNTS DUE TO XCC, ARE PAID IN FULL.**

**5. Shipment Terms.** Except as otherwise provided in the Proposal, and following payment in full of all amounts due to XCC, shipments of Goods or a respective phase of Goods shall be at Purchaser's expense and F.O.B. XCC's manufacturing or warehouse facilities.  Title and risk of loss or damage shall pass from XCC to Purchaser upon XCC's delivery of Goods to the carrier specified by XCC. XCC is not responsible for any expense associated with the shipment of Goods, including, but not limited to, loading of Goods onto carrier's conveyance or delay of shipment thereafter, freight, or any other charge associated with early shipment or the return of over shipments by Purchaser.

**6. Warranty.** XCC warrants that new Goods manufactured by it hereunder will be free of defects in material and workmanship for the periods of time specified in the warranties of XCC for such Goods applicable as of the time the Goods have shipped, which are incorporated herein by reference. Accessories or equipment furnished by XCC, but manufactured by others, shall carry whatever warranty the manufacturers have conveyed to XCC, and which can be passed on to Purchaser. **XCC MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR USE, AND XCC EXPRESSLY DISCLAIMS THE SAME, UNLESS SPECIFICALLY SET FORTH HEREIN.**  Correction by XCC of nonconformities, whether patent or latent, within the applicable warranty period shall constitute fulfillment of all liabilities of XCC for such nonconformities, whether based on contract, warranty, negligence, indemnity, strict liability or otherwise with respect to such Goods.

**7. Compliance with Laws.** Purchaser shall, at all times, comply with all federal, state, and local laws, rules and regulations. Purchaser shall furnish any information required to enable XCC to comply with such laws, rules and regulations, or otherwise confirm compliance with such laws, rules and regulations.

**8. Default.** If Purchaser fails to perform or breaches any obligation, XCC may terminate, in part or whole, any part of this Proposal, unless Purchaser resolves the breach within five (5) calendar days after receipt of XCC's notification of Purchaser's breach. In the event Purchaser fails to pay any amount as and when stated herein or in the Proposal, the balance of the Purchase Price, along with any other amounts due to XCC, including, but not limited to storage expenses incurred by XCC, shall immediately become due and owing and shall accrue interest thereon at the rate of eighteen percent (18%) per annum  (the "Default Rate") until paid in full.  In the event that XCC terminates this Proposal in whole or in part as provided herein, Purchaser shall reimburse XCC upon demand for all actual damages suffered as result of such breach, including,

but not limited to, attorney's fees and costs. The rights and remedies granted to XCC pursuant to this Proposal are in addition to, and shall not limit or affect, any other rights or remedies available to XCC.

**9. Assignment.** Purchaser may not assign this Proposal without the express written consent of XCC, provided, however, that XCC may assign this Proposal to its successors, as well as to any entity or corporation now or hereafter owned or affiliated with XCC.

**10. Change Orders.** XCC shall have no obligation to make any modifications, additions, or changes to the specifications set forth in the Proposal for Modular Building Structure Goods, unless and until XCC completes and execute a change order in a form acceptable to XCC.

**11. Indemnity.** To the maximum extent allowed by law, Purchaser shall defend, hold harmless, and indemnify XCC, its officer, directors, employees and agents, affiliates and subsidiaries, against all sums, costs, liabilities, losses, obligations, suits, actions, damages, penalties, fines, interest and other expenses (including investigation expenses and attorneys' fees) that XCC may incur or be obligated to pay, **INCLUDING BUT NOT LIMITED TO LOSSES CAUSED IN PART BY THE ACTIVE OR PASSIVE NEGLIGENCE OR FAULT OF XCC, ITS OFFICERS, AGENTS AND EMPLOYEES,** as a result of (i) Purchaser's acts or omissions, use, ownership, maintenance, transfer, transportation or disposal of the Goods, or anyone for whom Purchaser is responsible; (ii) if manufactured to Purchaser's specifications, any infringement or alleged infringement of the industrial and intellectual property rights of others arising from Purchaser's plans, specifications (including Purchaser's trademarks and brand names) or production of the Goods ordered by Purchaser; or (iii) Purchaser's violation or alleged violation of any federal, state, county or local laws or regulation, including without limitation, the laws and regulations governing  product safety and labor practices.

**12. Governing Law.**  This Contract shall be construed and enforced in accordance with the laws of Nevada, excluding it conflicts of laws provisions.  Purchaser agrees that any action related to the Contract or subject matter thereof shall be brought and maintained only in the State and/or Federal Courts located in Clark County, Nevada.

**13. Insurance.** Purchaser shall maintain, at its expense, a comprehensive general liability insurance policy covering claims of bodily injury, including dealing with property damage that may arise out of use of the Goods or acts or omission of Purchaser under this Proposal.  Such policy or policies shall provide a coverage minimum of $2,000,000 USD per occurrence. Upon written request by XCC, Purchaser shall promptly supply XCC with certificates of insurance of such policies naming XCC as an additional insured.

**14. Intellectual Property.**  The XCC name and logo, and all related product and service names, design marks and slogans are the trademarks of XCC. All intellectual property rights are expressly reserved herein, and Purchaser shall not in any manner whatsoever infringe on any copyright, trademark, service mark, trade secrets, logo, patent, or other intellectual property rights of XCC without the prior written consent of XCC.

**15. Limitations of Liability. THE REMEDIES OF PURCHASER SET FORTH HEREIN ARE EXCLUSIVE, AND THE TOTAL LIABILITY OF XCC WITH RESPECT TO THIS CONTRACT OR THE GOODS FURNISHED HEREUNDER, WHETHER BASED ON CONTRACT, WARRANTY, NEGLIGENCE, INDEMNITY, STRICT LIABILITY OR OTHERWISE, SHALL NOT EXCEED THE PURCHASE PRICE OF THE GOODS UPON WHICH SUCH LIABILITY IS BASED. XCC SHALL IN NO EVENT BE LIABLE TO PURCHASER, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE OF THIS CONTRACT FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS CONTRACT OR ANY BREACH THEREOF, OR ANY DEFECT IN, OR FAILURE OF, OR MALFUNCTION OF THE GOODS HEREUNDER, WHETHER BASED UPON LOSS OF USE, LOST PROFITS OR REVENUE, INTEREST, LOST GOODWILL, WORK STOPPAGE, IMPAIRMENT OF OTHER GOODS, LOSS BY REASON OF SHUTDOWN OR NON-OPERATION, INCREASED EXPENSES OF OPERATION, COST OF PURCHASE OF REPLACEMENT POWER OR CLAIMS OF PURCHASER OR CUSTOMERS OF PURCHASER FOR SERVICE INTERRUPTION, WHETHER OR NOT SUCH LOSS OR DAMAGE IS BASED ON CONTRACT, WARRANTY, NEGLIGENCE, INDEMNITY, STRICT LIABILITY OR OTHERWISE.**

**16. Miscellaneous.**  Any waiver, or purported or implied waiver, by XCC of the Contract shall not be deemed to be a waiver unless it is in a writing signed by an authorized officer of XCC.  Any such waiver shall not prejudice the rights of XCC in respect of any breach of Purchaser which is not specifically set forth in such waiver. The invalidity, illegality or unenforceability of any provision of the Contract shall not affect the validity, legality, or enforceability of any other provision of the Contract, which shall remain in full force and effect.  The Contract contains the entire understanding between XCC and Purchaser and supersedes all prior understandings and agreements in respect of the subject matter stated herein.  The Contract may not be modified or amended unless agreed to in a writing signed by the parties.  XCC shall not liable for any failure or delay on its part in performing its obligations under the Contract if such failure or delay is due to "Force Majeure" conditions in whole or in part, including, but not limited to, strikes, governmental restrictions and controls, wars, riots, fire, floods, earthquakes, and other acts of God. The Contract shall not create and is not intended to create any relationship between the parties other than supplier and purchaser.  Any notice required or permitted to be given hereunder shall be in writing and delivered to the addresses set forth in the Proposal.

**Additional Warranty Terms and Conditions Applicable to Modular Building Structures Only**

**Products Warranted**

This Limited Warranty applies to new modular building structures ("Product(s)") manufactured by Xtreme Cubes Corporation ("XCC").

**Warranty Period**

XCC warrants that new Product(s) will be free of defects in material and workmanship under normal use and service (the "Limited Warranty") for a period of one (1) year after the date of delivery of the Product(s) (the "Warranty Period") to the original customer of the new Product(s) (the "Customer"). XCC does not warrant any equipment, materials, parts, or other components that are not manufactured by XCC, except to the extent of the warranty that XCC may receive from the manufacturer of such items. If assignable, XCC hereby assigns all manufacturers' warranties for such other equipment, materials, parts, or other components that are not manufactured by XCC, which shall be subject to the specific manufacturer's warranty provisions and time periods. This Limited Warranty is not transferable.

**Coverage**

During the Warranty Period, the Customer shall promptly notify XCC in writing if the Product(s) fail to comply with the Limited Warranty, which notification must be made within 24 hours of identification of the alleged defect, and which notification shall describe the alleged defect in sufficient detail to permit XCC to isolate the alleged defect. Following said notice, XCC shall test the Product(s) in order to isolate any malfunctions and/or defects in the Product(s). If XCC determines that the Product(s) contains malfunctions due to defects in workmanship, then Customer's sole and exclusive remedy will be for XCC, at XCC's discretion, to correct, repair, or replace the nonconforming or defective Product(s) that is/are covered under the Limited Warranty. Xtreme Cubes shall cover the cost of labor to the extent reasonably necessary to repair or replace the nonconforming or defective Product(s) that is/are covered under this Limited Warranty. The remedies set forth in this paragraph are exclusive and correction by XCC of Product(s) non- conformities in the manner provided above shall constitute fulfillment of all liabilities and obligations of XCC.

**Customer Responsibilities**

The Customer is responsible for proper inspection, installation, maintenance, use and operation of the Product(s), including, but not limited to, accompanying fixtures, devices, plugs, equipment, power supply, winterization, and cleaning the interior/exterior of the Product(s). The Customer shall also be responsible to store defective material as to not cause further damage, and prepare the defective material or Product(s) for shipment at XCC's instructions and direction. If requested by XCC, Product(s) and/or parts for which a warranty claim is made are to be returned to XCC.

**Labor Reimbursement Policy**

All Warranty labor and travel allowance must be approved in advance, in writing, by Xtreme Cubes prior to any work being performed.

**Disclaimer**

XCC's obligation under this Limited Warranty is expressly limited to the conditions as stated above and shall not include duty, taxes, or any other charges whatsoever, or any liability for direct, indirect, incidental, or consequential damage or delay. **THE WARRANTIES CONTAINED HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, AND XCC HEREBY DISCLAIMS ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE. ADDITIONALLY, XCC HEREBY DISCLAIMS ANY OF ITS OBLIGATIONS OR LIABILITIES ARISING FROM STATUTE, WARRANTY, CONTRACT, TORT, OR NEGLIGENCE. THIS LIMITED WARRANTY IS EFFECTIVE FOR ONE (1) YEAR FROM THE DELIVERY DATE THEREOF. XCC MAKES NO WARRANTIES, EXPRESS OR IMPLIED, OTHER THAN EXPRESSED HEREIN, AND SHALL NOT BE LIABLE FOR ANY DIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF USE WHICH CUSTOMER MAY SUFFER, EXCEPT AS**

**MAY OTHERWISE BE REQUIRED BY LAW. XCC SHALL NOT BE RESPONSIBLE FOR DEFECTS DUE TO FIRE, FLOOD, FAULTY ELECTRICAL CURRENTS, ACTS OF WAR AND TERRORISM, OR ANY OTHER FACT OR CIRCUMSTANCE OUTSIDE XCC'S CONTROL.** No employee or representative is authorized to change this Limited Warranty in any way or grant any other warranty, unless such change is made in writing and signed by an officer of Xtreme Cubes Corporation.

**Exclusion / Warranty Does Not Cover / Warranty is Void**

This Limited Warranty does not apply to: (i) any first articles, prototypes, pre-production units, test units of a Product(s); (ii) any Product(s) which have been repaired by Customer or a third party; (iii) any Product(s) which have been altered or modified in any way by Customer or third party; or (iv) any Product(s) which have been subject to insufficient maintenance, improper operation, misuse, abnormal and/or excessive use, accident, or neglect.

This Limited Warranty shall not apply to general maintenance services (including but not limited to equipment services and adjustments, proper drainage, cleaning, winterizing, etc.) or to general maintenance parts (including, but not limited, to HVAC filters, fluids, lubricants, light bulbs, devices, etc.). In addition, this Limited Warranty shall not apply to acts of God (hail, storms, earthquakes, floods, etc.) or equipment, materials, parts, or other components not manufactured by XCC, including but not limited to mechanical, plumbing, or electrical components (e.g., fixtures, devices, equipment).

XCC and Customer expressly agree that upon termination of the Warranty Period, the Product(s) carry no warranty whatsoever.

**Applicable Law**

This Limited Warranty shall be governed by and interpreted in accordance with the laws of the State of Nevada and is applicable to contracts made and to be performed in Nevada.

**Inspections and Warranty Registration Procedure**

The Customer Acceptance form and a Warranty Claim form will be included with the Product(s) shipped from XCC's manufacturing facilities. A PDF copy of Customer Acceptance and Warranty Claim forms are available upon request. Upon delivery, the Customer is advised to complete a thorough inspection to ensure that the Product(s) has/have arrived in satisfactory condition and notify XCC of any defects within ten (10) days of installation completion.

**Warranty Claim Procedure**

A Warranty Claim form will be shipped with new Product(s) and will be available in PDF format from XCC.

To initiate a warranty claim:

**A.)** Completely fill out the Warranty Claim form and submit to XCC via email to cubecontact@xtremecubes.com within 24 hours of discovering the defect.

**B.)** All defective parts must be kept and fully protected from further damage until a determination is made by XCC (See Return Material Authorization Procedure).

**Return Material Authorization (RMA) Procedure**

XCC shall make any and all final decisions on warranty claimed material and provide a Return Material Authorization (RMA) Number to the claimant. XCC will specify the type of transportation regarding freight and carrier for all returns. Replacement parts will be billed at list price and credited when the defective component has been returned and a determination has been made in favor of the claimant by XCC. XCC may from time to time specify other parts, or components to be returned for analysis, problem solving, and cost recovery from suppliers. All replacement parts will be shipped standard freight. Overnight freight will be accommodated at the claimant's request and expense. All items are subject to be returned to XCC.

To return items for warranty:

**A.)** Obtain a returned goods authorization (RMA) number from XCC.

**B.)** All material for return must have a return material authorization (RMA) number on all packaging and documents.

**C.)** Contact XCC when returning material is properly packaged, secured, and ready for pickup.

# Exhibit E
# Miller Declaration

Xtreme Cubes Corporation

8350 Eastgate Road
Henderson, NV 89015



# Invoice

| Date | Invoice # |
|------|-----------|
| 7/19/2023 | 2896 |

**PAID 07/20/2023**

| Bill To | Ship To |
|---------|---------|
| KONALA COEUR D'ALENE ID - 23069<br>1423 W APPLEWAY AVE<br>COEUR D'ALENE, ID 83814<br>USA | KONALA COEUIR D'ALENE<br>1423 W APPLEWAY AVE<br>COEUR D'ALENE, ID 83814 |

| Proposal Number | Terms | Rep | | Via | F.O.B. | S.O. No. |
|---|---|---|---|---|---|---|
| | Due on receipt | | | | | |

| Description | Quantity | Price Each | Amount |
|-------------|----------|------------|--------|
| DESIGN AND ENGINEERING | 1 | 11,500.00 | 11,500.00 |
| STATE INSPECTIONS | | 7,110.00 | 7,110.00 |

| | |
|---|---|
| **Subtotal** | $18,610.00 |
| **Sales Tax (6.0%)** | $0.00 |
| **Total** | $18,610.00 |
| **Payments/Credits** | -$18,610.00 |
| **Balance Due** | $0.00 |

Make checks payable to: XTREME CUBES CORPORATION
WIRE & ACH Transfers: BANK OF NEVADA (Western Alliance)
Routing: 122105980 / Acct: 8924678810     Swift PLEASE ASK IF NEEDED

# Exhibit F
# Miller Declaration

08/25/2023   WIRE TYPE:WIRE OUT DATE:230825 TIME:0417
ET TRN:2023082400522534 SERVICE...       -10,000.00

**Edit Description**

**Type:**                    Withdrawal
**Description:**             WIRE TYPE:WIRE OUT DATE:230825 TIME:0417 ET
                            TRN:2023082400522534 SERVICE REF:003221 BNF:SVN
                            CORNERSTONE ID:1001556206 BNF BK:WASHINGTO N TRUST
                            BANK ID:125100089 PMT DET:452570794
**Merchant name:** ?         SVN CORNERSTONE   Edit
**Merchant information:**
**Transaction category:** ?  Savings & Transfers: Savings   Edit

Print transaction details

08/25/2023   DoorDash, Inc. DES:703 N Spok ID:ST                              559.29

# Exhibit G
# Miller Declaration

INBE Capital LLC
ATTENTION: Craig Boddington
30 N Gould Street,
Sheridan, Wyoming, 82801

Re:   Konala

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated   Jul 31 2023

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER:

By: _____          8 Dec 2023

Name:   Trace Miller

Title:   CEO , Konala


By:

Name:

Title:


SUBSCRIBED AND SWORN TO BEFORE ME on this day: 12/8/2023

NOTARY PUBLIC _Kathy Blanchard_

In and for the State of _Idaho_

My Commission Expires: 7/1/2024



INBE CAPITAL



**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

INBE Capital LLC
Attn: Craig Boddington
30 N Gould Street
Sheridan, Wyoming 82801

9590 9402 7171 1251 0483 40

2. Article Number *(Transfer from service label)*

9589 0710 5270 0967 3891 60

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X                        ☑ Agent
                          ☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery
WYCO                                    12/11/23

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053        Domestic Return Receipt

## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

Sheridan, WY 82801          OFFICIAL USE

Certified Mail Fee  $4.35
                                              0854
                                                07
Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)      $ $7.55
☐ Return Receipt (electronic)    $ $0.00
☐ Certified Mail Restricted Delivery $ $0.00     Postmark
☐ Adult Signature Required       $ $0.00         Here
☐ Adult Signature Restricted Delivery $ $0.00

Postage  $0.66
                                              12/08/2023
Total Postage and Fees  $8.56

Sent To  INBE Capital LLC, Attn: Craig Boddington
Street and Apt. No., or PO Box No.  30 N Gould Street
City, State, ZIP+4®  Sheridan, WY 82801

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

9589 0710 5270 0967 3891 60

# Exhibit H
# Miller Declaration

DocuSign Envelope ID: CABA3B41-CE0A-4F95-B93A-3C21F6A3FB4D

**HUNTON, LLC FROM THE BUNKER BAR (FOOD BUNKER)**
**CLOSING STATEMENT**
**702 N. SPOKANE ST., POST FALLS, ID 83854**

BUYER: HUNTON, LLC                    SELLER: THE FOOD BUNKER

|  | **BUYER** | | **SELLER** | |
| --- | --- | --- | --- | --- |
|  | Charges | Credits | Charges | Credits |
| Purchase/Sale Price |  |  |  | $500,000.00 |
| Business | $500,000.00 |  |  |  |
| Equip & Inventory | $150,000.00 |  |  | $150,000.00 |
| Liquor License | $100,000.00 |  |  | $100,000.00 |
| **SUBTOTAL PURCHASE PRICE** | **$750,000.00** |  |  | **$750,000.00** |
| Earnest Money |  | $20,000.00 |  |  |
| Seller Promissory Note |  | $150,000.00 | $150,000.00 |  |
| Attorney's Fees | $1,250.00 |  | $1,250.00 |  |
| Edoc/Wire/Doc Prep | $100.00 |  | $100.00 |  |
| UCC Fees |  |  | $200.00 |  |
| Broker Fee |  |  | $11,250.00 |  |
| Set-up Escrow Fees | $55.00 |  | $55.00 |  |
| Idaho Sales Taxes | $9,000.00 |  |  |  |
| **SUBTOTAL CHARGES** | **$760,405.00** | **$170,000.00** | **$162,855.00** | **$750,000.00** |
| **Due From Buyer** | **$590,405.00** |  |  |  |
| **Sub total Due to Seller** |  |  | **$587,145.00** |  |
| **Less to Joe Barnes** |  |  | **$325,000.00** |  |
| **Due To Seller** |  |  | **$262,145.00** |  |

The undersigned have read, approved and acknowledged receipt of a copy of this Closing Statement. This Closing Statement is subject to audit and should there be any errors or omissions, they shall be corrected.

**BUYER:**                                  **SELLER:**
**HUNTON, LLC**                          **FOOD BUNKER, LLC**

_Trace Miller_

_____        _____
By: BRENT LEE TOPIE, Manager         By: TRACE MILLER, Manager

H:\Clients\Hunton, LLC\Closing Stmt-Business-loan FINAL.docx

1

# Konala LLC
# Profit and Loss
### January - February, 2024

|  | Total |
|---|---:|
| **Income** | |
| **Sales** | 167,867.08 |
| **Sales - Door Dash** | 16,504.52 |
| **Total Sales** | **$ 184,371.60** |
| **Total Income** | **$ 184,371.60** |
| **Cost of Goods Sold** | |
| **Food Purchases** | 48,845.73 |
| **Payroll Expenses** | |
| **Taxes** | 3,567.83 |
| **Wages** | 38,803.41 |
| **Total Payroll Expenses** | **$ 42,371.24** |
| **Total Cost of Goods Sold** | **$ 91,216.97** |
| **Gross Profit** | **$ 93,154.63** |
| **Expenses** | |
| **Advertising & Promotion** | 1,510.67 |
| **Bank Service Charges** | 10.00 |
| **Credit Card Processing Fees** | 4,946.21 |
| **ID Sales Tax Paid** | 12,746.99 |
| **Legal & Professional Fees** | 2,515.00 |
| **Reimbursements** | 1,800.00 |
| **Restaurant Supplies** | 13,944.34 |
| **Utilities** | 2,271.03 |
| **Total Expenses** | **$ 39,744.24** |
| **Net Income** | **$ 53,410.39** |

Tuesday, Oct 15, 2024 02:57:55 PM GMT-7 - Accrual Basis

# Konala LLC
## Profit and Loss
## March- August 2024

|  | TOTAL | % of Gross Sales |
|---|---|---|
| Income |  |  |
| Sales | $829,665.69 | 91.49% |
| Sales – Third Party Delivery | $77,204.01 | 8.51% |
| **Total Gross Sales** | **$906,869.70** | 100.00% |
| Cost of Goods Sold |  |  |
| Food Purchases | $276,305.16 | 30.47% |
| **Total Cost of Goods Sold** | **$276,305.16** | 30.47% |
| Payroll Expenses |  |  |
| Taxes | $12,292.67 | 1.36% |
| Wages | $133,622.38 | 14.73% |
| **Total Payroll Expenses** | **$145,915.05** | 16.09% |
| **Prime Cost** | **$422,220.21** | 46.56% |
| **Prime Margin** | **$484,649.49** | 53.44% |
| Expenses |  |  |
| Bank Service Charges | $20.00 | 0.01% |
| Computer and Internet Expenses | $3,581.00 | 0.39% |
| Credit Card Processing Fees | $24,607.76 | 2.71% |
| Insurance | $2,471.79 | 0.27% |
| Repairs and Maintenance | $5,741.23 | 0.63% |
| Legal & Professional Fees | $5,715.00 | 0.63% |
| Restaurant Supplies | $54,865.62 | 6.05% |
| Shipping | $375.18 | 0.04% |
| Utilities | $6,842.95 | 0.75% |
| **Total Expenses** | **$104,220.53** | 11.49% |
| **Rent** | **$57,000.00** | 6.29% |
| **Net Income** | **$323,428.96** | 35.66% |