Julie E. Kenworthy (9536)
Qiwei Chen (18333)
**KIRTON MCCONKIE**
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893
jkenworthy@kmclaw.com

Jennifer Schrack Dempsey (ID Bar No. 7603)
~~Alyson Foster (14877)~~
DEMPSEY FOSTER PLLC
714 West State Street
Boise, ID 83702
Telephone: (208) 401-9533
Email: jen~~alyson~~@dempseyfoster.com

*Attorney for Plaintiff Konala LLC*

Field Code Changed

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| KONALA, LLC, an Idaho limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MESSNER REEVES LLP, a Colorado limited liability partnership; and INBE CAPITAL LLC, a Wyoming limited liability company,<br><br>Defendants. | **~~FIRST~~ SECOND AMENDED COMPLAINT**<br><br>**JURY DEMANDED**<br><br>Case No.: 2:24-cv-00195-HCN<br><br>District Judge Howard C. Nielson, Jr. |

Plaintiff Konala LLC ("Konala") brings this action against Defendants Messner Reeves LLP ("Messner") and INBE Capital LLC ("INBE"), stating as follows:

**PARTIES**

1. Plaintiff Konala LLC is an Idaho limited liability company with a principal place of business in Post Falls, Idaho. At the time of the filing of the original complaint and at the present time, Konala LLC's sole member, Trace Miller, resides in, is domiciled in, and is a citizen of the state of Idaho.

2. Based on publicly available information, including but not limited to, Messner's website https://messner.com/ and the business social media platform LinkedIn, Plaintiff alleges the following with respect to the citizenship of the partners of Defendant Messner, on information and belief:

a. Defendant Messner is a Colorado limited liability partnership of 129 attorneys but that, on information and belief, in certain circumstances serves as a trustee, escrow holder, and/or agent rather than as attorneys. Messner has offices in Costa Mesa, California; San Jose, California; Reno, Nevada; Las Vegas, Nevada; Phoenix, Arizona; Salt Lake City, Utah; Denver, Colorado; Greenwood Village, Colorado; Colorado Springs, Colorado, and New York City, New York.

b. Messner's Salt Lake City, Utah office is located at 65 East Wadsworth Park Drive, Suite 110, Draper, Utah. Three Messner partners are licensed to practice in Utah and do practice out of the Salt Lake City, Utah office. Upon information and belief two of those partners, Andrew R. Welch and Torben M. Welch, reside in, are domiciled in, and are citizens of the state of Utah.

i. None of Messner's partners reside in, are domiciled in, or are citizens of the state of Idaho but are instead residents, domiciliaries, and citizens of California, Nevada, Arizona, Utah, Colorado, and/or New York. The

partners of Messner at the time of the original complaint and currently are as follows:

1. Caleb Meyer, CEO. His listed locations of practice are Denver, Colorado, Greenwood Village, Colorado, and Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the State of Colorado.
2. Michelle L. Harden, COO & Managing Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the State of Colorado.
3. Renne M. Finch, CSO and Partner. Her listed location of practice is Las Vegas, Nevada. Upon information and belief, she is a citizen and domiciliary of the State of Nevada.
4. David A. Reeves, Managing Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
5. Benjamin Tietgen, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.
6. Darren D. Alberti, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
7. Kate A. Bailey, Partner. Her listed location of practice is Denver, Colorado, Greenwood Village, Colorado and Salt Lake City, Utah.

Upon information and belief, she is a citizen and domiciliary of either the state of Colorado or the State of Utah.

8. Brenda L. Bartels, Partner. Her listed location of practice is Colorado Springs, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

9. Alex Beltz, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

10. Amber L. Blasingame, Partner. Her listed location of practice is Colorado Springs, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

11. Brett A. Boon, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

12. Valerie D. Bromley, Partner, whose listed location of practice is Greenwood Village, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

13. Edgar Carranza, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

14. Kathleen Carter, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

15. Cynthia T. Carucci, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.
16. Charles C. Cavanagh, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
17. Laura Chartrand, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
18. Gregory B. Cohen, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
19. Kimberley P. Cronin, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
20. Isaac S. Crum, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.
21. Erica M. Deatherage, Partner. Her listed location of practice is Phoenix, Arizona. Upon information and belief, she is a citizen and domiciliary of the state of Arizona.

22. Matthew J. Deenihan, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
23. Allison Dodd, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
24. Brieanna M. Dolmage, Partner, whose listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.
25. Patrick G. Drake, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
26. R.J. Ertmer, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
27. Rachel Farr, Partner. Her listed location of practice is Denver, Colorado  Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
28. Mary Bryne Fletcher, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

29. Austin J. Gemmell, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
30. Matthew W. George, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
31. Deanna Gilbertson, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
32. Margaret K. Gray, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
33. Scott Hawranek, Partner. His listed location of practice is Colorado Springs, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
34. Andrew S. Hollins, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
35. Amy E. Huff, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

36. Craig a. Humphrey, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
37. Matt M. Jedrzejek, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
38. Maclain Joyce, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
39. Idin Kashefipour, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
40. Dara Keller, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
41. Daniel J. Klett, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.
42. Steven G. Knauss, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.

43. Marjorie E. Kratsas, Partner. Her listed location of practice is Las Vegas and Reno, Nevada. Upon information and belief, she is a citizen and domiciliary of the state of Nevada.
44. Jason G. Martinez, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.
45. Bryant Messner, Partner. His listed location of practice is Denver, Colorao.Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
46. Ian R. Mitchell, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
47. Scott Monroe, Partner. His listed location of practice is Costa Mesa, California.. Upon information and belief, he is a citizen and domiciliary of the state of California.
48. Simone M. Montoya, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
49. Bruce A. Montoya, Partner. His listed location of practice is Denver and Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

50. Kathleen J. Mowry, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
51. Christina Mundy, Partner. Her listed location of practice is Las Vegas, Nevada. Upon information and belief, she is a citizen and domiciliary of the state of Nevada.
52. Ann A.P. Nguyen, Partner. Her listed location of practice is San Jose, California. Upon information and belief, she is a citizen and domiciliary of the state of California.
53. Katherine Otto, Partner. Her listed location of practice is Denver, Colorado and New York, New York. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
54. Jonathan B. Owens, Partner. His listed location of practice is Las Vegas, Nevada. Upon information and belief, he is a citizen and domiciliary of the state of Nevada.
55. Julian Pardo de Zela, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
56. Frank J. Perretta, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

57. Peter W. Pierce, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
58. William D. Randall, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
59. Richard Reice, Partner. His listed location of practice is New York, New York. Upon information and belief, he is a citizen and domiciliary of the state of New York.
60. Adam M. Royval, Partner. His listed location of practice is Denver, Colorado and Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
61. Heather A. Salg, Partner. Her listed location of practice is Greenwood Village, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
62. Edwin N. Schwartz, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.
63. Mikhail A. Shah, Partner. His listed location of practice is New York, New York. Upon information and belief, he is a citizen and domiciliary of the state of New York.

64. Greg Sitrick, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.

65. Rowan P. Smith, Partner. His listed location of practice is Phoenix, Arizona. Upon information and belief, he is a citizen and domiciliary of the state of Arizona.

66. Aaron N. Soleimani, Partner. His listed location of practice is Costa Mesa, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

67. Heather E. Stern, Partner. Her listed location of practice is Costa Mesa, California. Upon information and belief, she is a citizen and domiciliary of the state of California.

68. John H. Stevens, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

69. Deanne R. Stodden, Partner. Her listed location of practice is Denver, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.

70. Matthew R. Sullivan, Partner. His listed location of practice is Greenwood Village, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.

71. Jenny L. Thornton, Partner. Her listed location of practice is Greenwood Village, Colorado. Upon information and belief, she is a citizen and domiciliary of the state of Colorado.
72. Wade Warthen, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
73. Andrew R. Welch, Partner. His listed location of practice is Salt Lake City, Utah. Upon information and belief, he is a citizen and domiciliary of the state of Utah.
74. Torben M. Welch, Partner. His listed location of practice is Salt Lake City, Utah. Upon information and belief, he is a citizen and domiciliary of the state of Utah.
75. Karie N. Wilson, Partner. Her listed location of practice is Las Vegas, Nevada. Upon information and belief, she is a citizen and domiciliary of the state of Nevada.
76. Douglas C. Wolanske, Partner. His listed location of practice is Denver, Colorado. Upon information and belief, he is a citizen and domiciliary of the state of Colorado.
77. Jon B. Zimmerman, Partner. His listed location of practice is San Jose, California. Upon information and belief, he is a citizen and domiciliary of the state of California.

3. Based on publicly available information, including but not limited to, the Wyoming Secretary of State, INBE's website (https://theinbegroup.com/), and the business social

media platform LinkedIn, Plaintiff alleges the following with respect to the citizenship of Defendant INBE, on information and belief:

a. INBE is a Wyoming limited liability company with a principal place of business at 30 N. Gould Street, Sheridan, Wyoming.

b. At the time of the original complaint and currently, the Members of INBE were as follows:

i. Craig Boddington, who is domiciled in and is a citizen of the State of Florida.

ii. Jonathan Wright, who is domiciled in and is a citizen of the State of Virginia.

**JURISDICTION AND VENUE**

4. Defendant Messner is subject to general personal jurisdiction in Utah because Messner's contacts with this forum state, including the practice of law in Utah and operation of a Draper, Utah law office, are continuous and pervasive such that it is fair to subject Messner to personal jurisdiction in Utah for all purposes.

5. Defendant INBE is subject to specific personal jurisdiction in Utah because, on information and belief, INBE purposefully availed itself of the forum state's benefits and this controversy is related to or arises out of INBE's contacts with the forum state as it relates to its relationship with and actions involving Messner, and the exercise of personal jurisdiction over INBE would comport with fair play and substantial justice.

6. Diversity jurisdiction exists under 28 U.S.C. § 1332(a).

a. The parties are citizens of different states.

b. As outlined in detail above, Plaintiff is an LLC with a single member, who resides in, is domiciled in, and is a citizen of the state of Idaho. As a limited liability company's citizenship is determined, for purposes of diversity jurisdiction, by the citizenship of all its members, the Plaintiff is therefore a citizen of the State of Idaho.

c. As outlined above, Messner is a limited liability partnership with partners who, detailed above upon information and belief, are residents, domiciliaries, and citizens of either California, Nevada, Arizona, Utah, Colorado, or New York., As a limited liability partnership's citizenship is determined, for purposes of diversity jurisdiction, by the citizenship of all its partners, Defendant Messner is therefore a citizen of California, Nevada, Arizona, Utah, Colorado, and New York.

d. As outlined above, INBE is a limited liability company located and organized in Wyoming. As detailed above upon information and belief, the members of INBE are residents, domiciliaries, and citizens of Florida and Virgina. As a limited liability company's citizenship is determined, for purposes of diversity jurisdiction, by the citizenship of all its members, Defendants INBE is therefore a citizen of Florida and Virginia.

e. Thus, the parties' citizenship is diverse under 28 U.S.C. § 1332(a)(1).

f. The amount in controversy exceeds $75,000.00.

7. Venue is appropriate in this court under 18 U.S.C. § 1391 because one of the attorneys involved in the underlying facts resides and practices in Utah and performed services in Utah that led to the claims in this case; and because one of the defendants is a resident and citizen of Utah doing business in Utah.

**FACTUAL ALLEGATIONS**

8. Plaintiff is a quick service restaurant (QSR) that offers healthy food through a convenient drive through-only model.

9. Defendant Messner is a law firm with 129 attorneys with 20 practice groups in 11 offices, including a Utah office that offers banking and financial services from its Utah office. On information and belief, Messner also acts as a trustee, escrow holder, and/or agent, not an attorney, in certain financial transactions wherein it is retained as a neutral third party whoto receives and disbursetributes fundsmonies between two parties in a non-legal transaction in accordance with the terms of an agreement outside of a traditional attorney client relationship, and did so at all relevant times herein. On information and belief, Messner used a paymaster account for these transactions instead of a traditional Interest on Lawyer's Trust Account (IOLTA) because it was not acting inas an attorney capacity and therefore did was not apply required to comply with the attorney rules of professional conduct and other applicable ethical obligations rules that governapply to the attorney-client relationship.

10. Defendants INBE are a venture capital lender and investor.

11. In anticipation of the significant growth in the healthy QSR industry, Konala franchised its business model. In 2023, Konala was seeking funding to facilitate its franchising opportunities and support its growth.

12. INBE offered Konala its business expansion line of credit ("BELOC") to open a new location.

13. On July 31, 2023, Konala and INBE entered into the BELOC Agreement, a true and correct copy of which is attached hereto as Exhibit A (the "Agreement"). As generally reflected in the Agreement, INBE agreed to provide Konala a business line of credit for the total amount of one million three hundred thousand dollars ($1,300,000.00), payable in three separate

tranches over the course of two hundred and ten (210) days: the first tranche was payable in ninety (90) days; the second tranche was payable sixty (60) days thereafter; and the third tranche was payable sixty (60) days after the second tranche. The Agreement refers to these tranche disbursements as "Advances."

14. Pursuant to Exhibit C of the Agreement, the BELOC was secured by the assets of Konala.

15. INBE expressly "represented and warranted" its ability to fund the BELOC per Section 10.12 of the Agreement, entitled "Lender's Ability to Fund": "Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC [line of credit] in the full amount of the Maximum Amount."

16. INBE also confirmed that it "covenants and agrees that it shall fully and timely fund" the BELOC.

17. In Exhibit F to the Agreement, INBE stated that Konala should expect regular communication with INBE and ongoing open access to its appointed INBE representatives.

18. Prior to receipt of the Advances, and pursuant to Section 3.6 and Exhibit F of the Agreement, Konala agreed to deposit three hundred thousand and twenty-five dollars ($325,000.00) ("the ICA Payment") withto INBE or one of its "nominated administrative agents for aggregation before being forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging the issuance of a Loan (Line of Credit)." Ex. A (Exhibit F) Exhibit F also directed the ICA Payment to be made's interest credit account ("ICA") bythrough wire transfer to thea financial account ofheld by Messner, identified as i.e., "Messner Reeves LLP – COLTAF Paymaster." (COLTAF refers to the Colorado Lawyer Trust Account Foundation, which administers Colorado's Interest on Lawyers' Trust Accounts (IOLTA) program.) Exhibit F

contained Messner's bank account information at Northern Trust Company, with a specific account number, and referred to the account as an "Escrow Account." *Id.* ~~and confirmed that the ICA Payment was to be in "Trustee [Messner]'s sole possession and control." Such funds were not to be collateralized in any manner with any funds other than the ICA Payment.~~

19. On information and belief, Messner was acting in one or more of three roles, and not ~~as attorneys~~in its capacity as legal counsel—in connection with ~~, related to~~ this transaction:

a. Messner was the "nominated Trustee (Attorney)" appointed by INBE "for the purpose of arranging for the issuance of a Loan (Line of Credit)" ~~who~~and received Konala's ICA Payment from INBE or INBE's nominated agent. ~~to receive and hold the ICA Payment.~~

b. Alternatively, or in addition to, Messner agreed to, consented to, approved, and ratified an escrow agreement with INBE, and undertook the duties and responsibilities of an escrow holder for the Escrow Account, either as INBE's "nominated administrative agent" or in some other capacity through its COLTAF Paymaster account.

~~a.~~c. Alternatively, or in addition to, Messner was acting as an agent of INBE, again either as INBE's "nominated administrative agent" or in some other capacity through its COLTAF Paymaster account.

20. Upon information and belief, in any one or all of these capacities, Messner was obligated to hold the ICA Payment in its "sole possession and control" and was not permitted to collateralize the ICA Payment "in any manner." *Id.* Messner was further required to return the ICA Payment "per [Messner's] contractual obligations with" INBE. *Id.*

19.21. On information and belief, bBy accepting INBE's nomination as Trustee pursuant to Exhibit F of the BELOC, and/or by accepting the ICA Payment into its account, Messner became aassumed fiduciary with duties and responsibilities to Konala as a third party beneficiary of the contract between INBE and Messner for Messner governing Messner's trustee and/or escrow servicesan escrow holder.

20. Messner agreed to, consented to, approved, and ratified the escrow agreement, as applied to Plaintiff as discussed herein, and Messner undertook the duties and responsibilities of an escrow holder.

22. On information and belief, asA Trustee and/or escrow holder, s an agent to both INBE and Konala, Messner owedhad a fiduciary duty to exercise reasonable skill and ordinary diligence in holding and disbursing funds receivedwhich came into its hands by virtue of its rolestatus under the BELOC Agreement and as Trustee and/or escrow holder and pursuant to its contractual arrangements with INBEagent.

23. On information and belief, Konala was a third party beneficiary of the contract(s) between Messner and INBE, whether those contracts took the form ofdesignated Messner serving as Trustee, or escrow holder, or both. The terms of the contract(s) between INBE and Messner, including Exhibit F, reflect demonstrate anthe intention of INBE and Messner to "arrange for the issuance of a Loan (Line of Credit)" (Exhibit F) for the benefit of Konala, and to hold the ICA payment in such a manner such that it the ICA Payment would be returned to Konala in the event that the BELOC failed to did not fund.

21.24. On information and belief, and alternatively, Messner acted as was an agent of INBE, withhose scope of authority to hold the ICA Payment pursuant to the BELOC Agreement and to return the ICA Payment if the n the event the BELOC did not fund.

~~22.~~25. ~~A termination provision in~~ Section 13.7 of the BELOC Agreement contains a termination provision allowinged Konala to terminate the Agreement in the event ~~should~~ INBE failed to make the Advances. Upon termination, ~~at which point~~ INBE—or, on information and belief, Messner, acting as ~~the~~ Trustee, escrow holder, and/or agent—was requiredould to refund the ICA Payment in full ~~its entirety~~ and release all security interests granted by Konala to INBE.

~~23.~~26. Exhibit F to the Agreement likewise provided that if INBE was unable to fund the Advances under the Agreement, INBE contractually agreed to reimburse Konala the amount of the ICA Payment. Under Exhibit F, INBE was to use its best efforts, including legal efforts, to recover the ICA Payment should Messner fail to return the ICA Payment. However, Exhibit F further provided that should Messner fail to return the ICA Payment, INBE was to itself reimburse the full amount of the ICA Payment to Konala within 90 days.

~~24.~~27. Konala moved forward with plans to expand its franchise and open a new location, relying on the Agreement and INBE's promise to provide the BELOC.

~~25.~~28. On August 1, 2023, pursuant to an electronic communication received from INBE during the underwriting process, Konala directed its ICA Payment be wired to Messner, acting asas INBE's Trustee, escrow holder, and/or agent, in accordance with~~pursuant to~~ Section 3.6 and Exhibit F of the Agreement. On August 3, 2023, INBE confirmed receipt of Konala's ICA Payment.

~~26.~~29. Over the course of the following months, Konala met all other conditions precedent required by the Agreement to receive INBE's disbursement of the first Advance. Thus, according to Section 7.1 of the Agreement, INBE was obligated to pay the first Advance to Konala on or around November 1, 2023.

~~27.~~30. In reliance on the Agreement and INBE's promises, Konala prepared to launch another location for its franchise. Among other things, Konala engaged architects, contractors, and other professionals to start the construction phase of its business expansion. Konala expended significant sums as it moved forward with the franchise launch. Konala anticipated this new location would generate revenue streams in excess of one-million dollars ($1,000,000) per year, similar to the revenue generation at its other locations.

~~28.~~31. Notwithstanding its contractual obligations and promises, INBE never made the first Advance, or any other Advances, to Konala as required by the Agreement.

~~29.~~32. INBE never responded to Konala's repeated requests for information or otherwise responded in any way to Konala's several attempts to communicate or correspond with it and has not communicated with Konala since at least November 1, 2023.

~~30.~~33. On information and belief, at the time INBE made promises to Konala and entered the Agreement with Konala, INBE did not have—and still does not have—the financial ability or wherewithal to fund any part, much less the entire amount, of Konala's line of credit as required by Section 10.12 of the Agreement. Yet INBE made representations and warranties to Konala that INBE did have the financial ability to fund the BELOC; Konala did not know, and had no reason to believe, that INBE actually lacked such financial wherewithal.

~~31.~~34. Contrary to its representations in Exhibit F, INBE~~O~~ has failed to provide Konala with regular communication with INBE and ongoing open access to its appointed INBE representatives.

~~32.~~35. Due to INBE's breaches and ongoing silence, and to hedge against any further loss, Konala had no choice but to terminate the Agreement. On December 8, 2023, Konala delivered to INBE written notice of termination in the form and manner required by Section 13.7

and Exhibit E of the Agreement. INBE received the notarized termination letter on December 11, 2023.

~~33.~~36. Pursuant to the termination clause of Section 13.7, INBE had ninety (90) calendar days from the date of receipt within which to return the ICA Payment to Konala. ~~Likewise~~Additionally, under Exhibit F, INBE was obligated ~~had ninety (90) calendar days~~ to reimburse the full amount of the ICA Payment within ninety (90) calendar days to Konala if Messner failed to return the ICA Payment ~~to Konala~~ pursuant to Messner's agreement(s) with INBE and the duties it owed Konala.~~was unwilling or unable to return the funds.~~

~~34.~~37. INBE or Messner thus had until March 10, 2024, to return the ICA Payment or otherwise reimburse the full amount of the ICA Payment and for INBE to release any security interests. As of the date of the filing of this Complaint, the ICA Payment has not been returned by either INBE or Messner and INBE has failed to release its security interests in the property of Konala.

~~35.~~38. On February 15, 2024, Konala made demand upon Messner for return of the ICA Payment that it was holding as Trustee, escrow holder, or agent. When Messner failed to respond, Konala continued to ask Messner for the return. Messner still has not responded to the demand or additional communications by Konala and has not returned the ICA Payment.

~~36.~~39. On information and belief, because Messner has failed to ~~not~~ return~~ed~~ the ICA Payment as required by Exhibit F, it has breached its fiduciary duties owed to Konala as Trustee and/or escrow holder under its agreement(s) with INBE or, alternatively, has acted outside the scope of its authority as an agent of INBE.~~is not being held in Messner's sole possession and control as represented and required. Rather, on information and belief, Messner transferred the~~



4915-2823-1753.v1

~~ICA payment to another, unknown party and the ICA Payment has been improperly comingled with other funds.~~

~~37.~~40. Because of INBE's and Messner's breaches and failures, Konala was unable to open its planned new franchise location, has lost significant profits, and has incurred significant expenses.

~~38.~~41. Messner and INBE continue in their failure to return Plaintiff's $325,000 in escrow which Messner received ~~seven~~ months ago.

~~39.~~42. Messner and INBE are in default.

~~40.~~43. Exhibit A (Promissory Note) of the Agreement provides that if "[Konala] or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between [Konala] and [INBE], then this Note shall be in default," for which the Default Rate of Interest is 24%. Further, "[u]ntil cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed."

~~41.~~44. Messner and INBE owe Plaintiff's attorney fees. The Agreement contains a fee shifting provision, which is bilaterally applied.

~~42.~~45. Plaintiff has been forced to engage counsel and has agreed to pay them reasonable attorney fees.

**COUNT ONE – BREACH OF CONTRACT**
**(Against INBE)**

~~43.~~46. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

~~44.~~47. A valid and binding contract between Plaintiff and INBE exists as set forth in the Business Expansion Line of Credit Agreement and its Exhibits, dated July 31, 2023.

~~45.~~48. Plaintiff fulfilled all conditions precedent for the funding of the BELOC, including making the ICA Payment to Messner.

~~46.~~49. INBE failed to fund the BELOC, contrary to its agreement to do so and its warranties and representations that it has the financial ability and wherewithal to do so.

~~47.~~50. Because INBE did not fund the BELOC and because Plaintiff delivered a Termination in the form and manner required by the Agreement, the Agreement required INBE to effectuate the return of the $325,000 ICA Payment to Plaintiff, to release all security interests by March 10, 2024, and to terminate any obligations that Plaintiff may owe.

~~48.~~51. Moreover, INBE pledged that "in the event [INBE] is unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days."

~~49.~~52. INBE has failed to effectuate the return of the ICA Payment, whether from Messner or through its own means.

~~50.~~53. INBE pledged that it would provide regular communication with Konala and ongoing open access to Konala's appointed INBE representatives.

~~51.~~54. INBE has failed to communicate with Konala since at least November 1, 2023.

~~52.~~55. Plaintiff has performed all its contractual obligations.

~~53.~~56. All conditions precedent occurred or have been waived.

~~54.~~57. INBE breached the contract by failing to fund the BELOC.

~~55.~~58. INBE breached the contract by failing to communicate with Konala.

~~56.~~59. INBE breached the contract by failing to effectuate the return of the $325,000 ICA Payment within 90 days of its failure to fund the BELOC and/or within 90 days of the termination of the contract by Plaintiff for INBE's failure to fund the BELOC and/or after Messner's failure to return the ICA Payment.

~~57.~~60. INBE breached the contract by failing to release all security interests within 90 days of the termination of the contract by Plaintiff for INBE's failure to fund the BELOC and to terminate any and all obligations that may be owed by Plaintiff under the BELOC.

~~58.~~61. INBE's breach of contract caused the damages Plaintiff sustained.

~~59.~~62. Plaintiff has sustained damages of $325,000.

~~60.~~63. Plaintiff has also sustained incidental and consequential damages.

~~61.~~64. Plaintiff is entitled to recover costs and prejudgment interest.

~~62.~~65. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

~~63.~~66. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-826, which allows fee and cost-shifting to a prevailing party in an action based upon written contract when the contract allows at least one party to recover attorney fees. Exhibit A of the Agreement includes a provision which allows for the recovery of attorney fees for INBE to enforce the terms of, among other things, the BELOC.

**COUNT TWO – BREACH OF CONTRACT**
**(Against Messner as Trustee, Escrow Holder, and/or Agent)**

~~64.~~67. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

68. A Vvalid and binding contract(s) exist between INBEPlaintiff and Messner exists whereby Messner is Trustee, an escrow holder and/or agent whose primary purpose is to ensure the ICA Payment is properly handled for the benefit of Konala.and Messner is obligated to comply with the instructions of the parties privy to the escrow agreement.

69. On information and belief, INBE and Messner intended to confer a direct benefit upon Konala at the time they entered into these valid and binding contract(s), as reflected, in part, in Exhibit F to the BELOC Agreement. Thus, Konala is an intended third party beneficiary of these contract(s).

70. On information and belief, as Trustee and/or escrow holder, as set forth in Paragraphs 9 and 18 through 23 above, Messner was obligated to comply with its contractual arrangementsduties to and contract(s) with INBE as it pertains to the holding, possessing, disbursing, or returning Konala's ICA Payment.

71. On information and belief, Messner failed did notto hold, manage, disbursepossess, distribute, or return Konala's ICA Payment as required by its contract(s) with INBE, as its role as Trustee and/or escrow holder.

65.72. Alternatively, on information and belief, in its capacity as an agent of INBE, Messner acted without authority, or in excess of itsthe authority, in a manner of INBE, acted in such a way as thatto rendered INBE inaccessible or unresponsiveirresponsible, or otherwise acted in bad faith.

66. An escrow holder's failure to comply with the escrow agreement renders the escrow holder liable to the parties for breach of contract.

67. Upon the escrow holder's breach of an instruction that it has contracted to perform or an implied promise arising out of the agreement, the injured party acquires a cause of action for breach of contract.

68. Messner was required to hold Plaintiff's $325,000 as INBE's "Nominated Trustee (Attorney)."

69. The Agreement specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $325,000 ICA Payment was to be held in its "sole possession and control."

70. Pursuant to the Agreement, Messner was required to disburse the funds in a number of specific ways, including to return the funds to Plaintiff should INBE be unable to fund the Advances.

71.73. Plaintiff has performed all its contractual obligations, and all conditions precedent to INBE and Messner's performance have occurred or have been waived.

72.74. On information and belief, because Messner's failure to properly did not hold, manage, disbursepossess, distribute, or return Konala's ICA Payment, as required under its role as Trustee and/or escrow holder, constitutes Messner breached of its or otherwise failed to perform its contractual obligations with INBE.the contract by failing to hold Plaintiff's $325,000 ICA Payment it is sole possession and control. Instead of holding Plaintiff's $325,000 ICA Payment in its sole possession and control, on information and belief, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

Messner breached the contract by failing to return Plaintiff's $325,000 ICA Payment to Plaintiff upon INBE's failure to fund the Advances and/or following Plaintiff's notice of termination under the Agreement.

~~73.~~75. Messner's breach of its contractual obligations and agreements with INBE directly ~~contract~~ caused the damages sustained by ~~the third party beneficiarythe~~ Plaintiff, as an intended third-party beneficiary ~~sustained~~.

~~74.~~76. Plaintiff has sustained damages of $325,000.

~~75.~~77. Plaintiff has also sustained incidental and consequential damages.

~~76.~~78. Plaintiff is entitled to recover costs and prejudgment interest.

~~77.~~79. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

~~78.~~80. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-826, which allows fee and cost-shifting to a prevailing party in an action based upon written contract when the contract allows at least one party to recover attorney fees. Exhibit A of the Agreement includes a provision which allows for the recovery of attorney fees for INBE to enforce the terms of, among other things, the BELOC. Further, on information and belief, the contract(s) between Messner and INBE include a provision which allows for the recovery of attorney fees to enforce the terms of the contract(s).

~~79.~~81. Plaintiff is also entitled to attorney fees incurred in pursuing its claims against the other Defendant, INBE, as consequential damages because it is reasonably foreseeable that Messner's breach of contract would cause Plaintiff to incur attorney fees through litigation with INBE.

**COUNT THREE – NEGLIGENCE**
**(Against Messner as Trustee, Escrow Holder, and/or Agent)**

~~80.~~82. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

83. As a Trustee, escrow holder, and/or agent as set forth in Exhibit F to the BELOC Agreement, and by because of its acceptingance of Konala's ICA Payment into its Paymaster account, Messner undertook certain duties to Konala to properly and appropriately hold, manage, disburse, possess, distribute, orand return Konala's ICA Payment to Konala.

84. Messner breached those duties by when it actinged outside the scope of its agreement and relationship with INBE, and by failinged to exercise act with the care and skill that a person of ordinary prudence would exercise under similar circumstances. in holding, possessing, distributing, or returning Konala's ICA Payment.

85. Messner further breached its duties to Konala when it acted outside the scope of its agreement and relationship with INBE and failed to hold, managepossess, disbursetribute, or return Konala's ICA Payment when INBE failed to did not fund the Advances and Plaintiff provided notice of termination under the BELOC Agreement.

81. Escrow occurs when any express or implied agreement provides for one or more parties to deliver or entrust any money to another person, to be held, paid, or delivered in accordance with the terms and conditions prescribed in the agreement.

82. An escrow agent assumes the role of the agent to both parties to the transaction, and as such, is a fiduciary held to a high standard of care in dealing with its principals. This fiduciary duty requires the escrow agent to act for the benefit of the principals on all matters within the scope of their relationship, owing the duties of good faith, loyalty, due care, and disclosure.

83. All assets or property received by an escrow agent in accordance with an escrow agreement shall be maintained in a manner which will reasonably preserve and protect the

property from loss, theft, or damage, and which will otherwise comply with all duties and responsibilities of a fiduciary.

84. Konala directed its ICA Payment be deposited into escrow with Messner as the Agreement required. By accepting the money, Messner assumed a fiduciary duty to Konala to hold the ICA Payment and release it upon the conditions outlined in the Agreement.

85. As an escrow agent, Messner had a duty to exercise reasonable skill and ordinary diligence in disbursing funds which came into its hands by virtue of its status as escrow agent.

86. If the escrow holder negligently breaches its duty of care pursuant to the escrow agreement, the escrow holder is liable for any foreseeable loss arising from its negligence.

87. Messner was required to hold Plaintiff's $325,000 as INBE's "Nominated Trustee (Attorney)."

88. The Agreement specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $325,000 ICA Payment was to be held in its "sole possession and control."

89. Pursuant to the Agreement, Messner was required to disburse the funds in a number of specific ways, including returning the funds to Plaintiff should INBE be unable to fund the Advances and/or in the event Plaintiff provided notice of termination under the Agreement.

90. Messner negligently breached its duty of care by failing to hold Plaintiff's $325,000 ICA Payment it is sole possession and control. Instead of holding Plaintiff's $325,000 ICA Payment in its sole possession and control, On information and belief, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

Formatted: Indent: Left: 0.5", No bullets or numbering

~~91. Messner negligently breached its duty of care by failing to disburse the funds in the manner required by the Agreement, in particular, by failing to return Plaintiff's $325,000 ICA Payment to Plaintiff upon INBE's failure to fund the Advances and/or following Plaintiff's notice of termination under the Agreement.~~

~~92.~~86. Loss of Plaintiff's money was a foreseeable result of Messner's negligence.

~~93.~~87. Messner's negligence caused the damages the Plaintiff sustained.

~~94.~~88. Plaintiff has sustained damages of $325,000.

~~95.~~89. Plaintiff has also sustained incidental and consequential damages.

~~96.~~90. Plaintiff is entitled to recover costs and prejudgment interest.

~~97.~~91. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

~~98.~~92. Plaintiff is also entitled to attorney fees incurred in pursuing its claims against the other Defendant, INBE, as consequential damages because it is reasonably foreseeable that Messner's breach of contract would cause Plaintiff to incur attorney fees through litigation with INBE.

**COUNT FOUR – BREACH OF FIDUCIARY DUTY**
**(Against Messner as Escrow Holder)**

~~99.~~93. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

~~100.~~94. Escrow occurs when any express or implied agreement provides for one or more parties to deliver or entrust any money to another person, to be held, paid, or delivered in accordance with the terms and conditions prescribed in the agreement.

~~101.~~95. An escrow agent assumes the role of the agent to both parties to the transaction, and as such, is a fiduciary held to a high standard of care in dealing with its principals. ~~This fiduciary duty requires the escrow agent to act for the benefit of the principals on all matters within the scope of their relationship, owing the duties of good faith, loyalty, due care, and disclosure.~~

~~102.~~96. All assets or property received by an escrow agent in accordance with an escrow agreement shall be maintained in a manner which will reasonably preserve and protect the property from loss, theft, or damage, and which will otherwise comply with all duties and responsibilities of a fiduciary.

~~103.~~97. Exhibit F to the BELOC Agreement directed Konala to deposit ~~directed~~ its ICA Payment ~~be deposited~~ into an escrow account with Messner as the ~~Agreement required. By accepting the money, Messner became an~~ escrow holder~~, attorney, and trustee~~ with a fiduciary relationship to Konala.

~~104. Messner knowingly assumed a fiduciary duty to Konala to hold the ICA Payment and release it upon the conditions outlined in the Agreement.~~

~~105. Pursuant to this fiduciary relationship, Messner was bound by fiduciary duties of good faith, loyalty, due care, and disclosure.~~

~~As a fiduciary, Messner is precluded from taking advantage of its acts relating to the interest of the Plaintiff without the Plaintiff's knowledge and consent.~~

~~106.~~98. As an escrow holder~~agent~~, Messner is held to a high standard of care to Konala and had a duty to exercise reasonable skill and ordinary diligence in disbursing funds which came into its hands by virtue of its status as escrow agent.

~~107. The Agreement specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $325,000 ICA Payment was to be held in its "sole possession and control."~~

~~108. Messner had a fiduciary duty of care to ensure that it adhered to the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."~~

~~109. Messner also had a fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."~~

~~Messner was required to hold Plaintiff's $325,000 as INBE's "Nominated Trustee (Attorney)."~~

~~110.~~99. Pursuant to the Agreement, Messner was required to disburse the funds in a number of specific ways, including returning the funds to Plaintiff should INBE be unable to fund the Advances.

~~111.~~100. Messner had a fiduciary duty to adhere to the instructions of the Agreement to return the funds to Plaintiff should INBE be unable to fund the Advances.

~~112.~~101. Messner also had a fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to return the funds to Plaintiff should INBE be unable to fund the Advances.

~~113.~~102. On information and belief, Messner had an interest in the transaction, and therefore, Messner was obligated to disclose that interest to Plaintiff before becoming an escrow agent for the parties.

~~114. Messner violated its fiduciary duty by failing to adhere to the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."~~

~~115. Messner violated its fiduciary duty by failing to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."~~

~~116.~~103. Messner violated its fiduciary duty by failing to adhere to the instructions of the BELOC Agreement and abide by its high standard of care to Plaintiff to return the funds to Plaintiff should INBE be unable to fund the Advances.

~~117.~~104. Messner violated its fiduciary duty by failing to disclose to Plaintiff if Messner intended to deviate from the instruction or its high standard of care to return the funds to Plaintiff should INBE be unable to fund the Advances.

~~118.~~105. On information and belief, Messner violated its fiduciary duty by failing to disclose that it had an interest in the transaction.

~~119.~~106. Messner's ~~violation of its~~ fiduciary duties arose from its status as an escrow holder, the duties created by the BELOC Agreement, and the duties created by its contractual agreement(s) with INBE and is an independent tort.

~~120.~~107. As a result of Messner's breaches of its fiduciary duties, Plaintiff sustained damages.

~~121.~~108. Plaintiff has sustained damages of $325,000.

~~122.~~109. Plaintiff has also sustained incidental and consequential damages.

~~123.~~110. Plaintiff is entitled to recover costs and prejudgment interest.

~~124.~~111. Plaintiff is entitled to recover attorneys' fees pursuant Utah Code § 78B-5-825.

112. Plaintiff is entitled to recover attorneys' fees because "breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally," including a fiduciary duty tort claim arising from a contractual duty.

**COUNT FIVE – BREACH OF FIDUCIARY DUTY**
**(Against Messner as Trustee)**

113. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

~~125.~~114. Pursuant to one or more ~~the agreement or~~ agreements with INBE, Messner was the nominated ~~Trustee~~ and accepted theits role of ~~as the nominated~~ Trustee with respect to Konala's ICA Payment.

~~126.~~115. As the nominated Trustee, Messner owed fiduciary duties to Konala, who was the intended ~~was a~~ beneficiary of the BELOC Agreement.~~to whom Messner, as the nominated Trustee, owed fiduciary duties.~~

~~127.~~116. ~~As the nominated Trustee,~~ Messner had a fiduciary duty to hold Konala's ICA Payment for the purpose of arranging the issuance of the BELOC for the benefit of Konala.

~~128.~~117. Messner had a fiduciary duty to retain ~~ensure that it held~~ Konala's ICA Payment in its "sole possession and control."

~~129.~~118. Messner also had a fiduciary duty to disclose to Konala any ~~if Messner~~ intentionsded to deviate from its obligation ~~the instruction~~ to "hold" Konala's ICA Payment ~~for the purpose of arranging the issuance of the BELOC for the benefit of Konala and in Messner's~~ in its "sole possession and control~~.~~" or from its role in arranging the issuance of the BELOC.

~~130.~~119. Pursuant to the BELOC Agreement, Messner was required to hold, managepossess, disburse, ~~tribute,~~ or return Konala's ICA Payment in accordance with ~~a number~~

of specific instructionsways, including to return Konala's ICA Payment in the event INBE faileddid not to fund the Advances.

131.120. Messner had a fiduciary duty to complyadhere with to the instructions of the BELOC Agreement and its obligation to contract(s) with INBE to return the funds to Plaintiff in the event INBE did not fund the Advances.

132.121. Messner also had a fiduciary duty to disclose to Plaintiff any intentions to if Messner intended to deviate from the obligationsinstruction to return the funds to Plaintiff's ICA Payment under those circumstances in the event INBE did not fund the Advances.

122. Messner breached its fiduciary duties by:

i. failing to hold Konala's ICA Payment for the purpose of arranging the issuance of the BELOC for the benefit of Konala;

ii. failing to hold Konala's ICA Payment in its "sole possession and control;"

iii. failing to disclose to Konala if Messner intendedany intention to deviate from its obligation duty to hold Konala's ICA Payment for the intended purpose of arranging the issuance of the BELOC for the benefit of Konala;

iv. failing to disclose to Konala any if Messner intentionded to relinquish deviate from its duty to hold Konala's ICA Payment in its "sole possession and control;" of Konala's ICA Payment;

v. failing to adhere to the instructions of the BELOC Agreement to return Konala's ICA Payment to Konala after in the event INBE failed to did not fund the Advances, in violation of the BELOC Agreement; and,

i.vi. failing to disclose to Plaintiff any if Messner intention ded to deviate from the obligationinstruction to return Konala's ICA Payment to Konala if in the event INBE did not fund the Advances

133.123. As a direct and proximate result of Messner's breaches of its fiduciary duties, Plaintiff sustained damages.

134.124. Plaintiff has sustained damages in the amount of $325,000.

135.125. Plaintiff has also sustainedincurred incidental and consequential damages as a result of Messner's conduct.

136.126. Plaintiff is entitled to recover costs and prejudgment interest.

137.127. Plaintiff is entitled to recover attorneys' fees pursuant Utah Code § 78B-5-825.

138.128. Plaintiff is entitled to recover attorneys' fees because "breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally," including a fiduciary duty tort claim arising from a contractual duty.

**COUNT SIXFIVE – ACTION FOR RESTITUTION BASED ON QUASI-CONTRACT AND UNJUST ENRICHMENT**
**(Against both Defendants)**

139.129. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

140.130. This claim is pleaded in the alternative to the Breach of Contract claims pleaded against the Defendants.

141.131. Plaintiff conferred benefits on Defendants INBE and Messner and Defendants had knowledge of those benefits. The benefits included, but were not limited to, the use, arrogation, and usurpation of Plaintiff's ICA Payment$325,000.

~~142.~~132. Defendants voluntarily appreciated, accepted, and retained the benefits.

~~143.~~133. The circumstances are such that it would be unjust for Defendants to retain the benefits at the expense of Plaintiff without paying the value thereof to Plaintiff.

~~144.~~134. Plaintiff can recover in quasi-contract for restitution based on Defendants' unjust enrichment.

~~145.~~135. The purpose of a quasi-contract claim is to restore Plaintiff, the aggrieved party, to its former position through the return of the wrongfully obtained property or equivalent in money.

~~146.~~136. The unjust enrichment which Defendants obtained should be returned to Plaintiff.

~~147.~~137. As a result of Defendants' unjust enrichment, Plaintiff sustained damages of $325,000, among other damages as may recoverable.

~~148.~~138. Plaintiff is entitled to recover costs and prejudgment interest.

~~149.~~139. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

**COUNT SEVEN~~SIX~~ – RECISSION**
**(Against both Defendants)**

~~150.~~140. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

~~151.~~141. This claim is pleaded in the alternative and is a claim for recission of any and all contractual agreements between Plaintiff and Defendants and a refund of all money, property, and value that Plaintiff conferred to Defendants.

~~152.~~142. Any contractual agreements between Plaintiff and Defendants are subject to recission due to Defendants' failure to fulfill their obligations.

~~153.~~143. Defendant INBE materially breached the contract by failing to fulfill its obligations to timely fund the BELOC and by failing to refund the ICA Payment when proper notice was provided by Plaintiff.

~~154.~~144. Defendant Messner materially breached the contract by failing to discharge its obligations as the nominated Trustee, ~~an~~ escrow holder, and/or agent (i) by failing to hold the ICA Payment for the purpose of arranging the issuance of the BELOC for the benefit of Konala; (ii) by failing to return the $325,000 ICA Payment upon INBE's failure to fund the Advances~~BELOC~~; and (iii) by failing to maintain the funds in its "sole possession and control."

~~155.~~145. Plaintiff therefore seeks to restore the status quo by the return of its $325,000 ICA Payment, plus interest, which is being wrongfully retained by Defendants, and to recover additional damages that would not have been incurred but for Defendants' breaches and failures.

~~156.~~146. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

~~157.~~147. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-826, which allows fee and cost-shifting to a prevailing party in an action based upon written contract when the contract allows at least one party to recover attorney fees. Exhibit A of the Agreement includes a provision which allows for the recovery of attorney fees for INBE to enforce the terms of, among other things, the BELOC.

**COUNT EIGHTSEVEN – CONSUMER PROTECTION**
**Utah Code § 13-11-1 to § 13-11-23**
**(Against both Defendants)**

158.148. Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

159.149. The Agreement constituted a consumer transaction, as it was an agreement for the transfer of intangible property in the form of money, for a purpose that related to a business opportunity that required an expenditure of money by Konala.

160.150. Defendants were suppliers, as they are entities who regularly solicit and engage in such consumer transactions.

161.151. Defendant INBE committed deceptive acts in connection with a consumer transaction by knowingly and/or intentionally mispresenting and warranting its ability to fund the Advances; by, after receipt of the ICA Payment, failing to furnish the service of funding the Advances within the time represented and required by the Agreement; and, by failing to return and instead keeping the ICA Payment after Plaintiff provided proper notice.

162.152. Defendant Messner committed deceptive acts in connection with a consumer transaction by knowingly and/or intentionally, after receipt of Konala's ICA Payment and after INBE was unable to fund the Advances, failing to fulfill its duties as a nominated Trustee, an escrow holder, and/or agent by refunding Konala's ICA Payment within the time represented and required by the Agreement; by failing to hold Konala's ICA Payment for the purpose of arranging the issuance of the BELOC for the benefit of Konala; and by failing to hold the ICA Payment within its "sole possession and control."

163.153. Defendants knew or had reason to know that the deceptive acts were unconscionable under circumstances which Defendants knew or had reason to know.

~~164.~~154. In particular, Defendant INBE knew or had reason to know that, in reliance upon its representations that INBE was financially able to and would in fact fund the Advances, Konala would pay the ICA Payment to Messner, engage architects, contractors, and other professionals to start the construction phase of its business expansion, and otherwise expended significant sums as it moved forward with its franchise launch.

~~165.~~155. Defendant Messner knew or had reason to know that failing to hold the ICA Payment for the purpose of arranging the issuance of the BELOC for the benefit of Konala, failing to hold the ICA Payment within its sole possession and control, and failing to refund Konala's ICA Payment upon INBE's inability to fund the Advances and notice by Konala to terminate could cause Konala's ICA Payment to be lost and unavailable for return.

~~166.~~156. As a result of these unconscionable and deceptive acts, Plaintiff has suffered actual damages in the amount of the lost $325,000 ICA Payment as well as incidental and consequential damages.

~~167.~~157. These losses were caused by the unconscionable and deceptive acts of Defendants.

~~168.~~158. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

~~169.~~159. Plaintiff is entitled to recover attorneys' fees under Utah Code § 13-11-19(5).

## ATTORNEYS' FEES

~~170.~~160. Plaintiff seeks an award of attorney's fees under Utah Code §§ 78B-5-825, 78B-5-826, 13-11-19(5), other applicable law, including as set forth in each specific count, as well as pursuant to Federal Rule of Civil Procedure 54. Moreover, Plaintiffs' counsel affirms that they will not share any legal fee, as to any count, in violation of Utah Rule of Professional Conduct 5.4.

## RESERVATION OF RIGHT TO REQUEST PUNITIVE DAMAGES

~~171.~~161. Plaintiff reserves the right to develop additional evidence supporting punitive damages, pursuant Utah Code § 78B-8-201, after compensatory or general damages are awarded, by establishing by clear and convincing evidence that the acts or omissions of Messner are the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## DEMAND FOR JURY TRIAL

~~172.~~162. Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendants, jointly and severally, as follows:

1. Money damages in an amount in excess of $325,000, and incidental and consequential damages;
2. Costs and prejudgment interest;
3. Attorneys' fees; and,

4. Such other and further relief that the Court finds just and proper.

DATED this ~~2nd~~ 10th day ~~of~~ ~~May~~ June, 2025.

**KIRTON MCCONKIE**

*/s/ Julie E. Kenworthy*

Julie E. Kenworthy (9536)
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone: (801) 328-3600
jkenworthy@kmclaw.com

**DEMPSEY FOSTER PLLC**

*/s/ Jennifer Schrack Dempsey*
Jennifer Schrack Dempsey, ISB No. 7603
Admitted pro hac vice
714 W. State Street
Boise, ID 83702
Telephone: (208) 401-9533
jen@dempseyfoster.com

*Attorneys for Plaintiff Konala, LLC*

~~*/s/ Alyson A. Foster*~~
~~Alyson A. Foster~~
~~Dempsey Foster PLLC~~

# EXHIBIT A

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

**- CONFIDENTIAL & PRIVATE, NOT FOR PUBLIC USE –**

Among

**INBE Capital LLC**

as Lender

&

Konala

As Borrower

Dated as of

Jul 31 2023

INBECAPITAL

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made and entered as of Jul 31 2023 between INBE Capital LLC (the "Lender")

, and INBE Capital, LLC
a Wyoming,USA Company ("Borrower").

## RECITALS

A. The Borrower desires to obtain from Lender an asset backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B. The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion (as more fully described on Exhibit I attached hereto the "Project").

C. Secured assets will be described on Exhibit C attached hereto (the "Property").

D. The Borrower has agreed to pay a loan application fee of N/A Waived to the Lender, within fourteen (14) Calendar days after the Lender receives the Borrower's fully executed counterparts of the LOC Documents.

E. The Borrower has agreed to pay, pursuant to Section 3.6 hereof, of three hundred twenty-five thousand dollars $325,000

,(the "ICA Payment"), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

F. Lender has agreed to make the LOC to Borrower in an aggregate amount, according to Exhibit I, not to exceed the Maximum Amount for the purposes set forth in these recitals and in the Promissory Note (as hereinafter defined) and upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

# ARTICLE 1 - DEFINITIONS

Section 1.1. Certain Defined Terms. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied. As used in this Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

“Advance(s)” means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

"Applicable Interest Rate" means the fixed interest rate specified in the Promissory Note.

“Borrower” means that term as defined in the first paragraph of this Agreement.

“Business Expansion” means any transaction that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

“Closing Date” means the last date of signed execution of this Agreement by Lender and Borrower.

“Collateral” means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

“Event of Default” means any event or condition that shall constitute an event of default as described in Article 12 of this Agreement.

“ICA” means the Interest Control Account.

“ICA Payment” means the amount remitted pursuant to Recital B of this Agreement.

“Interest Reserve” means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from or on behalf of the Borrower, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

“Interest Reserve Account” means funds retained to cover the contractual payment obligations.

“Lender” means that term as defined in the first paragraph of this Agreement.

"LOC" means the Line of Credit provided to the Borrower by the Lender as defined in Exhibit I of this Agreement.

“LOC Disbursement Account” means that term as defined in Section 3.12 hereof.

"LOC Document(s)” means, collectively, this Agreement, the Promissory Note and each Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

“Maximum Amount” means an amount equal to the Project LOC Amount plus all fees, costs and expenses which are the Borrower’s responsibility to pay.

“Organizational Documents” means, with respect to any Person (other than an individual), such Person’s Articles (Certificate) of Incorporation or equivalent formation documents, and Regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

“Other Taxes” means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

“Person” means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

“Project” means that term as defined in Recital B of this Agreement.

“Project Costs” means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project, as more specifically set forth in the project budget set forth on Exhibit B attached hereto).

“Project LOC Amount” means as defined in Exhibit I attached hereto.

“Property” means that term as defined in Exhibit C of this Agreement.

"Promissory Note" means the Promissory Note, in the form attached hereto as Exhibit A.

“Security Agreement” means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as Exhibit D.

“Security Document” means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

“Scheduled Maturity Date” means the 10 year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

“Subsidiary” means any other entity in which the Company controls, directly or indirectly, at least 50% of the equity or which is under the direct control or management of the Company or Company’s owners.

“Taxes” means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that “Taxes” shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

“Term Sheet” means that document(s) attached hereto as Exhibit I, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

“Tranche Schedule” means the schedule of Advances to Borrower from the Lender, based upon the dates of the disbursements attached hereto in the Term Sheet: Exhibit I; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Project LOC Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

# ARTICLE 2 - THE CREDIT

Section 2.1. Line of Credit Amount. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

Section 2.2. Line of Credit Documents. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and it’s counsel.

a. Promissory Note.

a. this Agreement; and

a. each Security Document.

# ARTICLE 3 - TERM, INTEREST AND PAYMENTS

Section 3.1. Initial Term. The initial term of the LOC is ten years 10 years and shall commence on the Closing Date. This Agreement will initially expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full on the Scheduled Maturity Date.

Section 3.2. Extended Term. As of the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty four (24) month period, up to a total of one (1) such additional consecutive periods (separately, “Extended Term”; collectively, the “Extended Terms”). In connection with Lender’s granting of each Extended Term,

(a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees.

Section 3.3. Applicable Interest Period. The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full; provided, however, that, no interest period may end later than the Scheduled Maturity Date.

Section 3.4. Interest Rate Calculation. Interest shall be calculated on the basis of a 365- day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "Maximum Interest Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to fees or other amounts due to lender, then to the unpaid principal balance outstanding under the Promissory Note, then, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. Interest Payments. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. Reserves. Following the signing of this Agreement, the Borrower shall remit

three hundred twenty-five thousand dollars $325,000

as the ICA Payment, in accordance with the terms and time period set forth in Exhibit I. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and become non-refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable. The ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds, and may be utilized by Lender.

Section 3.7. Prepayment. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC. Upon a full prepayment of all outstanding principal of the LOC, Lender must, within ninety (90) calendar days from the date of that full prepayment, pay Borrower an amount equal to any credit balance of the ICA.

Section 3.8. Interest Credit Account. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit in the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable. Where the Lender has agreed to a payment holiday, as specified within Exhibit I, the interest payments shall first be drawn from the ICA for the duration of the payment holiday, thereafter the Borrower shall make interest payments monthly.

Section 3.9. Fees. LOC Establishment Fee. Out of the initial Advance, the Borrower shall pay Lender a non-refundable fee for the LOC in an aggregate amount equal to 9% % of the Loan Value, being: one hundred seventeen thousand dollars $117,000

(the "Establishment Fee"). The Establishment Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Section 3.10. Line of Credit Extension Fees. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a non-refundable LOC extension fee for each extension in an aggregate amount equal to six percent (6%) multiplied by the Project LOC Amount.

Section 3.11. Legal and Incidental Fees. Charges and Costs. Borrower shall pay all reasonable out of pocket legal, recording and filing fees, documentary stamps, taxes, service charges, credit reports, reasonable search costs, title company and escrow fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or an adversary proceeding) or judicial or non-judicial proceeding, through appeal. Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or wilful misconduct.

Section 3.12. Line of Credit Disbursement Account. The proceeds of each Advance under the LOC shall be advanced into the account with Lender to be used by Borrower for payment of the Borrower's Project Costs (the "LOC Disbursement Account"), solely for the purposes and in the manner set forth in this Agreement.

The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights to the LOC Disbursement Account.

Section 3.13. Taxes.

a. All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

b. Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or Other Taxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

c. The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

# ARTICLE 4 - CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing (the same to be considered representations of Borrower upon Closing):

Section 4.1. Delivery of the LOC Documents.

a. As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

b. The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Deposit Account and Security Account (as each term is defined in the Security Agreement) maintained by the Borrower.

Section 4.2. Authority. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, and (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

Section 4.3. Liens. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of security searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) security termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender, such permission not to be unreasonably withheld.

Section 4.4. Litigation. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

Section 4.5. Events of Default. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in full compliance with the terms and provisions of this Agreement.

Section 4.6. Purchase and Agreement Contracts. Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

Section 4.7. Compliance with Certain Requirements. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable local, state, federal and international laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) and all local, state, federal and international laws, regulations, ordinances, conditions, reservations and restrictions applicable to the Project.

Section 4.8. Evidence of Insurance.

a. For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders 'loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of the size and character of the business of the Borrower, and shall furnish Lender with the satisfactory evidence of such insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

b. Borrower shall always maintain a life insurance policy on the life of N/A Waived

, as permitted under applicable local, state, federal and international law in an amount agreed to by Lender. The Borrower shall have provided to Lender (directly or through the issuer of such life insurance policy) an assignment of each such life insurance policy, in form and substance satisfactory to Lender, on or before the date of the funding of the first Advance under the Tranche Schedule. In connection with such policy(ies), the Borrower shall cause the insurer to agree to provide in writing to Lender any notice of cancellation or non-renewal at least thirty (30) days prior to such event. In the event N/A Waived cannot qualify for a keyman policy, Borrower shall submit proof of application and denial of coverage. Upon submission of proof of denial, Lender may thereafter waive the requirement in writing.

Section 4.9. Financial Statements. Lender shall have received all financial reports required by Section 8.6 hereof.

Section 4.10. Business Pro Forma. Lender shall receive a pro forma income and expense statement quarterly in connection with the Project.

Section 4.11. Management Plan. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of business.

Section 4.12. Material Change. Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

Section 4.13. Non-Subordination. Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

Section 4.14. Securitization. Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or due diligence required by the insurer in a timely manner.

# ARTICLE 5 - USE OF LINE OF CREDIT PROCEEDS

Section 5.1. Business Expansion Costs.

a. Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached Exhibit B, updated yearly by Borrower.

b. The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

# ARTICLE 6 - INSPECTIONS

Section 6.1. Project Inspection. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days 'prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

Section 6.2. Books and Records. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project and the Borrower and to make extracts therefrom or copies thereof.

Section 6.3. Force Majeure Event Inspection Right. In the event of a Force Majeure Event which actually interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project for a period of time beyond ninety (90) days, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project.

# ARTICLE 7 - ADVANCE OF FUNDS

Section 7.1. Timing and Advances to Payee. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than ninety (90) calendar days (inclusive of underwriting period) following confirmation of receipt by the Lender of the ICA Payment.

Section 7.2. Conditions Precedent to Advance of Funds. Lender's obligation to make Advances hereunder shall be conditioned upon fulfilment of the terms set forth in Article 4 hereof to Lender's satisfaction.

Section 7.3. Unpaid Lien Claims. If Lender receives notice of non-payment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred fifty percent (150%) of the lien amount claimed from future advances .

Section 7.4. Mandatory Advances. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

# ARTICLE 8 - BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion):

Section 8.1. Project. (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project. Borrower shall submit and update its business plan which shall include the scope of the Project. Lender agrees that all affiliates, joint venture partners and subsidiaries described in the business plan are a part of the Project and the Project LOC Amount may be used within such entities. This Section 8.1prevails over Section 5.1(b), and additional approval from Lender is not required.

Section 8.2. Compliance with Laws. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

Section 8.3. Compliance with Documents. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

Section 8.4. Books and Records. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

Section 8.5. Payment of Obligations. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

Section 8.6. Financial Reports. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within fifteen (15) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within sixty (60) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.

Section 8.7. Notification to Lender. Promptly after learning thereof, notify Lender of:

a. the details of any material action, proceeding, investigation or claim against or affecting the Borrower or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower or the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

Section 8.8. Partnership/Corporate Existence. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

# ARTICLE 9 - BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion) Borrower shall not:

Section 9.1. Liquidation, Merger and Sale of Assets. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

Section 9.2. Liens. Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such Liens, shall not be increased).

Section 9.3. Intentionally Omitted.

Section 9.4. Investments, Loans and Guaranties. (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind, without prior written approval of the Lender.

Section 9.5. Acquisitions. Without prior written approval of the Lender the Borrower may not enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

Section 9.6. Organizational Documents. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

Section 9.7. Project and Project Documents. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a Major Decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

a. terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

b. sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project.

# ARTICLE 10 - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

Section 10.1. Validity of Agreement. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents.

The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms.

The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than as permitted by this document) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. Existing Defaults. As of the date of execution of the LOC Documents, Borrower is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower is a party or by which it, or any of its properties, may be bound.

Section 10.3. No Default in Other Agreements. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a
party or by which it or any of its properties may be bound or result in the violation by it of any law, order, rule, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties.

Section 10.4. No Consents. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

Section 10.5. Litigation. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to its knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

Section 10.6. Financial Statements. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

Section 10.7. Legal Requirements. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning and equal employment practices.

Section 10.8. Taxes. The Borrower has filed all tax returns and reports required of it, has paid all Taxes which are due and payable, and has provided adequate reserves for payment of any Tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of Taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any Taxes except as otherwise previously disclosed to the Lender in writing.

Section 10.9. Organization. The Borrower is a duly formed or organized and validly existing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement.

Section 10.10. Insurance. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

Section 10.11. Accurate and Complete Statements. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

Section 10.12 Lender's Ability to Fund. Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount. Lender covenants and agrees that it shall fully and timely fund each Advance requested by Borrower so long as no Event of Default has occurred and is continuing at the time of such Advance and subject to satisfaction by Borrower of the requirements of Article 4 hereof with respect to each Advance.

Section 10.13. Timing of Lender Funding. Lender will provide Advances as defined in the Payment Schedule within Exhibit I.

## ARTICLE 11 - NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. Generally. The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for an representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12 - EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

Section 12.1. Non-payment. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower (such thirty (30) day notice to be given once during each twelve (120 month period of the Term; thereafter, no such notice is required).

Section 12.2. Other Covenants and Agreements. Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected within twenty (20) days after notice of such default is sent by Lender to Borrower.

Section 12.3. Representations and Warranties. If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

Section 12.4. Security. If any lien granted in this Agreement or any other LOC Document favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days

from the date of such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. Validity of LOC Documents. If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. Petition for Bankruptcy, Insolvency. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; commencement of a sale for the benefit of creditors; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

Section 12.7. Material Litigation. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, or the Project of the disclosed litigation.

## ARTICLE 13 - REMEDIES

Section 13.1. General. Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable;

(b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13.

If an Event of Default referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Section 13.2. Right of Remedial Action. At the sole direction of Lender should the Lender assess and deem it necessary due to negative trending performance or upon the occurrence of an Event of Default hereunder, Borrower shall place the Project and business into a late state incubator operated by the Lender or by agent for the purposes of providing remedial management and guidance.

Furthermore, upon the occurrence of an Event of Default hereunder Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC Documents, to enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender in so doing, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

For the purpose of allowing the Lender to exercise its rights and remedies provided hereunder following the occurrence of an Event of Default, the Borrower hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

a. to enter and endorse all agreements, instruments, and documents in connection therewith.

b. to use any unadvanced proceeds of the LOC for the purpose of completing, operating, or maintaining the Project.

c. to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

d. to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

e. to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

f. to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

g. to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

h. to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable, (A) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (B) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. Curing of Defaults by Advances. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right (but not the obligation) to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.

Section 13.4. Remedies Are Cumulative. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Section 13.5. Offsets. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC Documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any and all deposit (general or special) balances, and any and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

Section 13.6. Collateral. The Lender shall at all times have the rights and remedies of a secured party, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Document executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC Documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender.

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC Document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC Documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than seven (7) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC Documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC Documents, the cost of which shall be paid by Borrower.

Section 13.7. Default by Lender and Borrower's Sole Remedy.

a. If Lender fails to provide the first (1st) Advance when due, pursuant to the Payment Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Upon receipt of such notice, Lender shall have ninety (90) calendar days from the date of receipt within which to return the ICA Payment to Borrower.

b. If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Within ninety (90) calendar days from the date of receipt of such notice by Lender, the Lender must (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) terminate Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC Documents.

c. Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC Documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue.

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

Section 13.8 Binding Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming USA, before a single arbitrator using the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules"). The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply.

The Party initiating a demand for Arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to being arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming USA. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

## ARTICLE 14 - GENERAL PROVISIONS

Section 14.1. Disclaimer of Liability. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith.

Section 14.2. Publicity. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and it's financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

Section 14.3. Confidentiality. Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC Documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place except to any officers or shareholders in the Borrower or the Borrower's advisors or as required by law. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

Section 14.4. Responsibility for Application of Funds. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or wilful misconduct (in each case as determined by a court of competent jurisdiction in a final and non- appealable decision).

Section 14.5. Notices. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the Lenders portal using the Borrower's Portal account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two calendar days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower: Konala
Founder and CEO
702 N Spokane St.
Post Falls, ID 83854

To Lender: INBE Capital LLC
Attention: Chief Funding Officer
30 N Gould St Sheridan, WY 82801

Section 14.6. Applicable Law. This Agreement and, unless otherwise specifically provided for therein, each other LOC Document, shall be governed by and construed in accordance with the laws of the State of Wyoming.

Section 14.7. Successors and Assigns. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.8. Severability. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition.

Section 14.9. Amendments. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

Section 14.10. Headings; Attachments. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

Section 14.11. No Third-Party Rights. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

Section 14.12. Indemnification. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys ’fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by final non- appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement.

The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the Manager of Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfil all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Lender's default of its obligations under this Agreement.

Section 14.13. General Limitation of Liability. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; or the making or administration of the Advances, including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called "lender liability theories," or any covenants, agreements, duties or obligations set forth in the Loan Documents, (or any actions or omissions of any of the Lender Parties and/or the Lenders' Affiliates in connection with the initiation or continuing exercise of any right or remedy contained in the Loan Documents or at law or in equity, or lost profits, or loss of business opportunity, or increased financing costs, or increased legal or other administrative fees, or damages to business reputation. ; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage.

Section 14.14. Entire Agreement. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.

Section 14.15. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

Section 14.16. Legal Representation of the Parties. The LOC Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

Section 14.17. JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

**[Remainder of page intentionally left blank; Signatures follow]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** INBE Capital LLC

By: Jonathan Wright

Name: Jonathan Wright

Title: Chief Funding Officer

**BORROWER:** Konala

By: Trace Miller

Name: Trace Miller

Title: Founder and CEO

By:

Name:

Title:

# EXHIBIT A: PROMISSORY NOTE

**one million three hundred thousand dollars** **$1,300,000**

FOR VALUE RECEIVED, Konala
, a USA
corporation (the "Maker"),
hereby promises to pay to INBE Capital LLC or any subsequent holder of this Master Promissory Note (the "Payee"), at such place as Payee may designate, the principal sum of
one million three hundred thousand dollars $1,300,000

or the aggregate unpaid principal amount of all Advances, as defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is less, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

a. Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this "Note") as follows:

   i. simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to;

- six percent ( 6% % ) per annum for years one to ten (1-10).

Interest payments shall be due and payable to Payee monthly in arrears, on the first (1st) day of each month of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

a. Except for the payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

a. All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.

All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.

d. Maker shall pay all amounts due under this Note to INBE Capital LLC, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

d. All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the "Obligation" of Maker.

In addition, the following provisions shall govern this Note:

1. LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS. This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the document entitled "Business Expansion Line of Credit Agreement" dated on or about the date of this Note between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "LOC Agreement"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2. LATE CHARGES. If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the "Late Charges") shall be added to the delinquent payment in an amount equal to ten percent (10.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

DEFAULT, CROSS-DEFAULT AND ACCELERATION. Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC

Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, then this Note shall be in default. Upon default, Payee shall provide written notice to Maker specifying the nature of the default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon default, the interest rate provided for in this Note shall immediately increase to twenty four percent (24%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in
Konala
and the project – Konala
To INBE Capital LLC.

3. COSTS, FEES AND COMPENSATION. Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

4. WAIVER. Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

5. SUCCESSOR AND ASSIGNS. The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

6. CUMULATIVE REMEDIES. Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

7. GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY. This Note shall be governed by and construed in accordance with the laws of the State of Wyoming, United States of America.

BINDING ARBITRATION: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using the current JAMS Comprehensive Arbitration Rules and Procedures (“Arbitration Rules”). The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-Calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys ’fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of Western Australia. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

8. AUTHORIZATION. To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

a. That the undersigned is the authorized representative of Maker and has the authority to bind Maker.

b. That Maker is duly organized and validly existing under the laws of the State of its formation, and duly qualified to transact business where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

c. That upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

9. ATTORNEY FEES AND COSTS OF COLLECTION. Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

10. MISCELLANEOUS PROVISIONS.

a. No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

b. The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

c. This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

d. This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

e. Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

**[Remainder of page intentionally left blank; Signature page follows]**

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


IN WITNESS WHEREOF, the Maker has duly executed and delivered this Master Promissory Note as of the date first set forth above.

**MAKER:** Konala

By: Trace Miller

Name: Trace Miller

Title: Founder and CEO

Address: 702 N Spokane St.
Post Falls, ID 83854

**PAYEE:** INBE Capital LLC

By: Jonathan Wright

Name: Jonathan Wright

Title: Chief Funding Officer

Address: 30N Gould St, Sheriden, WY 82801, USA

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


# EXHIBIT B: PROJECT COSTS

This loan agreement pertains to the direct funding for Konala

which is set out in the Term Sheet attached herein Exhibit I and executed by INBE Capital LLC and Konala

This agreement pertains to the loan of one million three hundred thousand dollars

$1,300,000

# EXHIBIT C: THE PROPERTY – SECURED ASSETS

TO SECURE THE PAYMENT OF THE BUSINESS EXPANSION LOC AND ALL OTHER OBLIGATIONS OF BORROWER TO LENDER, ITS SUCCESSORS AND ASSIGNS, HOWEVER CREATED, WHETHER DIRECT OR INDIRECT, ABSOLUTE OR CONTINGENT, OR NOW OR LATER EXISTING, BORROWER GRANTS TO LENDER A SECURITY INTEREST IN THE FOLLOWING PROPERTY AND ANY REPLACEMENTS THEREOF:

a. all fixtures and Company property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

b. all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c. all plant and equipment

d. all computer equipment and electronic data stored therein

e. all Intellectual Property rights

f. all inventory

g. all motor vehicles

h. all goodwill

i. all brand names

j. all real estate and land

k. all accessories, parts, and equipment now or later affixed to the same

l. to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as “collateral.”

# EXHIBIT D: SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of Jul 31 2023 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by Konala (the "Grantor"), in favor of INBE Capital LLC (the "Secured Party").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "LOC Agreement").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. For purposes of this Agreement, the following terms shall have the following meanings:

   "Collateral" has the meaning set forth in Section 2 hereof.

   "Control Agreement" means (a) with respect to a deposit account, each Deposit Account Control Agreement (or similar agreement with respect to a Deposit Account) among the Grantor, the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and (b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

   "Deposit Account" means a deposit account. "Event of Default" has the meaning set forth in the LOC Agreement.

   "First Priority" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

   "Proceeds" means all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"Secured Obligations" has the meaning set forth in Section 3 hereof.

"Securities Account" means a securities account.

2. Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired and any replacements thereof (collectively, the "Collateral"):

a. all fixtures and property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

b. all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c. all plant and equipment
d. all computer equipment and electronic data stored therein
e. all Intellectual Property rights
f. all inventory
g. all motor vehicles
h. all goodwill
i. all brand names
j. all real estate and land
k. all accessories, parts, and equipment now or later affixed to the same
l. to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."

3. Secured Obligations. The Collateral secures the due and prompt payment and performance of:

a. the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

b. all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "Secured Obligations").

4. Perfection of Security Interest and Further Assurances.

a. The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party, including filing of a UCC-1 statement. All the foregoing shall be at the sole cost and expense of the Grantor.

b. The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by applicable law of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

c. The Grantor hereby further authorizes the Secured Party to file with relevant governmental authorities or agencies this Agreement and other documents for the purpose of perfecting, confirming,

d. continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

e. If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

f. If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

g. The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5. Representations and Warranties. The Grantor represents and warrants as follows:

a. (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable law and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

b. At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

c. The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

d. Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

e. Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

f. No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

g. The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

h. The Grantor has taken all action required on its part for control to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to applicable law. No person other than the Secured Party has control or possession of all or any part of the Collateral.

i. Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Deposit Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or Securities Intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

j. Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6. Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7. Covenants. The Grantor covenants as follows:

a. The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

b. The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

c. The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

d. The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

e. The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

f. The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

g. The Grantor will continue to operate its business in compliance with all applicable provisions of applicable law dealing with the control, shipment, storage or disposal of hazardous materials or substances.

h. The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Deposit Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Deposit Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

i. The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

j. At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8. <u>Secured Party Appointed Attorney-in-Fact</u>. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9. Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. Remedies Upon Default. If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder.

The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

a. If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

b. If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12. <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13. SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

a. any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

b. any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

c. any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

d. any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

e. any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

f. any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

g. any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15. Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

16. Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17. Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. GOVERNING LAW. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Wyoming, United States of America.

19. Binding Arbitration. Except for any rights to self-help or possession of the collateral under state law. any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using the current JAMS Comprehensive Arbitration Rules and Procedures (“Arbitration Rules”). The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules.

Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming, United States of America. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20. JURY TRIAL WAIVER. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

21. Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

**[Remainder of page intentionally left blank; Signature page follows]**

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR:** Konala

By: Trace Miller

Name: Trace Miller

Title: Founder and CEO

**SECURED PARTY:** INBE Capital LLC

By: Jonathan Wright

Name: Jonathan Wright

Title: Chief Funding Officer

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


# EXHIBIT E: FORM TERMINATION LETTER

INBE Capital LLC
ATTENTION: Craig Boddington
30 N Gould Street,
Sheridan, Wyoming, 82801

Re: Konala

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated Jul 31 2023

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER:

By:

Name:

Title:

By:

Name:

Title:

SUBSCRIBED AND SWORN TO BEFORE ME on this day:

NOTARY PUBLIC
In and for the State of

My Commission Expires:

# EXHIBIT F: WIRE & JOINT INSTRUCTIONS

I instruct the BORROWER to fund the sum of $325,000

(the "ICA"),

to be initially wired to INBE Capital LLC or one of its nominated administrative agents for aggregation before being forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit). The Trustee will be nominated and confirmed via electronic communication during final underwriting. Best efforts are made to select The Trustee based on a suitably negotiated escrow holding term per funding cycle. Typically, a 90 day escrow term applies. However, upon successful negotiation of a shorter escrow term, we're then able to facilitate tranche 1 delivery faster than our standard 90 day allowance. Whilst this cannot be guaranteed, we will always apply best efforts to shorten the overall payment schedule so we consistently deliver your funding quickly and seamlessly. Expect regular communication as we move through the remaining stages of the process. As well as ongoing open access to your appointed INBE representatives.

**Contractual Guarantee on ICA Advance Fee:**

In the event that Lender is unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee. Such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA Advance Fee, which shall be in Trustee's sole possession and control. The Lender agrees none of the Indemnitees shall be liable in any manner should Trustee fail to return the ICA Advance Fee per his contractual obligations with the Lender, although the Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per his contractual agreement with the Lender. For avoidance of doubt, in the event we're unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days.

**WIRE INSTRUCTIONS:**

| | |
|---|---|
| Account Name: | Messner Reeves, LLP – COLTAF Paymaster |
| Bank Name: | The Northern Trust Company |
| Account Address: | 50 S LaSalle, Chicago, IL |
| Account No.: | 3813128494 |
| ACH Transfers: | N/A |
| ABA: | 071000152 |
| Swift (US Currency): | CNORUS44 |
| Swift (Foreign Currency) | |
| Payment Reference: | INBE CAP |

Mandatory KYC/AML Required Message on all wire transfers: **KYC/AML message not required. Use only payment reference ("INBE CAP") as shown above.**

All transfer instructions shall state: **"Funds are clean and clear of non-criminal origin and are for immediate credit – same day value / instant cash upon receipt."**

**IMPORTANT: All transfers must be accompanied by proof of wire to frb@inbe.capital**

INBECAPITAL

**Re: Joint Instructions regarding Deposit Amount**

The purpose of these joint instructions (“Instructions”) is to document the agreement of the parties regarding the Deposit Amount described below.

As background, (The Borrower) has obtained a loan commitment from INBE Capital LLC for the total amount of:

(the “Loan Amount”) from INBE Capital LLC (“The Lender”) To fund their proposed project and business activities as further set forth in Exhibit B, Exhibit H, & Exhibit I.

In connection with the Proposed Transaction, INBE Capital LLC, requires the borrower remit to INBE Capital LLC the Interest Credit Deposit Amount of:

(the “Deposit Amount”), which Lender requires as a deposit for the funding of the Proposed Loan, care of the “WIRE INSTRUCTIONS” stipulated within this Exhibit - Exhibit F (the “Escrow Account”).

These  Instructions are provided to clarify what happens with the Deposit Amount and when the Deposit Amount may be returned to The Borrower. Specifically:

- The administrative agent will remit the Deposit Amount to Lender where it will remain in Escrow until the Lender funds the Proposed Loan specified in Exhibit I.
- If the Proposed Transaction does not complete pursuant to the execution of definitive agreements and the payment of the BELOC Loan to The Borrower, then INBE Capital LLC or one of it’s nominated agents will wire return the Deposit Amount to The Borrower promptly.
- If Lender cancels the Proposed Loan pursuant to the terms of the Business Expansion Line of Credit to be entered into between The Borrower and Lender, or if the Proposed Loan commitment expires, then INBE Capital LLC will promptly wire return the Deposit Amount to The Borrower.

All signers of these Instructions agree to strictly comply with the terms hereof.

INBE Capital LLC may update or supplement these Instructions at any time in writing signed by all parties. If there is a conflict between these Instructions and the Proposed Loan, these Instructions control.

The parties agree to the use of email for the purpose of delivering notices under these Instructions, as follows:

If these Instructions are acceptable, please acknowledge below.

| **The Borrower** | **INBE Capital LLC** |
| --- | --- |
| Trace Miller | Jonathan Wright |
| ____________________________ | ____________________________ |

INBECAPITAL

# EXHIBIT G: KYC & AML

In order to satisfy Know Your Customer (KYC) and Anti Money Laundering compliance all clients must complete the following Client Information Form and upload verification information:

## STEP 1 - COMPLETE KYC & AML FORM

**GO HERE - Link to online Client information form**

or Scan QR Code:

## STEP 2 - DECLARATION

We may take up such references and make such enquiries about your company as we consider necessary, and we may use credit scoring and may search the files of credit reference agencies. The fact a search had been made will be recorded by each credit reference agency used and the data supplied will be available to other lenders and others authorized to search the credit reference agencies files, for purpose such as credit assessment of your company and occasionally for debtor tracing and fraud prevention. If your application for finance is accepted then details about your company and the conduct of your account may be passed to credit reference agencies and these details will be used for similar purposes.

We may also disclose information about your company and the conduct of your account to credit industry fraud avoidance networks and to tracing and debt collection agencies and our solicitors.

Data Protection Your company information will be treated as confidential and will only be disclosed:
a) at your request;
b) to our agents in connection with running accounts;
c) in the public interest; or
d) to prevent fraud or legal compulsion; or
e) taking up of references.

The Data Protection Act gives you a right to a copy of your company records held on our files on payment of a fee.

***Signatures Follow on Next Page***

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


**1. Signatures(s)** Trace Miller .................................................................................. **Date:** Jul 31 2023 .........................................

**Name .** Trace Miller ..................................................................................

**2. Signatures(s)** .................................................................................. **Date:** .........................................

**Name .** ..................................................................................

**3. Signatures(s)** .................................................................................. **Date:** .........................................

**Name** ..................................................................................

Zoho Sign Document ID: 2B0A4254-I2ZFVOCXRUO9YLXQZYLDUAOCPVPCH-XWIEGFCYSEZXM


# EXHIBIT H: TERM SHEET

[intentionally left blank; Executed Term Sheet follows]

# EXHIBIT I: THE PROJECT

The Borrower desires to obtain the LOC from Lender for the purposes detailed below;

[intentionally left blank; Project Summary follows Term Sheet]