IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| Konala, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>Messner Reeves, LLP, et al.,<br><br>Defendant. | Case No: 2:24-cv-00195-HCN-JCB |

**MOTION HEARING/ORAL RULING VIA ZOOM BEFORE THE HONORABLE HOWARD C. NIELSON, JR.**

Date: September 29, 2026

Time: 2:10 p.m. to 4:02 p.m.

Reported by Teena Green, RPR, CRR, CBC

Orrin G. Hatch United States Courthouse
351 South West Temple, 7.430
Salt Lake City, Utah 84101
(801) 910-4092
teena_green@utd.uscourts.gov

## APPEARANCES

FOR THE PLAINTIFF:

JENNIFER SCHRACK DEMPSEY
DEMPSEY FOSTER PLLC
714 West State Street
Boise, ID 83702
(208) 401-9533
jen@dempseyfoster.com

JULIE E. KENWORTHY
KIRTON MCCONKIE
PO Box 45120
Salt Lake City, UT 84145-0120
(801) 321-4838
jkenworthy@kmclaw.com

FOR THE DEFENDANT:

JOHN M. PALMERI
GORDON REES SCULLY MANSUKHANI LLP
555 Seventeenth Street, Suite 3400
Denver, CO 80202
(303) 534-5145
jpalmeri@grsm.com

September 29, 2025 2:10 p.m.

**P R O C E E D I N G S**

**THE COURT:** Good afternoon. We're here for a hearing in *Konala versus Messner Reeves, et al.* That's Case No. 2:24-cv-195.

The purpose of this hearing is to address Docket No. 16, the Defendant's Motion to Dismiss, and the more recently filed Docket No. 54, the Plaintiff's Motion for Leave to Amend its Complaint.

We will begin with appearances of counsel. First, counsel for the plaintiff, Konala, LLC.

**MR. PALMERI:** Good afternoon, Your Honor. This is Jennifer Dempsey on behalf of Konala. And my co-counsel, Julie Kenworthy, is here as well.

**THE COURT:** All right. Welcome, Ms. Dempsey. And welcome, Ms. Kenworthy.

All right. Counsel for the defendant, Messner Reeves, LLP.

**MR. PALMERI:** Good afternoon, Your Honor. John Palmeri appearing for Defendant Messner Reeves, LLP.

**THE COURT:** All right. Welcome, Mr. Palmeri.

Thank you for that. Now, I previously heard argument on Docket No. 16, the motion to dismiss. I don't think we need to revisit that. Today though, I want to hear argument on Docket No. 54, the subsequently filed motion for leave to amend

the complaint. And I guess there's really two aspects of that. I think you can briefly discuss whether it's timely or not, though I don't need a lot on that, honestly.

I think the primary argument that I'm interesting in hearing the parties' thoughts on is futility. As you know, the standard for futility is essentially whether the various claims as amended, or as the plaintiff proposes to amend them, could survive a motion to dismiss.

So I think what we can do is, you know, maybe almost picking up where we left off, we could discuss, you know, whether the plaintiff's proposed allegations, you know, address, you know, the issues that the defendant raised before to the extent that the plaintiff thinks they needed to be addressed. So maybe you could kind of focus on it through that lens.

Does that make sense, or does anyone have questions about that?

**MS. DEMPSEY:** That makes sense to me, Your Honor. Thank you.

**MR. PALMERI:** I understand, Your Honor. I agree that makes sense. Thank you.

**THE COURT:** All right. Okay. Very well. It's Konala's motion, so I'll let Konala go first. I don't anticipate -- maybe I said this already -- I don't anticipate more than about 10 or 15 minutes of argument since we've been

over a lot of this ground before. I'm mainly interested in what the parties think is different now, or from Mr. Palmeri's perspective, what isn't different.

All right. With that, Ms. Dempsey, since you spoke, are you planning to argue? Is that correct?

**MS. DEMPSEY:** That's correct, Your Honor.

**THE COURT:** All right. You may proceed.

**MS. DEMPSEY:** Thank you. May it please the Court and Counsel. And if I could -- Your Honor, if I could share my screen to pull up Exhibit F to the loan agreement, I'm just going to get right to the issues that the Court directed.

**THE COURT:** You may do that.

**MS. DEMPSEY:** And I think it's helpful to look directly at the Exhibit F. So --

**THE COURT:** Yeah, you may proceed with that.

**MS. DEMPSEY:** Thank you. Thank you.

So I'm hopeful that what is showing on the screen is Docket No. 54-1. And this the Second Amended Complaint with all the redlines accepted. And we attached to the Second Amended Complaint the full BELOC agreement, including Exhibit F, which is where really the heart of the case against Messner lies.

And I think real briefly, Your Honor, because the Court didn't want any real in-depth discussion on undue delay, I won't address it, I'll just rely on the documents that we

submitted to date.

But, again, to get to what Konala believes clearly puts Messner central to this loan agreement is Exhibit F. And there's a lot of ambiguity, I will admit. And in part, that is why we have pled the claims that we brought against Messner in the alternative.

And so when you look at Exhibit F, Messner is identified. It's identified under the account name, under the wire instructions. And Messner's central role in its receipt of the ICA Payment is elaborated in the remainder of Exhibit F.

For example, if you look at the beginning -- and the highlights, I don't want to mislead anyone -- the highlights are the ones I added for the purpose of oral argument. They are not highlighted in the actual exhibit, but I thought it might help elucidate the points I'd like to make.

And initially it says, "I instruct the Borrower to fund the sum of $325,000 (the ICA Payment) to be initially wired to INBE Capital LLC or one of its nominated administrative agents for aggregation before being forwarded and held by a nominated trustee (Attorney) for the purpose of arranging the issuance of a loan of credit. The Trustee will be nominated and confirmed via electronic communication during final underwriting."

Now, what happened is, in 2023, Konala, pursuant to this directive, received instructions to send its ICA Payment

to Messner Reeves, identified below in the COLTAF Paymaster payment. What we don't know specifically, because we received no communications from Messner or INBE, is whether Messner was acting as the nominated administrative agent, was it acting as the trustee, was it acting as the escrow holder?

And you can see if you look at page 2 of Exhibit F, it identifies as an escrow account the account which is holding the ICA payment.

So based on these plain terms, which somewhat elaborate, at least identify a contract between INBE and Messner, which in our opinion identifies Konala as the third-party beneficiary. And so based on this agreement, Messner -- there's no dispute that Messner received the funds, we just don't know what happened to them or what Messner did with it afterwards.

And this agreement elucidates at least three different roles that Messner played. Either it was a nominated trustee who was to arrange for the issuance of the line of credit and to hold the ICA payment in its sole possession, custody, and control with specific obligations to Konala and/or -- I mean Messner may have held each one of these roles. It was an escrow holder who was responsible for administering the escrow account, which held Konala's ICA payment in a manner that complied with those contractual arrangements with INBE, or it was INBE's nominated agent where it was to remit the payment

to INBE and, if the loan did not fund, return it to Konala.

So at this point in the litigation, before discovery, before anything else, and based on the fact that we have no idea what happened to the $325,000, other than it landed in Messner's account, and based on Exhibit F and all of these duties of the agent/trustee escrow holder, we believe that we have grounds to proceed against Messner.

And because there is this, quote, "special relationship," we believe that is set forth in Exhibit F, it takes it outside of the application of *BMF*, which is the primary case, and we spent a lot of time talking about *BMF* at the last hearing.

But the purpose of the amendment was to clarify and focus and establish that Messner's role is not like the attorneys in *BMF* who passively accepted that direction to then transfer the monies that it received, rather Messner had an affirmative obligation in one of these three roles that was breached.

And so I'm happy to answer any additional questions, but we do think that Exhibit F and the affirmative obligations set forth in Exhibit F at least give rise to a question of fact as to what Messner's role is there.

Respectfully, if the Court accepts Messner's argument as true here that it only acted as an attorney like *BMF*, it is not applying the appropriate standard at this point on the

motion for leave to amend and/or the motion to dismiss. As this Court knows, the standard is the Court accepts as true all the well-pled allegations and claims against the defendant.

And it would be our position, Your Honor that the Second Amended Complaint does it a little bit better than the first complaint and articulates in a way that establishes and confirms Messner's affirmative obligations.

And we would request the Court grant the second amended -- grant Konala's motion to file the Second Amended Complaint so that it may proceed in its case against Messner.

**THE COURT:** All right. Thank you. I appreciate that, Ms. Dempsey.

Any other points you want to make?

**MS. DEMPSEY:** Not at this time, Your Honor. I'm happy to answer any questions. And I will stop sharing my screen.

**THE COURT:** All right. Thank you.

All right. Very well. Let's see. Mr. Palmeri, I'll give you the opportunity to respond to that now, if you'd like.

**MR. PALMERI:** Thank you, Your Honor.

Briefly, and we'll stand on our paper on the delay as well. But there's nothing that counsel has argued here that wasn't available over a year ago when they filed their amended complaint back in May of 2024.

And as the Court may be aware, Judge Barlow dismissed

a similar lawsuit that had been pending against Messner Reeves as well. So there's nothing new here and, accordingly, I think the timeliness is an issue.

Addressing futility, Your Honor, *BMF* is on point. *BMF* was a Rule 12 motion to dismiss, so it came up specifically in the same procedural posture. And as Judge Barlow found in the *BMF* case, there was no duty alleged there against the lawyer. The facts in this case are not distinguishable from *BMF*.

Let me start by addressing counsel's reference to the document that we have. That is an exhibit to an agreement. Messner is not a party to any agreement with Konala. And in the *BMF* case, on page 1285 at footnote 94, the court noted that an attorney does not owe a duty where an attorney was never retained or employed by the plaintiffs, as here, nor did they ever pay him anything for his actions, as here, nor did he ever perform any service at their request, as here.

So, again, this is a situation -- the fact that Konala says, "Well, you know, we don't know what Messner was hired to do" is exactly the reason there was no duty. So instead, then, they throw out, "Well, it must be an escrow agent or a trustee."

But, in fact, again, looking at the language of the exhibit itself, and counsel read from it, it begins by saying that the sum is to be initially wired to INBE Capital.

So the idea here that this is somehow -- that this was an escrow for Messner is inconsistent with that.

It then goes on to say, or "an administrative agent," "an administrative agent before being forwarded to be held by a nominated trustee."

So the language upon which counsel relies, in fact, discusses that in fact their agreement was with INBE, and those funds were going to be wired to INBE. Potentially they may go somewhere else, but they're going to INBE.

This is further supported, Your Honor, in Section 3.6 of the agreement. I don't have the screen share ability, but we had quoted it in our motion to dismiss. It says, "The ICA payment or account need not be segregated by lender," which is INBE, "may be commingled with other lender funds, and may be utilized by lender." That's a quote from Section 3.6.

**THE COURT:** Yeah, I have a question about that, I guess.

What do you do with the fact -- and just a moment. I'm trying to pull up my -- I want to pull up my version of this.

Yeah, 3.6 says what you said it says, though it also says -- earlier in the paragraph, it's clearly talking about what happens after the first tranche has been funded.

It talks about remittence and then it says -- you know, right after that it says, "Upon the funding of the first

advance," and then it continues to talk about what happens to the interest reserve account and the ICA payment.

But by contrast, this Exhibit F later says things that seem to be in some tension with that. And it says -- let me just make sure I'm on the right page.

Yeah, it says things like -- you know, it says that -- it talks about "In the event that the lender is unable to arrange for the issuance of funding." Then it goes on to say -- talk about "the ICA advance fee, which shall be in the trustee's sole possession and control."

And then on the next page it talks about "The administrative agent will remit the deposit amount to lender where it will remain in escrow until the lender funds the proposed loan specified."

You know, when we have a contract that seems to have provisions that point in different directions, usually we try and make sense of it and harmonize it. And it seems to me like a pretty natural way to harmonize this is to read 3.6 to apply after the loan is funded and to apply -- to understand these provisions of Exhibit F to apply until it's funded.

So I just -- do you have a response to that, or am I just crazy?

**MR. PALMERI:** No, I don't think you're crazy, Your Honor, but I disagree.

Again, when you look at 3.6, it's specifically

talking about the ICA payment. It's not talking about after. It just says, "Following the signing of this agreement, borrower shall remit 325,000 as the ICA payment." And then it says the ICA payment need not be segregated, may be comingled, and may be utilized by the lender.

**THE COURT:** Yeah, you're eliding over a lot of text between those two things, though.

**MR. PALMERI:** Well, I understand I am, but what it talks about and what I think makes sense is, the ICA payment is the initial credit agreement payment, that the idea here is if you don't fund that, then Konala is entitled to a refund of that.

That's not inconsistent with 3.6 or with the language in Exhibit F. In fact, when you look at the language in Exhibit F, it talks about under the "Contractual Guarantee and on ICA Advance Fee," if lender is "unable to arrange for the issuance of the funding," it goes back and says, next sentence, "such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA advance."

Then it goes on to say, "Lender does agree to use its best efforts, including legal efforts, to recover the ICA advance fee should trustee fail to return it per his contractual agreement with the lender."

So, again, I think the fair reading on this is Konala

makes an ICA payment and, again, under the Exhibit F, is initially wired to INBE. Then what INBE does after that is set forth and addressed in the agreement, it's not required to -- it can commingle it, it can -- need not be segregated and could be utilized.

Now, if it's not returned, then INBE agrees to use its best efforts to try to locate it and to recover any of the funds, and in fact goes on and talks about "will step in and reimburse the borrower the full amount of the ICA funds."

If it was a straight escrow, Your Honor, there would be no need for any of that language.

**THE COURT:** Well, what do you do with the language that says it will remain in escrow, for example, or that -- "which shall be in trustee's sole possession and control"? It flatout says that.

**MR. PALMERI:** Well, it does, but it typically says though -- but, again, when you read the agreement, the agreement between Konala and INBE requires the ICA deposit. What INBE does with that, and it can commingle it, it can segregate it, et cetera --

**THE COURT:** If 3.6 controls and we just ignore the plain language of Exhibit F, Counsel. I'm just saying that they say different things.

**MR. PALMERI:** They do say different things, Your Honor --

**THE COURT:** You can't just ignore -- you can't just ignore Exhibit F and say we just -- "3.6 governs, period, the end."

**MR. PALMERI:** No, but what I'm saying is --

**THE COURT:** (Inaudible) if it is at all possible. But go ahead.

**MR. PALMERI:** What I'm saying, though, again, when you read Exhibit F, the payment is to INBE. The contractual relationship is between Konala and INBE.

**THE COURT:** Right.

**MR. PALMERI:** Konala has no contractual relationship with Messner Reeves, never hired them, never paid them, has no contract with them. It's not a classic escrow situation. When you have a classic escrow situation you have a three-party contract and you know how it's set up. Konala has no contract with Messner.

And in fact, in *BMF* there's the discussion about that, comparing a bank situation and a trustee situation. In *BMF* they talked about even a bailment. So whether it's a trustee or a bailment or an escrow, whatever it is, it's distinguishable from a deposit into a lawyer's trust account.

And the reason for that, Your Honor, is Konala, in the absence of an escrow, cannot control the Messner trust account. So there's no duty then on the part of Messner, just like there's no duty on the part of the lawyer in *BMF*, to

Konala. And the idea there is, that's because Konala's never a client of Messner.

**THE COURT:** Well, let's take that in two pieces. Let's take that in two pieces.

First of all, if I place property in trust for my -- I don't have a 15-year-old child anymore, my children are older than that, but if I put money in trust for a 15-year-old child and made a trust agreement and appointed a trustee, would the trustee be able to avoid, you know, any duty to the child just because the child wasn't a party to the contract, the contract was between me and the trustee?

**MR. PALMERI:** I don't know that I quite understand your factual situation, but let me see if I can unpack it.

**THE COURT:** I mean do the beneficiaries of a trust have to be parties to the contract setting up the trust?

**MR. PALMERI:** Does the beneficiary? With a lawyer, yes. And the reason --

I'm sorry, go ahead.

**THE COURT:** Okay. But generally, no; right?

**MR. PALMERI:** Well, I don't know. It depends on the facts of the situation. But with a lawyer it does because the lawyer owes no duty to the client.

**THE COURT:** Well, let me ask you -- that's the second question. But the answer is clearly no. We have trusts all the time that the beneficiaries did not sign. Right?

**MR. PALMERI:** I'd have to say I don't practice in the trust arena, Your Honor, but I'm not going to argue with you on that.

**THE COURT:** Yeah, okay. But I guess it seems like it's implicit in your argument, and in *BMF*, that Messner Reeves must have been acting as INBE's attorney in this transaction.

What is the basis for assuming that? I mean are you suggesting a law firm can never be a third-party neutral?

**MR. PALMERI:** Well, what *BMF* holds -- and again to go back to the trustee, the one distinction here, Your Honor, is to the extent Messner is the trustee, there's no agreement that is between Messner that Konala's shown that Messner agreed to be a trustee for Konala's funds.

But are there instances where that could happen?

The problem is with the lawyers' trust account, Your Honor, is lawyers owe the duties to the clients.

**THE COURT:** If the --

**MR. PALMERI:** The client's always going to control that trust account.

**THE COURT:** If they have a client. How do I know that Messner was acting as INBE's attorney and that INBE was Messner's client in relation to the transaction?

**MR. PALMERI:** Well, what we know is it was not. Messner never represented Konala. But what's even talked about here and the reference is to the COLTAF --

**THE COURT:** Sorry, to be -- wait just a second. We have to be careful not to talk over each other.

I mean are you trying to say, though, that in any transaction, a lawyer has to be a client of one side or the other and it cannot be a third party neutral? Is that what you're saying?

**MR. PALMERI:** I think with its funds in the trust account I can't think of a situation where the lawyer -- I think -- I mean could a lawyer act as a trustee and not have an attorney/client relationship? Maybe.

But what we have here is -- and Konala -- the allegations in the complaint, which we have to accept as true, the argument is that Konala never was represented by Messner, but Messner represented INBE.

The reference in --

**THE COURT:** Where does it say that? Where does it say that Messner represented INBE in connection with this transaction?

**MR. PALMERI:** I'd have to go through it, Your Honor. And if I misspoke, then I apologize. I'll try to take a look at it as we go through.

But what we have when you look at it in Exhibit F is it references the Messner Reeves COLTAF account. That's their trust account. And it references their trust account repeatedly.

So the point there is that, when you're using the lawyer's client trust account, then there are special rules, special duties that are going to apply to the lawyer there. And Konala is a stranger to them.

So the point here is just simply, is there a duty to Konala. And the answer under *BMF* is no, that even if a lawyer takes -- in the facts in the *BMF* case, even if the lawyer takes funds of another and puts it in his or her trust account, the non-client -- they're still not going to have a situation where the client has a common law duty that would be owed to him. There is no contractual duty here. Go ahead.

**THE COURT:** So I mean are you suggesting that a lawyer just can't act as an escrow agent? I mean if -- I mean even if both parties agreed and the three parties agreed that, you know, the lawyer is going to be the third-party neutral and --

**MR. PALMERI:** It may under certain circumstances, but the funds then typically are not going to the lawyer's trust account.

**THE COURT:** Well, are you sure about that? I mean it says paymaster, and that's a term that's then around a lot in transactions. I suspect Messner Reeves knows that. Well, I'm confident Messner Reeves knows that. I assume you do. That's not a meaningless term, and it's usually used in connection with a third-party neutral that holds funds, you know, pending

the completion of the transaction. That's just how the term is used in this kind of transaction.

**MR. PALMERI:** Well, it's referenced to their COLTAF. It says "Messner Reeves LLP COLTAF Paymaster."

**THE COURT:** Yeah, and maybe I don't -- I mean I don't know that we know from the complaint -- I don't know to what extent I can take judicial notice here of different things. I mean you're asserting, and I think you're probably right, that the COLTAF is just the Colorado word for the IOLTA account.

But I also know as a practical matter that, for better or worse, attorneys acting as third-party neutrals put funds pending transactions in IOLTA accounts all the time. And the parties like that because they're subject to kind of special scrutiny and regulation and so forth. But, again, I don't know -- that may well be beyond the scope of what we can consider for purposes of this motion, but -- I don't know.

I guess my point is, I'm not -- I'm not persuaded that just the fact that Messner Reeves is a lawyer, per se, means it must have been representing INBE and it could not have been a third-party neutral. Because I think lawyers act as third-party neutrals all the time in this kind of transaction.

But go ahead.

**MR. PALMERI:** But you have to have some affirmative act to accept that responsibility. If you're setting it up as an escrow and you have a signed contract, then -- you know,

then the lawyer's signing on to something.

**THE COURT:** Yeah.

**MR. PALMERI:** But as *BMF* holds, and that's the holding of *BMF*, just simply putting the funds into the trust account doesn't create a duty back to the non-client. And, again, it's not that Konala's not without a remedy. They have a remedy against INBE. They had a contract with INBE, their funds were going -- under Exhibit F, they're going to INBE. If they went somewhere else, there's no contract with Konala.

And, again, that's what the *BMF* case holds. And again, in that footnote I referenced, when you have no agreement -- when you haven't paid them, when you haven't hired them, then the lawyer doesn't owe an obligation.

And as *BMF* talks about, if the client tells the lawyer "Transfer those funds to pay a bill, transfer those funds somewhere," a lawyer then has obligations to comply with client instructions. And that's what happened in *BMF*. So that's the rub.

**THE COURT:** Assuming that they have a client-attorney relationship. But let's go back to my example.

Let's say I hire just an ordinary individual who's not an attorney, that I ask him -- well, I designate him in a trust document as the trustee. I place money in the trust document to be held for the benefit of my children and paid out in specific installments. You know, because I'm a judge I

don't have enough money to do that but, you know, it says, you know, "Pay each of my children X amount of dollars per year." Then I die. And the trustee decides he doesn't want to pay the money to my children, he would prefer to keep it or do something else with it.

Are my children without a remedy if they did not sign the trust agreement?

**MR. PALMERI:** It depends if the trustee accepted it. Did the trustee sign that contract under your scenario? If the trustee signed -- right, we don't have the trustee. The alleged trustee here is Messner. We don't have any documents signed by Messner where Messner agrees and says, "This is what we will do."

**THE COURT:** So is your argument then that it's a matter of proof that, you know, there could be a contractual -- you know, that Konala -- excuse me, not Konala -- that Messner Reeves and INBE could have agreed to something that would have given Konala rights?

**MR. PALMERI:** No. Because, again, these are Konala's funds going to Messner. There has to be the contract between Konala and Messner.

So to take your example, you're giving money -- go ahead.

**THE COURT:** How is that different?

**MR. PALMERI:** If you're giving money to your trustee,

you have to have a contract with your trustee that you're giving money to your trustee. Then if the trustee doesn't pay the beneficiary, then the trustee is breaching the terms of the trust.

What we have here is Konala alleges that it is giving money where it has no contract with Messner. There's no contract where Messner agreed with Konala, signed by Konala and signed by Messner, saying Messner says "I will act as a trustee for you, Konala."

**THE COURT:** Okay. Is it your position that, as a matter of law, then, that Messner and INBE could not have contracted in a way that would make Messner Reeves a trustee for this money with duties to Konala as a beneficiary absent Messner Reeves signing that agreement? Is that your position as a matter of law, that that --

**MR. PALMERI:** Here the -- well, again, I don't know if it can never happen, Your Honor. Under the facts here, we don't have it.

Again, we don't have an agreement here that Konala can point to. And it's not a matter of proof, it's not -- I mean this is the only contract at issue, Your Honor. The contract at issue between Konala and INBE is before the Court. And there's no --

**THE COURT:** That's right, but they allege that there is a contract, that they don't have a copy of it because they

haven't been given it. But they allege there is a contract between Messner Reeves and INBE and that they're an intended third-party beneficiary.

And, you know, Exhibit F, you know, to the extent they allege that Messner Reeves is the trustee -- and, you know, that seems pretty plausible given that we know where the money went, it's -- the wire account says it's to this Messner Reeves account, Exhibit F is pretty clear that there is a contractual relationship between the trustee and the lender and that that contractual relationship requires the lender -- excuse me, requires the trustee to return the ICA payment if INBE doesn't fund the loan.

**MR. PALMERI:** Well, I mean there are a lot of assumptions there, but here's where it fails, Your Honor. Again, similarly to *BMF*, to the extent there's a relationship between INBE and Messner, the unique aspect of this, and the reason there isn't an implied special relationship is because of the attorney/client relationship and the nature of that.

And that is unique, Your Honor. If they wanted to do an escrow with a bank, it would be different. If they want to do an escrow with a trust company, they could do that. But --

**THE COURT:** Back to the argument that INBE could not have obtained services from Messner Reeves in any capacity but as its attorney.

**MR. PALMERI:** Your Honor, could that happen? Maybe.

With respect to the COLTAF account, no. And, again, everything's talked about a trust account. I'm not asking that the Court has to take judicial notice of the COLTAF. But an attorney's obligations to non-clients with respect to the trust account is what was addressed in *BMF*.

**THE COURT:** Understood.

**MR. PALMERI:** And I just keep coming back. Could there be other instances? Maybe. But those aren't the facts here.

All the facts that we have, as alleged in the complaint, is Konala had a contract with INBE, paid money to INBE. Even the assumption on -- information and belief is then those funds were deposited into a Messner trust account and they want to sue Messner Reeves. And the argument under INBE is, we do not owe a duty to Konala.

**THE COURT:** Understood. I've taken way too much of your time kind of asking you questions.

Are there points that you wanted to make that differ from what you had to say in response to my questions or that go beyond that?

**MR. PALMERI:** No, I want to address your concerns, Your Honor, so that's -- let me just go through my notes.

Again, *BMF* addressed a similar argument, whether it was a bailment, there as the bailment analysis, and found no special relationship. They compared it to the bank and that a

bank and other instances is addressed. Again, that's at Section -- or, I'm sorry, page 1285. And it talks about law firms are oriented to protecting and advancing the interest of their clients, not third parties.

And, again, they have a remedy. Their remedy is against INBE. And under the contract that they have with INBE, in fact, they have a default judgment here against INBE, but --

**THE COURT:** They have a default certificate. They've asked for a default judgment. I actually haven't granted that.

**MR. PALMERI:** Fair enough. But they have a remedy there.

So again, I'm happy to address any other questions the Court may have, but we ask that the Court deny the motion to amend and grant the motion to dismiss.

**THE COURT:** All right. Well, thank you, Mr. Palmeri. And I appreciate your patience with my questioning.

Would you like to reply to that, anything that Mr. Palmeri said, Ms. Dempsey?

**MS. DEMPSEY:** Very briefly, Your Honor. And, of course, if you have any questions, I assume you'll ask them.

But I'm going to try and go through quickly in order of kind of the timeline of events here. Right?

Exhibit F is central to the business line of credit. It's what kicks it off. Konala met its obligation by transferring its ICA payment not to Messner Reeves's COLTAF

account, but to its COLTAF Paymaster account pursuant to Exhibit F.

And Exhibit F, I think the Court very astutely identified the difference between the application of 3.6 to the agreement, which is conditioned upon the loan going through, which did not happen here, as opposed to Exhibit F, which applies when the loan doesn't go through.

And here, it didn't. And so Konala transfers the money to Messner's COLTAF paymaster account. Ninety days go by. Konala requests the return of that money, seems pretty simple, but they haven't heard anything from them, not from INBE and not from Messner, to whom Konala transferred the funds as pursuant to Exhibit F under the -- under the underwriting agreement.

I think that Exhibit F and the allegations in the Second Amended Complaint squarely take out Messner Reeves's role exclusively as a law firm into something different and more. And I think maybe discovery will help.

But as it stands right now, based on the plain terms of Exhibit F, which control, the money was sent to INBE or one of its nominated administrative agents for aggregation being forwarded to help by a nominated trustee.

So there's an agent and a trustee, and all Konala knows is that it was transferred to Messner in one of those roles or as an escrow holder.

And at page 10 of our motion for leave to amend, we cite case law which supports the proposition that a third-party beneficiary has enforcement rights. And it's our position that Exhibit F and the language under Exhibit F -- and, yes, it is on information and belief at this point in time, because we haven't been able to conduct discovery -- but either as a trustee, as an escrow holder and/or the nominated agent, Messner would owe duties to Konala.

Even under *BMF*, and if you look at pages of the opinion 1282 through 1284, *BMF Advance* even supports this proposition that when there is this special relationship which we submit Exhibit F articulates, then that person, whether it's a law firm, whether it's a father, whether it's a mother, right, whoever it is that stands in that role as a trustee, a nominated agent and/or escrow holder owes duties to the third-party beneficiary or under the case law that we cite -- that is cited to in *BMF* and also in our briefing.

So we do think at this point, Your Honor, we have pled facts that, if presumed true, articulate and assert plausible claims against Messner for liability for loss of the ICA payment.

I took longer than I wanted to, Your Honor, but if you have any questions, I'm happy to answer them.

**THE COURT:** I don't. Thank you.

Any brief final words, Mr. Palmeri?

**MR. PALMERI:** Your Honor, just very briefly, at page 1282 what *BMF* says is quoting, at a categorical level, a law firm does not have a special relationship with a third party.

So again, there has to be more. And they haven't pled more here. So I have nothing -- nothing further beyond that, Your Honor.

**THE COURT:** Understood. Thank you.

I'd like to take a brief break, maybe until 3:00. If you all could just hold on the line, you're welcome to turn off your cameras and your microphones and make yourself comfortable. I'd like to look at a couple of things and then I'd like to resume, if that's all right.

Please give me a few moments.

**MS. DEMPSEY:** Thank you.

**THE COURT:** 3:00.

(A recess was taken.)

**THE COURT:** All right. Sorry. That ended up just slightly longer than five minutes. Thank you for your patience.

Again, thank you for your arguments. They were very helpful.

This case raises some fairly intricate issues. Regardless, I am prepared to rule on the two pending motions at this time.

We are on the record, and the transcript of my oral ruling will serve as my opinion on the motions. That is, although my courtroom deputy will enter a minute entry stating the disposition of the motions, there will not be any written opinion.

The defendants' motion to dismiss is governed by Federal Rule of Civil Procedure 12(b)(6), of course.

To survive a motion to dismiss under this Rule, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" That's a quote from *Ashcroft v. Iqbal*, 556 U.S. 662 at page 678 from 2009.

A plaintiff cannot satisfy this standard by offering "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." And those are all quotes from the same page of the same case.

Nor will the court "accept as true a legal conclusion," even if it is "couched as a factual allegation." Again, that's a quote from the same page.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" thus "do not suffice," for Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." That's a quote from pages 678 to 679 of *Iqbal*.

Not only must a plaintiff's allegations cross "the line between the conclusory and the factual," they must also cross the line "between the factually neutral and the factually suggestive." That's a quote from *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at page 557 n.5 from 2007.

To bring his allegations across this second line, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." That's a quote from *Iqbal* at page 678.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that the defendant has acted unlawfully." That's a quote from the same page.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."

It follows that if a plaintiff's "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," then that plaintiff has not "nudged [its] claims across the line from conceivable to plausible," and dismissal is proper. Some of that is from *Iqbal* at page 679 and some is from *Twombly* at page 570.

All right. As relevant here, Federal Rule of Civil

Procedure 15 provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave," but that "[t]he court should freely give leave when justice so requires." And that's Section (a)(2) of that rule.

"Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." And that's a quote from *Bylin v. Billings*, 568 F.3d 1224 at page 1229 from the Tenth Circuit in 2009.

In opposing Konala's motion for leave to amend, Messner Reeves first argues that the motion is untimely.

No doubt Konala could, and probably should, have sought leave to file an amended complaint earlier.

Indeed, it probably would have made sense for Konala to seek leave to amend its complaint as soon as Messner Reeves moved to dismiss.

The standard governing leave to amend is quite lenient, however.

Because I have not yet ruled on the motion to dismiss, and because many judges routinely allow plaintiffs to amend their claims even after granting motions to dismiss, I will not deny the motion for leave to amend on the ground that it is untimely.

Messner Reeves also argues that Konala's motion for

leave to amend should be denied as futile.

"A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." That's a quote from *Anderson v. Suiters*, 499 F.3d 1228 at page 1238 from the Tenth Circuit in 2007.

Because this is the same standard that governs motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), I will consider Messner Reeves's argument that the motion for leave to amend should be denied as futile and its motion to dismiss together.

To be sure, "after the filing of an amended complaint, the district court may deny as moot the motion to dismiss the original complaint." That's a quote from *Pet Food Institute v. Grisham*, 2021 WL 1317990, at *1 from the District of New Mexico April 8, 2021.

But "if some of the defects raised in the original motion remain in the new pleading," a court may instead "consider the motion as being addressed to the amended pleading." That's a quote from *Schadel v. Gochis*, 2020 WL 4500644, at *3 n.4 from the District of Utah August 5, 2020, and that's in turn quoting from Charles Alan Wright, et al., Volume VI, Federal Practice and Procedure Section 1476.

I will do that here. I will look at each of Konala's seven claims against Messner Reeves and determine whether the claim, as Konala seeks to amend it, could survive dismissal.

If it could not, I will deny the motion for leave to amend as futile and grant the motion to dismiss with respect to that claim. If the claim as Konala seeks to amend it could survive dismissal, however, I will grant the motion for leave to amend and deny the motion to dismiss with respect to that claim.

As a threshold matter, Konala argues that Wyoming law governs because the Business Expansion Line of Credit Agreement, the "BELOC" Agreement, as the parties call it, contains a choice-of-law provision requiring the application of Wyoming law.

Messner Reeves counters that it did not agree to the BELOC Agreement, so it is not bound by the contract's choice-of-law provision. It further argues that "Utah law should apply because [Messner Reeves's] attorneys are domiciled in Utah and performed services there that allegedly led to the claims in this case."

"[O]ne of the most basic principles of contract law is that, as a general rule, only parties to the contract may enforce the rights and obligations created by the contract." And that's a quote from *Wagner v. Clifton*, 62 P.3d 440 at page 442 from the Utah Supreme Court in 2002.

Because Messner Reeves was not a party to the BELOC Agreement between Konala and INBE, I find no basis for applying the Wyoming choice-of-law provision.

Konala presents no other argument supporting the

application of Wyoming substantive law. And under the choice-of-law principles of Utah, the forum State, which I must apply in determining which state's substantive law to apply to the claims, I see no basis for applying Wyoming law. To the contrary, I agree with Messner Reeves that the facts and circumstances of its Utah-based work related to the claims support the conclusion that Utah substantive law governs Konala's claims against Messner Reeves.

I will accordingly apply Utah's substantive law to those claims.

Konala asserts seven claims against Messner Reeves in the Proposed Second Amended Complaint. These include breach of contract, negligence, breach of fiduciary duty as and escrow holder, breach of fiduciary duty as a trustee, unjust enrichment, rescission, and violation of the Utah Consumer Sales Practices Act.

I will first address Count Two, the breach of contract claim.

In its proposed Second Amended Complaint, Konala bases its breach of contract claim primarily on an intended third-party beneficiary theory. In paragraphs 68 and 69 of the proposed complaint, Konala alleges that "[v]alid and binding contract(s) exist between INBE and Messner whereby Messner is Trustee, escrow holder and/or agent whose primary purpose is to ensure the ICA Payment is properly handled for the benefit of

Konala," that "INBE and Messner intended to confer a direct benefit upon Konala at the time they entered into these valid and binding contract(s)," and "[t]hus, Konala is an intended third party beneficiary of these contract(s)."

Konala further alleges in paragraphs 71 through 74 of the proposed complaint that Messner Reeves breached its contract with INBE by "fail[ing] to hold, manage, disburse, or return Konala's ICA payment as required by its contract(s) with INBE, in its role as Trustee and/or escrow holder" or, alternatively, that "in its capacity as an agent of INBE, Messner acted without authority, in excess of its authority, in a manner that rendered INBE inaccessible or unresponsive, or otherwise acted in bad faith."

In response to the motion for leave to amend, Messner Reeves argues that the Proposed Second Amended Complaint is futile for many of the same reasons it contends the First Amended Complaint failed to state a claim. But Messner Reeves does not address the new allegations that Konala is an intended third-party beneficiary of one or more contracts between INBE and Messner Reeves.

Under Utah law, "[t]hird-party beneficiaries are persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." I'm quoting there from *SME Industries, Inc. v. Thompson, Ventulett, Stainback and*

*Associates, Inc.*, 28 P.3d 669 at page 684 from the Utah Supreme Court in 2001.

For a third party to have enforceable rights under a contract, the intention of the contracting parties to confer a separate and distinct benefit upon the third party must be clear. That's a quote from the same page of the same case. "Accordingly, a party only incidentally benefited has no right to recover under the contract"; instead, "[t]he contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." That's a quote from the same page.

Ordinarily, courts look to the contract itself to determine whether a third party is an intended beneficiary. Here, however, Konala represents that it "does not yet have copies of these contracts" between INBE and Messner Reeves, and Messner Reeves has not submitted copies of the alleged contracts either in support of its motion to dismiss or in response to Konala's motion to amend.

Even though I do not have the alleged contract, or contracts, before me, the motion to dismiss standard remains the same: Konala must plausibly allege facts that support a reasonable inference that a contract existed between Messner Reeves and INBE, that the contract was intended to "confer a separate and distinct benefit upon" Konala, and that Messner Reeves breached the contract. I conclude that Konala has met

that burden.

Konala specifically alleges in the proposed Second Amended Complaint that INBE and Messner Reeves entered into a valid contract under which Messner Reeves acted as a trustee, escrow holder, or agent. It further alleges that the contract's primary purpose was to ensure proper handling of the ICA payment for Konala's benefit and that both INBE and Messner Reeves intended to confer that benefit directly upon Konala.

The BELOC Agreement between Konala and INBE, which Konala attaches as an exhibit to its proposed amended complaint, tends to corroborate these allegations. Specifically, Exhibit F, the Wire & Joint Instructions, directs Konala, the borrower, to wire the ICA payment to INBE, the lender, or its agent, to then be "forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan." And I'm quoting that last part from Docket No. 54-1 at 95, which is the copy of the BELOC agreement, and specifically Exhibit F that Konala attaches to its Proposed Amended Complaint.

Konala alleges, at least in the alternative, that "Messner was the 'nominated Trustee (Attorney)' appointed by INBE . . . and received Konala's ICA Payment from INBE or INBE's nominated agent." And that language, of course, is quoting -- I'm quoting that again from paragraph 19 of the Proposed Amended Complaint. These allegations are supported by

Exhibit F's instructions that Konala wire the ICA payment to "Messner Reeves, LLP - COLTAF Paymaster." And that's page 95 of 54-1.

Exhibit F further provides that if INBE fails to issue the loan to Konala, none of the indemnities will be liable "should Trustee fail to return the ICA Advance Fee per [its] contractual obligations with the Lender" and the Lender will "use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per [its] contractual agreement with the Lender." I'm quoting there from the same page.

I conclude that this contractual language supports an all but inescapable inference that, if INBE failed to issue the loan, the Trustee, which Plaintiffs allege, at least in the alternative, was Messner Reeves, was required by its contract with INBE to return the ICA payment to Konala.

Combined with Konala's allegations, I conclude that this language supports a reasonable inference that there was a contract between INBE and Messner Reeves, undertaken for Konala's benefit, to facilitate the issuance of the loan and to ensure return of the payment if no loan were issued.

Konala alleges in the proposed complaint that it wired the $325,000 ICA payment to Messner Reeves, that INBE confirmed receipt of that payment, and that INBE never issued the loan to Konala. Konala further alleges that, despite

INBE's failure to issue a loan, neither INBE nor Messner Reeves has returned the ICA payment to Konala.

Based on all of this, I conclude that in the Proposed Second Amended Complaint, Konala plausibly alleges the existence of a contract between Messner Reeves and INBE, an intent by those parties to that contract to confer a direct benefit upon Konala, and a breach of that contract by Messner Reeves when it failed to return the ICA payment after INBE failed to issue the loan to Konala.

Now, all of that is, of course, based on the allegations and just the language of Exhibit F to which Messner Reeves is not a party. You know, if discovery reveals the contract that Plaintiff has plausibly alleged existed between Messner Reeves and INBE, we will need to look closely at that contract to confirm whether it's properly read to confer an intended third-party benefit upon Konala.

But for current purposes, and based on Plaintiff's allegations, factual allegations, which I must accept as true, as well as corroborated by Exhibit F, I deny Messner Reeves's motion to dismiss, and grant Konala's motion to amend with respect to Count Two, Konala's claim for breach of contract.

I will now address Counts Three through Five and Eight, Konala's claims for negligence, breach of fiduciary duty, and violation of the Utah Consumer Sales Practices Act. I will address these claims together because Messner Reeves

moves to dismiss them on the same ground.

Specifically, Messner Reeves argues that the "claims for negligence, breach of fiduciary duty, and violation of the UCSPA are all predicated on a purported duty that Messner Reeves owed to Plaintiff," and "[s]ince [Messner Reeves] did not owe a duty to Plaintiff, those claims should be dismissed."

Messner Reeves's argument that it did not owe Konala any duty rests almost exclusively on *BMF Advance, LLC v. Litiscape, LLC*. In that case, Judge Barlow applied the Utah Supreme Court's five-factor test for determining whether a defendant owes a duty to a plaintiff: "(1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations." And I'm quoting there from the *BMF* decision. And the citation for that case is 637 F. Supp. 3d 1272 at page 1279 for the specific quote I just read, and that is from the District of Utah in 2022.

"In this analysis, not every factor is created equal and each may weigh in favor or against imposing a duty. . . [S]ome factors are featured heavily in certain types of cases, while other factors play a less important, or different, role. The court performs its analysis of duties of care at a

categorical level rather than on a case-by-case basis." That's a quote from the same page of the same case.

Messner Reeves briefly argues that the first factor weighs against finding a duty because Konala alleges only omissions by Messner Reeves: namely, that it "failed to hold payment 'in its sole possession and control'" and instead "transferr[ed] funds in an 'unauthorized manner.'"

Messner Reeves contends that "[j]ust as the defendant law firm in *BMF* did not affirmatively act when it failed to verify the authority of a third party fraudulently authorizing the release of funds, Messner Reeves did not affirmatively act when it failed to hold the payments and released them on the authorization of a third party."

This argument, however, is based on Konala's allegations in the current operative complaint. In its proposed amended complaint, Konala removed the allegations that Messner Reeves transferred the ICA payment and now alleges more vaguely that "Messner . . . breached its duties to Konala when it acted outside the scope of its agreement and relationship with INBE and failed to hold, manage, disburse, or return Konala's ICA Payment," and that "Messner and INBE continue in their failure to return Plaintiff's $325,000 in escrow which Messner received months ago," It is thus difficult to determine whether Konala now alleges an act or an omission by Messner Reeves.

Further, the Utah Supreme Court has clarified that the "act or omission factor" may be better characterized as "misfeasance or nonfeasance," explaining that "the term 'omission' can be somewhat misleading because . . . active misfeasance is not confined to situations where an affirmative act directly causes harm to the plaintiff.

In other words, in some cases an 'omission' may give rise to a duty even where there is no special relationship . . . because 'omission' may well be understood in some contexts as failing to do what one is obligated to do." And that is a quote from *Herland v. Izatt*, 345 P.3d 661 at page 672 n.66 from the District of Utah in 2015. And Konala may well plausibly allege misfeasance here: that Messner Reeves failed to do what it was obligated to do.

In all events, even when a plaintiff alleges only an omission, "a special legal relationship gives rise to . . . a duty," and that's a quote from *BMF* at page 1282, and Konala alleges such a legal relationship here.

For all of these reasons, I will give this factor little weight and instead focus, as the parties do, on the alleged legal relationship between the parties.

First, though, I will address Messner Reeves's argument relating to the fourth factor, who could have best prevented the loss.

Again relying on *BMF*, Messner Reeves briefly argues

that this factor weighs against imposing a duty.

First, it argues that INBE was better positioned to avoid the harm Konala alleges it suffered because INBE "had the authority to use the funds in the account," and "the agreement provides recourse to the plaintiff to recover the funds not retained by the law firm."

But as I suggested earlier during the hearing and as I will discuss more fully in a few minutes, I believe the BELOC contract is best read to give INBE authority to use the funds in the account only after funding the first tranche of the loan and to require that the Trustee, which Plaintiff alleges at least in the alternative was Messner Reeves, maintain "sole possession and control" of the funds until that time.

Further, as already discussed, Konala's allegations and the express terms of Exhibit F support a reasonable inference that Messner Reeves's contract with INBE required it to return the funds to Konala if the loan was not funded, with INBE acting as a guarantor if Messner Reeves failed to do so.

Messner Reeves also argues that Konala was better positioned to prevent the loss. Again relying on *BMF*, Messner Reeves argues that Konala had "both superior knowledge of the transaction and initial control over the funds." And that's a quote in part from *BMF* at page 1284.

But in *BMF*, the court also made clear that the "[t]he party who purportedly committed the fraud . . . is in the best

position to avoid the potential harms, 'namely by not committing the fraud in the first place.'" And that's a quote from the same page.

There, that is in *BMF*, the alleged party committing the fraud was not the defendant law firm. Here, by contrast, although it has not alleged fraud, Konala has alleged that Messner Reeves itself acted improperly, at least, by "fail[ing] to hold, manage, disburse, or return Konala's ICA Payment" as required by "its agreement and relationship with INBE."

For these reasons, I conclude that this factor probably tends to weigh in favor of imposing a duty of care, though I will not give it significant weight.

Instead, I will focus on Messner Reeves's primary argument: that it owed no duty to Konala because there was no "special relationship" between them. Messner Reeves relies on *BMF* for the proposition that, "[a]t a categorical level, a law firm does not have a special relationship with a third party." And that's a quote from page 1282 of the *BMF* decision.

Messner Reeves also quotes *BMF* for the proposition that "[a]n attorney will be held liable for negligence only to his or her client, and cannot, in the absence of special circumstances, be held liable to anyone else. Those special circumstances include when an attorney's employment constitutes a third-party beneficiary contract, meaning the parties clearly intended the third party to receive a benefit." And that's a

direct quote from *BMF* at page 1285.

I conclude that this argument does not support dismissal.

First, Messner Reeves's argument is based on the assumption that it was acting as INBE's counsel in connection with the transaction between INBE and Konala and not as a third-party neutral.

But based on the materials I may properly consider at this stage of the proceedings, namely Konala's allegations and the contract it attaches as an exhibit to its proposed complaint, I cannot conclude that this assumption is true.

In paragraph 9 of the proposed Second Amended Complaint, Konala alleges that although "Messner is a law firm" it "also acts as a trustee, escrow holder, and/or agent in certain financial transactions wherein it is retained as a neutral third party to receive and disburse funds between two parties in accordance with the terms of an agreement outside of a traditional attorney client relationship, and did so at all relevant times herein."

In paragraph 19, Konala further alleges that "Messner was acting in one or more of three roles, and not in its capacity as legal counsel . . . in connection with this transaction:"

Specifically, it alleges that "Messner was the 'nominated Trustee (Attorney)' appointed by INBE 'for the

purpose of arranging for the issuance of a Loan (Line of Credit)' and received Konala's ICA Payment from INBE or INBE's nominated agent";

"Alternatively, or in addition to, Messner agreed to, consented to, approved, and ratified an escrow agreement with INBE, and undertook the duties and responsibilities of an escrow holder for the Escrow Account, either as INBE's 'nominated administrative agent' or in some other capacity through its COLTAF Paymaster account";

"Alternatively, or in addition to, Messner was acting as an agent of INBE, again either as INBE's 'nominated administrative agent' or in some other capacity through its COLTAF Paymaster account."

These allegations are consistent with the terms of Exhibit F to the BELOC Agreement, which specifically provides, among other things, that:

The ICA payment will be "held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit)";

"[T]he Trustee will be nominated and confirmed";

"[B]est efforts are made to select the Trustee based on a suitably negotiated escrow holding term";

"The ICA Advance Fee . . . shall be in Trustee's sole possession and control";

"None of the Indemnitees shall be liable in any

manner should Trustee fail to return the ICA Advance Fee per [its] contractual obligations with the Lender";

"The Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per [its] contractual agreement with the Lender"; and

"[T]he administrative agent will remit the [ICA payment] to Lender where it will remain in Escrow until Lender funds the Proposed Loan."

Exhibit F also directs that the ICA payment be wired to Messner Reeves's "COLTAF Paymaster" account and later refers to that account as the "Escrow Account." Konala alleges in paragraph 9 of the proposed complaint that "Messner used a paymaster account for these transactions instead of a traditional Interest on Lawyer's Trust Account (IOLTA) because it was not acting in an attorney capacity."

I suspect all of you know, and I am confident that Messner Reeves knows based on its involvement in this sort of transaction, that in transactions of this sort the term "paymaster" is often used to refer to a third-party neutral, often an attorney, who hold funds, often in escrow or trust, pending completion of the transaction. And although I need not do so to resolve this motion, I suspect that I could take judicial notice of that.

Regardless, I have no difficulty concluding that the

language of Exhibit F that I have quoted, together with Konala's proposed allegations, supports a reasonable inference that Messner Reeves was functioning as a trustee or escrow holder, rather than as INBE's counsel, in connection with the transaction.

To be sure, Messner Reeves argues that it owed no duty to Konala because it was not in privity of contract with Konala. On page 5 of its reply, Messner Reeves cites *BMF* for the proposition that "the plaintiff [in that case] never contracted with the law firm as required to create a bailor-bailee relationship . . . just as the plaintiff here never contracted with Messner Reeves as required to create an escrow relationship."

At least in its briefing, Messner Reeves did not press this privity argument in response to Konala's allegations that Messner Reeves was acting as a trustee. And I had assumed that was because it very well knows that trusts are routinely created for the benefit of third parties who are not themselves parties to the trust agreement.

Now, counsel had resisted that position in the hearing today, though candidly I don't think there's a sound legal basis for resisting that proposition.

Regardless, and despite Messner Reeves's contrary contention, under Utah law the same principle can apply to escrow agreements.

Indeed, the Utah Supreme Court has squarely held that intended third-party beneficiaries of escrow agreements are "entitled to the fiduciary duties that run to those formal parties to the underlying contract." And I'm quoting there from *Orlando Millenia, LC v. United Title Services of Utah, Inc.*, 355 P.3d 965 at page 972 from the Utah Supreme Court in 2015.

Because Konala has plausibly alleged that it was an intended third-party beneficiary of a contract between Messner Reeves and INBE, Messner Reeves's privity argument fails.

Messner Reeves next argues that because Section 3.6 of the BELOC Agreement provides that "[t]he ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds, and may be utilized by Lender," Messner Reeves cannot be understood to have held the ICA payment as a trustee or in escrow or to have had any other sort of duty to hold and not release the funds.

Reading Section 3.6 in that manner, however, conflicts with other parts of the agreement. Specifically, Exhibit F provides that "the ICA Advance Fee . . . shall be in Trustee's sole possession and control," and that, "[i]n the event that Lender is unable to arrange for the issuance of funding as per this agreement," the lender agrees, among other things, "to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it

per [its] contractual agreement with the Lender." It further states that "[t]he administrative agent will remit the Deposit Amount to Lender where it will remain in Escrow until the Lender funds the Proposed Loan."

Under Utah law, it is well settled that "[w]hen interpreting a contract, the entire contract should be read as a whole, in an attempt to harmonize and give effect to all of the contract provisions." And I'm quoting there from *Favero Farms, LC v. Baugh*, 356 P.3d 188 at page 192 from the Utah Court of Appeals in 2015. And the apparent inconsistency between Section 3.6 and Exhibit F can be readily harmonized in a way that gives effect to both provisions simply by drawing a temporal distinction.

The portion of Exhibit F that I referenced appears to address the period before the loan is issued, during which time the ICA payment will be held in "Escrow" by the "Trustee." Indeed, the language stating that the ICA payment will be held in escrow is explicitly limited to the period "until the Lender funds the Proposed Loan," and the other language I quoted addresses circumstances where "the Lender is unable to arrange for the issuance of funding per this agreement."

Section 3.6, by contrast, appears to apply after the first advance of the loan is funded. Indeed, the second sentence of Section 3.6 expressly addresses the status of the ICA payment "[u]pon the funding of the first Advance under the

Tranche Schedule," and the balance of that section, including the language upon which Messner Reeves relies, can be readily understood to govern the status of the ICA payment after the first advance is funded.

On this reading of Section 3.6, which in the context of the entire contract I conclude is the best reading of that provision, Messner Reeves's reliance on that provision is unavailing.

For all of these reasons, I conclude that Konala has plausibly alleged that Messner Reeves functioned as a third-party neutral rather than as INBE's counsel with respect to this transaction. It follows that the decision in *BMF* does not support Messner Reeves's argument that it could not have owed any duty to Konala.

But even if Messner Reeves was acting as INBE's counsel, the court in *BMF* expressly recognized an exception to the general rule that attorneys owe no duty of care to non-clients for circumstances when "an attorney's employment constitutes a third-party beneficiary contract, meaning the parties clearly intended the third party to receive a benefit." And that's from page 1285 of *BMF*.

As I have already concluded, Konala plausibly alleges that it is an intended third-party beneficiary of the contract between Messner Reeves and INBE, and thus that those parties clearly intended it to receive a direct benefit under their

contract.

For all these reasons, I conclude that Konala has plausibly alleged that Messner Reeves owed it a duty of care. I therefore deny Messner Reeves's motion to dismiss, and grant Konala's motion to amend with respect to Counts Three through Five, negligence and breach of fiduciary duty, and Count Eight, violation of the UCSPA.

Let me rephrase that. I conclude that Konala has plausibly alleged that Messner Reeves owed it a duty of care and/or other duties.

I now turn to Count Six, in which Konala asserts a claim for restitution based on quasi-contract and unjust enrichment in the alternative to its contractual claims.

To state a claim for unjust enrichment under Utah law, a plaintiff must plausibly allege "the acceptance or retention . . . of [a] benefit under such circumstances as to make it inequitable . . . to retain the benefit without payment of its value." That's a quote from *Rawlings v. Rawlings*, 240 P.3d 754 at page 763 from the Utah Supreme Court in 2010.

Messner Reeves argues that "Plaintiff . . . alleges that Messner Reeves released the funds," and thus that the "unjust enrichment claim fails because Messner Reeves did not retain the benefit of the transaction."

But again, in its proposed amended complaint, Konala removed the allegations that Messner Reeves transferred the

funds to another party.

What Konala does allege in the proposed complaint is that "[o]n August 1, 2023 . . . Konala directed its ICA Payment be wired to Messner," that "INBE never made the first advance . . . as required by the Agreement," that "[d]ue to INBE's breaches . . . Konala had no choice but to terminate the Agreement," that "INBE or Messner thus had until March 10, 2024, to return the ICA Payment," that "Messner and INBE continue in their failure to return Plaintiff's $325,000 in escrow which Messner received months ago," and that "Plaintiff conferred benefits on Defendants INBE and Messner and Defendants had knowledge of those benefits," which "benefits included, but were not limited to, the use, arrogation, and usurpation of Plaintiff's ICA Payment,"

Given all of this, I conclude that Konala has plausibly alleged that it provided Messner Reeves and INBE the $325,000 ICA payment, and that one of them retained or used the money. At this stage, Konala cannot be expected to know which defendant retained or used the money.

For these reasons, I conclude that Konala has plausibly stated a claim for restitution based on quasi-contract and unjust enrichment, in the alternative to its contractual theory.

With respect to Count Six, quasi-contract and unjust enrichment, I deny Messner Reeves's motion to dismiss, and

grant Konala's motion for leave to amend.

I now turn to Count Seven, rescission.

Messner Reeves is certainly correct that under Utah law, rescission is not a separate cause of action. Rather, it is "a restitutionary remedy which attempts to restore the parties to the status quo to the extent possible or as demanded by the equities in the case." And I'm quoting there from *Breuer-Harrison, Inc. v. Combe*, 799 P.2d 716 at page 731 from the Utah Court of Appeals in 1990, and that case in turn is citing a Utah Supreme Court case.

I have already concluded that Konala's claim for breach of contract survives the motion to dismiss. And if Konala prevails on that claim, a rescissionary remedy might be appropriate.

Indeed, I do not understand Messner Reeves to raise arguments for the dismissal of this so-called claim apart from its arguments for dismissal of Konala's breach of contract claim.

Rather than dismissing this so-called claim or barring Konala from including it in its proposed amended complaint, I will simply construe it as part of Konala's prayer for relief.

I accordingly deny Messner Reeves's motion to dismiss, and grant Konala's motion to amend with respect to what Konala labels "Count Seven."

For the foregoing reasons, Docket No. 16, Messner Reeves's Motion to Dismiss, is denied. Docket No. 54, Plaintiff's Motion for Leave to File its Second Amended Complaint, is granted.

Konala may file the Proposed Second Amended Complaint attached to its motion as Docket No. 54-1, and I direct it to do so promptly.

It is so ordered.

All right. That was a mouthful, but are there any questions about the ruling?

First of all, Plaintiff, Ms. Dempsey, any questions?

**MS. DEMPSEY:** No, Your Honor. Thank you.

**THE COURT:** Mr. Palmeri?

**MR. PALMERI:** I don't have any questions on the ruling, Your Honor.

**THE COURT:** All right. Thank you. And to be clear, this ruling is based on the allegations and what's in front of me. I mean, I think the case may look very different once we have a factual development, you know, once we actually have -- you know, if it exists, as seems very likely, you know, any contracts between INBE and Messner Reeves that we can actually look at what they say, once we have some kind of insight into what actually happened to the money.

But for purposes of the motion to dismiss only, I have to accept the well-pleaded facts as true and, you know, I

think given the limitations on its knowledge and the lack of insight it has into the specifics of the relationship between INBE and Messner Reeves, I don't think plaintiff could have pleaded more than they did.

And importantly here, I think the language of Exhibit F to the BELOC does provide significant corroboration of the factual allegations regarding the existence of a contract between INBE and Messner Reeves that was intended to benefit Konala. That may not end up being true, but I think it's plausibly alleged for current purposes.

All right. Are there any other matters we need to address at this time?

**MS. DEMPSEY:** No, Your Honor.

**MR. PALMERI:** Your Honor, if I may, it's a lengthy complaint. If I could get additional time, maybe a brief enlargement to prepare an answer to it 21 days from service, I'd appreciate it.

**THE COURT:** Right. What I'm going to ask you to do is just -- you know, just submit a motion to the magistrate judge who's handling the case. I don't anticipate that that would be a problem, but I'd prefer to just let the magistrate judge handle that.

Yeah, I think I -- I'm -- the magistrate judge is more likely to get that taken care of promptly than I'm able to do given everything I have on my docket.

**MR. PALMERI:** Thank you, Your Honor.

**THE COURT:** All right. Anything else?

**MS. DEMPSEY:** No, Your Honor. Thank you.

**MR. PALMERI:** No, Your Honor. Thank you.

**THE COURT:** All right. Thank you very much. Again, I appreciate your arguments.

And I want to be clear, Mr. Palmeri, that your arguments may well be right. I just don't think I can accept them at this stage of the proceedings.

**MR. PALMERI:** Understood, Your Honor. And we'll further develop the record.

**THE COURT:** All right.

**MR. PALMERI:** May be coming back, but thank you.

**THE COURT:** All right. Very well. Okay. Thank you. Court is adjourned.

**MS. DEMPSEY:** Thank you.

(Concluded at 3:52 p.m.)

CERTIFICATE OF COURT REPORTER

This is to certify that the proceedings in the foregoing matter were reported by me in stenotype and thereafter transcribed into written form;

That said proceedings were taken at the time and place herein named;

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

In witness whereof I have subscribed my name this 29th day of September 2025.

Teena Green, RPR, CSR, CRR, CBC